1

1            UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2

3  - - - - - - - - - - - -  X

4  UNITED STATES OF AMERICA,  :  CR 08-605

5                      :

6
      -against-       :
7                        United States Courthouse
                      Brooklyn, New York
8  NORBY MARIN MORENO,    :

9                       December 8, 2008
        Defendant.  :  10:00 o'clock a.m.
10  - - - - - - - - - - - -  X

11

12            TRANSCRIPT OF JURY SELECTION
        BEFORE THE HONORABLE MARILYN GO
13      UNITED STATES MAGISTRATE JUDGE, and a jury.

14
APPEARANCES:
15
For the Government:     BENTON J. CAMPBELL
16                    United States Attorney
                  BY: ALI KAZEMI
17                      JOHN A. NATHANSON
                  Assistant United States Attorneys
18                    271 Cadman Plaza East
                  Brooklyn, New York
19

20  For the Defendant:     JUSTINE HARRIS, ESQ.
                  JAIME ST. PETER, ESQ.
21

22  Court Reporter:        Gene Rudolph
                  225 Cadman Plaza East
23                    Brooklyn, New York
                  (718) 613-2538
24

25  Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

GR    OCR    CM    CRR    CSR

1          (The following occurred in the absence of the

2     prospective jury panel.)

3          THE COURT:  Let me just go through the preliminaries

4     of this jury selection.  The defendant is Norby Marin Moreno.

5          I understand, Ms. Moreno, that you had previously

6     consented to have a Magistrate Judge select the jury in this

7     case.  Is that correct?

8          THE DEFENDANT:  Yes, yes.

9          THE COURT:  Okay.  Let me get the appearances of all

10    the attorneys who will be participating at trial during this

11    jury selection.

12          MR. KAZEMI:  For the government, Ali Kazemi.

13          MR. NATHANSON:  For the government, John Nathanson.

14          Good morning, Your Honor.

15          MR. KAZEMI:  Seated at the table is Special Agent

16    Salvador Acevas from the DEA.

17          THE COURT:  For the defendant?

18          MS. HARRIS:  Justine Harris, Federal Defenders, for

19    the defendant Norby Marin Moreno.

20          With me at counsel table is Jaime St. Peter.

21          MS. ST. PETER:  Good morning.

22          THE COURT:  As we discussed before we went on the

23    record, Ms. St. Peter is from Milbank, Hadley, Tweed and

24    McCoy.  I will be referring to both Ms. Harris and

25    Ms. St. Peter as attorneys who are with the offices of the

1    Federal Defenders of New York.

2              Is that correct?

3              MS. HARRIS:  Yes, Your Honor.

4              THE COURT:  Then, as I explained before we went on

5    the record, but let me again go through my jury selection

6    procedures, we will be using the struck method.  That means

7    that we need to qualify 34 jurors in order to select our 12

8    jurors and two alternates for trial.

9              We will first seat the first 27 jurors who have

10   already been randomly selected by computer and you all have

11   our list, the Judge's List.  They are numbered one through --

12   there are nine jurors on each page.  Jurors one through nine

13   will seat in the first row, ten through 18 in the second row,

14   and 27 through -- 19 through 27 in the third row, and

15   depending on how many jurors are eliminated, we will go --

16   after the first questioning of all of these jurors, we will

17   not replace any of them.

18             Every juror keeps the same number as on the juror

19   list that you have gotten from me and we will ask the first 27

20   jurors or whoever will be remaining after the first 27 to be

21   seated in the back and we will fill the seats, beginning with

22   juror number 28.

23             Do you all understand the procedures?

24             MR. NATHANSON:  Yes.

25             MS. HARRIS:  Yes.

4

1          THE COURT:  As I explained, peremptory challenges

2    will be made in five rounds for the main panel, beginning with

3    the government making two challenges, and the government will

4    make one challenge in rounds two through four.  The defendant

5    will make two challenges in each round.  If you waive a

6    challenge during that round, you will forego that challenge

7    altogether.

8          Does anybody have any questions?

9          MR. KAZEMI:  No, Your Honor.

10          THE COURT:  Okay.  Actually, I do have one last

11    question, which is on the list of places and things that the

12    government has submitted, I am not inclined to mention the

13    things.  I don't see any need to.  With respect to the places,

14    other than the John F. Kennedy International Airport, is there

15    any other place -- and the Metro Hotel.  Actually, the Metro

16    Hotel is the only place that I might mention, which is in

17    Queens, right?

18          MR. KAZEMI:  That is correct, Your Honor.

19          THE COURT:  Okay.  Is there any place else I need to

20    mention?

21          MS. HARRIS:  I don't think so, Your Honor.

22          THE COURT:  Okay.

23          MR. KAZEMI:  Your Honor, would it be possible to

24    also mention the defendant's hometown as one place?  It's

25    Tulua, Colombia.

5

1          MS. HARRIS:  It does have an unusual pronunciation,

2     Your Honor.  I always mess it up.  It's actually Tulua.  The

3     people who know it will know the pronunciation.

4          THE COURT:  Okay.  I will do my best, but I can't

5     promise I will get it right.

6          MR. KAZEMI:  Your Honor, the government does have an

7     updated witness list.  So two of the names are changed.  I can

8     provide it to the Court now, if you would like to see it.

9          THE COURT:  Yes, I would.

10          Do you have an extra copy for our court reporter

11     too?

12          MR. KAZEMI:  This is the current list.

13          THE COURT:  Okay.

14          MR. KAZEMI:  Thank you.

15          THE COURT:  Is this different from what was in your

16     proposed voir dire?

17          MR. KAZEMI:  I think one or two of the names are

18     different.

19          THE COURT:  Okay.

20          MR. KAZEMI:  Thank you, Your Honor.

21          THE CLERK:  Are we ready for the jurors, Your Honor?

22          THE COURT:  Yes.

23          (Prospective jurors now present.)

24          THE COURT:  You may all be seated.

25          A perfect fit.

6

1          Good morning, everybody.

2          Can you all hear me clearly?

3          THE JURORS:  Yes.

4          THE COURT:  Okay.  My voice tends to drop.  If I do

5     start mumbling and you can't hear me clearly, please raise

6     your hands and let me know and I will try to speak up.

7          My name is Marilyn Go.  I will be the judge who will

8     be presiding over jury selection today.

9          These of you who are privileged to be selected will

10    hear a criminal trial before District Judge Charles P. Sifton

11    beginning tomorrow morning.  The trial is estimated to last

12    one week.

13         I say it is a privilege to be selected because trial

14    by jury is one of the most important aspects of the American

15    system of criminal justice.  The jury trial is a concept that

16    originated over eight centuries ago when the barons of England

17    forced King John to grant the right to the people to be judged

18    by their peers.

19         Our founders of this country found the jury trial to

20    be so important to notions of fairness and due process that

21    they protected the right to trial by jury in the Bill of

22    Rights to our constitution.

23         You will be hearing a criminal case, as I mentioned.

24    In this court, criminal cases commence by the United States,

25    which I will frequently refer to as "the government."

GR      OCR      CM      CRR      CSR

7

1          The defendant in this case, who is charged with some

2     crimes, is Norby Marin Moreno.

3          The fact that the prosecution is brought in the name

4     of the United States does not entitle the government to any

5     greater consideration than any other litigant before this

6     Court.  All parties, the government and individuals, are equal

7     before this Court.  All parties are entitled to equal

8     consideration.  No party is entitled to any bias -- to any

9     sympathy or favor.

10          The function of the jury in this case is to listen

11     to the evidence and determine the facts.  You are the fact

12     finders.  That is why we stood for you when you came into this

13     courtroom.

14          At trial, Judge Sifton will give you detailed

15     instructions on what your duties are and on the applicable

16     laws.  You must decide this case based on the rules of law

17     given to you.

18          The defendant, Ms. Moreno, is charged by the

19     government with violations of federal law in a document called

20     the indictment.  The indictment is simply a formal document

21     used by the government to inform a defendant what crimes she

22     is accused of committing.

23          The indictment is not evidence of guilt and should

24     not be interpreted by you as raising even a suspicion that the

25     defendant has committed a crime.

1        The indictment in this case contains two charges

2   against Ms. Moreno.

3        In Count One, the indictment alleges that on or

4   about July 31, 2008, Ms. Moreno, together with others, did

5   knowingly and intentionally conspire to possess with intent to

6   distribute one kilogram or more of a substance containing

7   heroin, in violation of federal law.

8        In Count Two, the indictment charges Ms. Moreno with

9   having on or about July 31, 2008, together with others,

10  knowingly and intentionally possessed, with intent to

11  distribute, one kilogram or more of a substance containing

12  heroin, in violation of federal law.

13       Ms. Moreno has pleaded not guilty to the charges in

14  the indictment.  She is presumed innocent and will not have to

15  prove her innocence or present any evidence at all at trial.

16  This presumption of innocence will remain with her throughout

17  the trial.

18       The burden at trial will be on the government to

19  prove that she is guilty beyond a reasonable doubt of the

20  crimes charged.  As I mentioned, Judge Sifton will be giving

21  you detailed instructions regarding what the government must

22  prove with respect to the charges.

23       As I have said, some of you today will be selected

24  as jurors and alternates.  We are going to be using some

25  special procedures and most of you probably know about them

9

1    from watching TV.  What we do know is that they sometimes are

2    very repetitive, take a lot of time and are very cumbersome.

3    Sometimes I am going to meet with the attorneys here to my

4    left, which I call side bar, and we will try to be out of your

5    hearing when we meet at side bar.

6           We use these practices to ensure that we will have a

7    fair and impartial jury.  Because of the important issue at

8    stake, the potential loss of liberty, we have to make this

9    inquiry to make sure that there will be a fair trial.  I don't

10   mean to say that any of you will be intentionally unfair or

11   partial, but we are all products of our experiences and

12   backgrounds.

13          We will be asking you questions.  I don't mean to

14   pry or embarrass you.  There are no right or wrong answers.  I

15   simply need to ascertain your state of mind so that we can all

16   determine whether or not you can meet your sworn duty to be

17   impartial in this case as a juror.

18          You should --

19          A JUROR:  I can't hear you now.

20          THE COURT:  Okay.  Now, as I said, I am going to be

21   asking questions of all of you and there are no right or wrong

22   answers and I don't mean to pry or embarrass any of you.  But

23   we need to have answers to these questions to understand your

24   state of mind in order to determine whether or not you can

25   meet your sworn duty as jurors to be fair and impartial at

1    trial.

2         You should understand that the fact that you are

3    excused is not a reflection of anything and it is just simply

4    part of the procedures that we will be using that some of you

5    will in fact be excused.

6         Since I may not have the opportunity in the course

7    of this jury selection to do so, I want to thank you all in

8    advance today for participating in today's jury selection and

9    for answering my questions as fully as you can.

10        There are three things I am going to ask of you

11   today.

12        The first is the hardest; that is, to be patient.

13   Second, please listen carefully to my questions.  And, third,

14   please answer as truthfully and completely as you can.

15        I am going to ask all of you to please stand now and

16   take the oath as jurors.

17        THE CLERK:  Please raise your right hand.

18        (The panel is duly sworn/affirmed by the Clerk of

19   Court.

20        THE COURT:  The first thing I am going to do is ask

21   the first twenty-seven of you to come and sit in the jury box.

22   This jury box is a loose term because I am going to include

23   the three rows or three seats here at the side of the box.

24   You've all been randomly assigned a number, thanks to the

25   miracle of computers.  So I am going to call all of you and

1  juror number one will sit in the first seat in the first row

2  closest to me.  Ms. Park will direct you to where you have to

3  sit.

4          Juror number one, Stone Wallach.

5          Juror number two, Samuel Kurtz.

6          Juror number three, Gwenerier Jacobs.

7          Juror number four, Jesica Tavolacci.

8          Juror number five, Min Hui Huang.

9          Juror number six, Camille Croke.

10         Juror number seven, William Diedrich.

11         Juror number eight, Eileen Duff.

12         Juror number nine, Michael Veny.

13         I am going to ask juror number 12 to come up first

14  because of the way the seating is.

15         Juror number 12, Zofia Gurt.

16         Juror number eleven, Gail Kappel.

17         Juror number ten, Marc Randazzo.

18         Juror number 13, Eileen Dowling.

19         Juror number 14, Tanya Walton.

20         Juror number 15, John Callier.

21         Juror number 16, Gulshanara Ahmed.

22         Juror number 17, Diane Vines.

23         Juror number 18, Koshy Kunjummen.

24         Now I am going to seat the three jurors outside of

25  the box in the third row here, beginning with juror number 21.

1          Shardha Ramdhan.

2          Juror number 20, Fatmir Selovic.

3          Juror number 19, Frank Ercolano.

4          Juror number 22, George Basore.

5          Juror number 23, Michael Hogan.

6          Juror number 24, Brenda Valeo.

7          Juror number 25, Dana Aurora.

8          Juror number 26, Tyra Reid.

9          Juror number 27, Mihaela Timis-Kuhnle.

10         I have to apologize if I have mispronounced any of

11    your names.  When I get to you, I'm sure -- I will ask you to

12    please correct me if I have mispronounced your names.

13         I am going to first direct my questions to the

14    twenty-seven of you sitting in this jury box.  Those of you

15    sitting in the back, don't relax too much because I will be

16    getting to you too and I would like to proceed more quickly

17    the second time we go through this questioning.

18         You all have a card on your seat with a number which

19    corresponds with your number that you have been assigned for

20    this jury selection.  If your answer to my question is yes,

21    hold up your card with your number and keep it up until I call

22    your number.

23         If you don't understand my question, wave your hand

24    at me and let me know.

25         Now, most of your answers will be in open court.

1   There will be a few that I will expressly discuss with you at

2   side bar.  However, if there is an answer to a question that

3   you feel uncomfortable in answering publicly, let me know and

4   we will hear you at side bar.

5           Those of you, as I have said, sitting in the back,

6   please pay attention.  As you will see from this jury

7   selection, sometimes it will take a bit of time to go through

8   the individual questioning of jurors who have raised their

9   cards.  If you need to leave the courtroom to use the

10  facilities, you may do so.  But please come back immediately.

11          I am going to ask you, and I'm sure Judge Sifton

12  will remind you not to talk to anybody about this case until

13  you have heard all of the evidence and have been instructed on

14  the law.  You have to reserve judgment until everything has

15  been heard at trial and you have heard all of the

16  instructions.  It is important that you not acquire any

17  evidence except what happens in this very courtroom.

18          Do you all understand?

19          Okay.  Everybody ready to proceed?

20          I have read you a very brief description about this

21  case.  Do you know anything about this case?  Heard about it,

22  read about it?

23          Let me introduce to you all of the people sitting at

24  these two tables in front.

25          As I said, the defendant is Ms. Norby Marin Moreno.

1        Standing to her side closer to me is Ms. Justine

2   Harris, and to the other side of Ms. Moreno is Jaime

3   St. Peter.  They are with the offices of the Federal Defenders

4   of New York.

5        You may be seated.

6        Let me introduce to you the attorneys sitting at

7   this table who are representing the government.

8        The government in this case, as in all criminal

9   cases brought in this court, is represented by the United

10  States Attorney's office for the Eastern District of New York.

11  Appearing at trial on behalf of the US Attorney's office will

12  be United States Attorney Ali Kazemi, who is the first

13  gentleman standing there.  Standing next to him is Assistant

14  United States Attorney John Nathanson.  They will be assisted

15  at trial by Special Agent Salvador Acevas of the Drug

16  Enforcement Administration.

17       You may be seated.

18       As I have said, the defendant is Norby Moreno.

19       Do any of you know Ms. Moreno?  Or members of her

20  family?  Had any dealings personally or financially or any

21  kind of relationship with Ms. Moreno?

22       Do any of you -- as you know, Justine Harris and

23  Miss Jaime St. Peter represent her.  Do any of you or close

24  friend or relative know either of these attorneys or have been

25  represented by members of their office?

1          Have you had any personal dealings with anybody,

2     with any of these attorneys, or their offices?

3          Do any of you know the Assistant U.S. Attorney

4     Kazemi or Nathanson?

5          Have any of you had any dealings with their United

6     States Attorney's office or any United States Attorney's

7     office?

8          This case is brought as a result of an investigation

9     by the United States Drug Enforcement Administration.  Do any

10    of you know Special Agent Acevas?

11         Have any of you had any kind of experience with the

12    Drug Enforcement Administration?

13         I am referring to the Drug Enforcement

14    Administration sometimes as the DEA.

15         Have any of you had any involvement with any other

16    federal enforcement agency, whether in a civil or criminal

17    case, as a party, as a witness or otherwise?

18         I will next read the list of -- names of persons

19    whose names may be mentioned at trial or may testify at trial.

20    The fact that I name a person doesn't mean that that person

21    will necessarily testify, but you may hear those person's

22    names and you will -- I will ask you at the end, again, if any

23    of you know any of these witnesses or potential witnesses, or

24    persons who are participating in this trial.

25         Special Agent Salvador Acevas.

1          DEA Special Agent Elizabeth O'Connor.

2          DEA Special Agent David Samilo, S A M I L O.

3          DEA Special Agent Robert Garcia?

4          Customs and Border Protection Enforcement Officer

5     Luis Cordero.

6          Maria or Linda Moreno.

7           Maria Patricia Carrasquilla,.

8     C A R R A S Q U I L L A?

9          Toufic Saieh, T O U F I C, S A I E H?  I will spell

10    both names.  First name is T O U F I C, and the last name is

11    S A I E H.

12         Do any of you know any of these individuals or have

13    had any kind of dealings with any of these individuals?

14         I also want to mention some locations that will be

15    mentioned at trial.  The Metro Hotel in Queens, and Tulua,

16    Colombia, in South America.

17         Do any of you -- have any of you been to any of

18    these places or know anything about these two locations?

19         Now, are any of you or any of your close friends or

20    relatives involved in law enforcement or any federal, state or

21    city government or agency?  By law enforcement, I mean, the

22    police, investigative work for the police, a federal agency

23    such as the FBI, DEA, Bureau of Alcohol, Tobacco & Firearms,

24    corrections officers, sheriffs deputies, prosecutors, or any

25    other government attorneys involved in criminal prosecution?

1           Okay.  Hold up your numbers so I can see it.

2           Okay.  Juror number 8, number 10, number 19, 23, 24

3    and 25.

4           Okay.  Juror number eight, Ms. Duff?  What is your

5    connection with law enforcement?

6           THE PROSPECTIVE JUROR:  I don't know if it applies.

7    It is in New Jersey.

8           THE COURT:  That's all right.  Any connection.  All

9    over the world.

10          THE PROSPECTIVE JUROR:  She is an intensive

11   supervision program investigator.  She determines whether or

12   not prisoners get an early release.  Strict early release

13   program of prisoners.

14          THE COURT:  Who is this person you are referring to?

15          THE PROSPECTIVE JUROR:  My mother.

16          THE COURT:  Your mother.

17          THE PROSPECTIVE JUROR:  She is a former probation

18   officer.

19          THE COURT:  She was a former probation officer, you

20   said?

21          THE PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Okay.  What's the name of her agency?

23          THE PROSPECTIVE JUROR:  The Intensive Supervision

24   Program.  ISP, it is called.

25          THE COURT:  Is that part of the court system?

1          THE PROSPECTIVE JUROR:  I -- I suppose, yes.

2          THE COURT:  Do you know how long she has worked for

3    that agency?

4          THE PROSPECTIVE JUROR:  I think a few years.

5          THE COURT:  Okay.  She worked as a probation

6    officer?

7          THE PROSPECTIVE JUROR:  She was a senior probation

8    officer for Essex County.

9          THE COURT:  For how long?

10          THE PROSPECTIVE JUROR:  Twenty-five years.

11          THE COURT:  As far as you know, has she been

12    involved in any court proceeding?

13          THE PROSPECTIVE JUROR:  No, I don't think so.

14          THE COURT:  Have you ever talked to her about her

15    work?

16          THE PROSPECTIVE JUROR:  Sure.

17          THE COURT:  Have you formulated views about the

18    criminal justice system as a result of your discussions with

19    your mom?

20          THE PROSPECTIVE JUROR:  Yes, I suppose, yes.

21          THE COURT:  Okay.  Would those opinions in any way

22    affect your view about criminal prosecutions or persons who

23    are prosecuted for a crime?

24          THE PROSPECTIVE JUROR:  No, I don't believe so.

25          THE COURT:  Would you have any preconceived notions

1   about people who are arrested?

2          THE PROSPECTIVE JUROR:  No.

3          THE COURT:  Or who are charged as defendants at

4   trial?

5          THE PROSPECTIVE JUROR:  No.

6          THE COURT:  Do you think you would be inclined to

7   give the testimony of a law enforcement officer greater weight

8   as a result of your mother's involvement?

9          THE PROSPECTIVE JUROR:  No.

10          THE COURT:  Do you think you could be fair and

11   impartial?

12          THE PROSPECTIVE JUROR:  Yes, I can.

13          THE COURT:  Juror number ten, Mr. Randazzo?

14          THE PROSPECTIVE JUROR:  Yes.

15          THE COURT:  What's your connection with law

16   enforcement?

17          THE PROSPECTIVE JUROR:  I have three friends who are

18   currently members of various police departments.  I have two

19   that are currently serving for the New York City Police

20   Department and one that's on the Nassau County Police

21   Department.

22          I also serve on a committee with another member of

23   the New York City Police Department, who is part of the

24   Emergency Services Unit.

25          THE COURT:  When you say three friends, are these --

1  how often do you see these friends?

2         THE PROSPECTIVE JUROR:  On a regular basis, at least

3  once a month.

4         THE COURT:  So you consider them close friends?

5         THE PROSPECTIVE JUROR:  Yes.  I have known them

6  since high school.

7         THE COURT:  Do you ever talk to them about their

8  work?

9         THE PROSPECTIVE JUROR:  It comes up.  They talk

10  about things that they see and do and, you know.

11         THE COURT:  As far as you know, have they been

12  involved in investigations or arrests involving drug crimes?

13         THE PROSPECTIVE JUROR:  Not that I am aware of.

14         THE COURT:  Have you ever talked about drug crimes?

15         THE PROSPECTIVE JUROR:  No.

16         THE COURT:  Have you formulated any kind of opinion

17  about the criminal justice system as a result of your

18  discussions with these friends, or as a result of the work

19  that you have done on the committee?

20         THE PROSPECTIVE JUROR:  No.

21         THE COURT:  Would you be able to treat the testimony

22  of a law enforcement officer, special agent, police officer,

23  the same way as you would treat the testimony of any other

24  witness?

25         THE PROSPECTIVE JUROR:  Yes.

1          THE COURT:  You wouldn't be inclined to give greater

2   weight?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  Do you have any kind of opinion about

5   people who are arrested by law enforcement officers?

6          THE PROSPECTIVE JUROR:  No.

7          THE COURT:  Do you think you could be absolutely

8   fair and impartial?

9          THE PROSPECTIVE JUROR:  I believe --

10          THE COURT:  In listening to the evidence in this

11   case?

12          THE PROSPECTIVE JUROR:  I believe so.

13          THE COURT:  Do you have any doubts about that?

14          THE PROSPECTIVE JUROR:  No.

15          THE COURT:  Juror number 19, Mr. Ercolano?

16          THE PROSPECTIVE JUROR:  How are you?

17          THE COURT:  Okay.  What's your connection with law

18   enforcement?

19          THE PROSPECTIVE JUROR:  My -- my two neighbors, one

20   is a detective NYPD.  My other next door neighbor is a

21   corrections officer at Rikers Island.

22          THE COURT:  How often do you see these neighbors?

23          THE PROSPECTIVE JUROR:  Almost every day.  Every

24   day.

25          THE COURT:  Do you ever -- do you ever talk to them

1    about their work?

2              THE PROSPECTIVE JUROR:  Of course, yes.

3              THE COURT:  As far as you know, are either of them

4    involved in drug crimes?

5              THE PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Have you formulated any kind of opinion

7    about the criminal justice system?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Or -- I will talk to you at side bar.

10             Juror number 23, Mr. Hogan?

11             THE PROSPECTIVE JUROR:  Yes.

12             I have a friend that's a sergeant at NYPD and

13   another friend who is an undercover cop in New Jersey.

14             THE COURT:  How often do you see these friends?

15             THE PROSPECTIVE JUROR:  The NYPD sergeant I see once

16   a month.  The other person I see maybe once a year.

17             THE COURT:  You consider them close friends?

18             THE PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Do you ever talk to them about their

20   work?

21             THE PROSPECTIVE JUROR:  Yes.

22             THE COURT:  As far as you know, are any of them

23   involved in any arrests involving drug crimes or

24   investigations?

25             THE PROSPECTIVE JUROR:  Yes.

1        THE COURT:  Have you formulated any kind of opinion

2  about the criminal justice system or people who are arrested

3  offer charged with drug crimes?

4        THE PROSPECTIVE JUROR:  No.

5        THE COURT:  Would you be able to treat the testimony

6  of a law enforcement officer just like the testimony of any

7  other witness and not give them any greater credit?

8        THE PROSPECTIVE JUROR:  Yes.

9        THE COURT:  Do you think you could be absolutely

10  fair and impartial in listening to the evidence and making

11  findings of fact?

12        THE PROSPECTIVE JUROR:  Yes.

13        THE COURT:  Juror number 24, Ms. Valeo.

14        THE PROSPECTIVE JUROR:  My --

15        THE COURT:  Tell me why you raised your hand.

16        THE PROSPECTIVE JUROR:  My cousin's husband is a

17  police officer in New York City.

18        THE COURT:  Do you often see that cousin?

19        THE PROSPECTIVE JUROR:  Once a month.

20        THE COURT:  Do you ever talk to him about his work?

21        THE PROSPECTIVE JUROR:  Just like -- not really.

22  Nothing about crime.

23        THE COURT:  Have you formulated any kind of opinion

24  about the criminal justice system?

25        THE PROSPECTIVE JUROR:  No.

1          THE COURT:  As a result of your work -- I mean,

2    discussions with your cousin's husband?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  As far as you know, has he ever been

5    involved in arrests or investigations involving drug crimes?

6          THE PROSPECTIVE JUROR:  Not that I know of.

7          THE COURT:  Would you be able to treat a law

8    enforcement officer just like any other witness and not give

9    him additional credit or penalize him?  Yes?

10          THE PROSPECTIVE JUROR:  Yes, I would.

11          THE COURT:  Do you think you could be absolutely

12    fair and impartial as a juror at trial in this case?

13          THE PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Yes?

15          THE PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Juror number 25, Ms. Aurora?  What is

17    your connection with law enforcement?

18          THE PROSPECTIVE JUROR:  My brother is a cop.

19    Retired cop.  And several friends.

20          THE COURT:  Have you ever talked to them about their

21    work?

22          THE PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Where did your brother work?

24          THE PROSPECTIVE JUROR:  Staten Island.

25          THE COURT:  For the NYPD?

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Were any of them ever involved in drug

3    arrests or investigations involving drugs?

4          THE PROSPECTIVE JUROR:  Probably.  Never really

5    talked about it.  Probably.

6          THE COURT:  Have you ever talked to them about drug

7    cases?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  Have you as a result of your discussions

10   with these individuals formed any kind of opinion about the

11   criminal justice system or people who have been arrested?

12         THE PROSPECTIVE JUROR:  No.

13         THE COURT:  Would you be able to treat a law

14   enforcement officer just like any other witness and not give

15   him credit or penalize him for that job?

16         THE PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Could you be absolutely fair and

18   impartial as a juror in this case?

19         THE PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Now, as you have heard me go through the

21   list of witnesses, many of the witnesses will be law

22   enforcement personnel.  Under our laws, the testimony of a

23   witness is not entitled to greater or lesser weight solely

24   because of that person's occupation.

25         Do any of you have any feelings that would make you

1  inclined to believe or disbelieve the testimony of a law

2  enforcement officer solely because of his or her occupation?

3         Juror number two?

4         THE PROSPECTIVE JUROR:  Your Honor, I'm sorry.  I

5  just want to back up a little bit.  I didn't mention any

6  connection to law enforcement because it's not a member of my

7  family.  But everybody is talking about their friends and

8  neighbors.  My neighbor is a New York State Supreme Court

9  justice.

10        THE COURT:  Okay.

11        THE PROSPECTIVE JUROR:  He is one of my friends.  It

12  doesn't affect my opinions or anything.  I have not discussed

13  his detailed cases.

14        THE COURT:  Have you -- as far as you know, does the

15  Supreme Court Justice hear criminal cases.

16        THE PROSPECTIVE JUROR:  I think it may have been a

17  time that he did, but I don't believe he does anymore.

18        THE COURT:  Did you ever talk to him about the cases

19  he handled?

20        THE PROSPECTIVE JUROR:  I spoke to him about one

21  arraignment many years ago.

22        THE COURT:  Have you formulated any kind of opinion

23  about the criminal justice system?

24        THE PROSPECTIVE JUROR:  No.

25        THE COURT:  Do you think you can set aside whatever

1    you may have learned from your discussions with your neighbor?

2              THE PROSPECTIVE JUROR:  Yes, I can.

3              THE COURT:  And decide this case based solely on the

4    evidence presented at trial?

5              THE PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Could you be absolutely fair and

7    impartial as a juror?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Juror number 15?

10             THE PROSPECTIVE JUROR:  Can I be briefly excused?

11             THE COURT:  You need to use the facilities?

12             THE PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Okay.  I guess this is a time to take

14   the break -- a break then.

15             What I might do is perhaps ask the attorneys to come

16   to side bar.  I will meet with them and talk to juror number

17   19.  Juror number --

18             THE PROSPECTIVE JUROR:  15.

19             THE COURT:  Juror number 15, you may step out.

20   Remember my instructions to come back immediately.

21             THE PROSPECTIVE JUROR:  Yes.

22             THE COURT:  I see number 17 and juror number 18 have

23   your cards up too.

24             THE PROSPECTIVE JUROR:  Yes.  I thought about it

25   after you asked us to put our papers up.

GR      OCR      CM      CRR      CSR

1          THE COURT:   Number 17.

2          THE PROSPECTIVE JUROR:   My sister-in-law retired but

3   I think she worked for the DEA.  But I am -- I have no idea

4   what she did.  I don't think she was an officer.  I think she

5   just worked in the office.

6          THE COURT:   Okay.  Clerical work?

7          THE PROSPECTIVE JUROR:   I don't know.

8          THE COURT:   You don't know.

9          THE PROSPECTIVE JUROR:   I have no idea.

10         THE COURT:   How often do you see this sister-in-law.

11         THE PROSPECTIVE JUROR:   I see her at least once a

12   month but she never really has spoken about it.

13         THE COURT:   Have you learned anything about the

14   criminal justice system, the federal government or --

15         THE PROSPECTIVE JUROR:   Never, never.

16         THE COURT:   From your discussions with her?

17         THE PROSPECTIVE JUROR:   She never speaks about work.

18         THE COURT:   Okay.  Do you think the fact that she

19   may have worked for the DEA affect your ability to be fair and

20   impartial in evaluating the testimony of the witnesses?

21         THE PROSPECTIVE JUROR:   Not at all.

22         THE COURT:   So you think you could be fair?

23         THE PROSPECTIVE JUROR:   Yes.

24         THE COURT:   Juror number 18.

25         THE PROSPECTIVE JUROR:   I have some personal

1   problem.   Side bar?

2           THE COURT:  I will talk to you later.

3           Okay.   I will ask the attorneys to come up to

4   side bar.

5           (Side bar.)

6           MR. KAZEMI:  Your Honor, a as an initial matter, I

7   think Ms. Harris has an expert who she may be calling.   I

8   don't know if --

9           MS. HARRIS:  The witness is on our witness list.

10          THE COURT:  I forgot to transfer it here.   It is in

11   my old list.   I will ask that.

12          Okay.   Are we ready for juror number 19?

13          MR. KAZEMI:  Yes.

14          (In open court.)

15          THE COURT:  Juror number 19.

16          MS. HARRIS:  I think 20 might also have raised his

17   card before.   You can ask him.

18          THE COURT:  Okay.

19          (Juror present.)

20          THE PROSPECTIVE JUROR:  I have three -- three

21   issues.

22          MR. NATHANSON:  Keep your voice down a little bit.

23          THE PROSPECTIVE JUROR:  There are three issues I

24   have right now.   I cannot be impartial in this particular

25   case.   Because of my friends and my brother-in-law is a drug

1  addict and we have had --

2          THE COURT:  Your --

3          THE PROSPECTIVE JUROR:  My brother-in-law is a drug

4  addict, lifelong drug addict.  I have preconceived notions of

5  this particular case.

6          Second problem is that I just got another part-time

7  job at night in the holiday season is tough for me to work.  I

8  leave at -- I need the money for the kids and the presents.

9  It's hard for me to be here now in December.

10          THE COURT:  Okay.

11          THE PROSPECTIVE JUROR:  The other one is I have a

12  note from a doctor regarding my low back, I can't sit for long

13  periods of time.

14          If I could possibly put this in January or February

15  or something.  It is tough for me right now.

16          THE COURT:  All right.

17          MR. KAZEMI:  No objection.

18          THE COURT:  We will call down and ask you to defer

19  four jury selection.  Do you want to do it in February?

20          THE PROSPECTIVE JUROR:  February is fine.

21          THE COURT:  January, February.

22          THE PROSPECTIVE JUROR:  Yes.  February.

23          THE COURT:  Okay.  Fine.

24          THE PROSPECTIVE JUROR:  Thanks.  Should I sit down?

25  Do you need my note?

1           THE COURT:  No.  You are excused.  Report downstairs

2    to the central jury room.

3           THE PROSPECTIVE JUROR:  Okay.

4           THE COURT:  We will call down.  Wait for our call.

5           THE PROSPECTIVE JUROR:  I will wait down there?

6    Thank you.  Have a nice holiday.

7           (Juror leaves side bar.)

8           (In open court.)

9           THE COURT:  Juror number 20, were you on the verge

10   of raising your card?  One of my spotters told me that you

11   were?

12          THE PROSPECTIVE JUROR:  No.

13          THE COURT:  Okay.  No problem.

14          Juror number 18.

15          (Side bar.)

16          (Juror present.)

17          THE PROSPECTIVE JUROR:  I have a personal problem.

18   I have twelve-hour shift.  I have two kids.  I work seven to

19   seven.  Sometimes she get home 8:00 o'clock.  I have to take

20   them in school.  Really uncomfortable sitting.

21          THE COURT:  Everybody has personal inconveniences in

22   coming to serve as jurors.  I understand it is quite a

23   disruption to your lives.  Everybody --

24          THE PROSPECTIVE JUROR:  I have nobody to take to

25   school.

1        THE COURT:  I will talk to the attorneys here, but

2   everybody has to make accommodations in order to meet their

3   obligations to serve as a juror.  I would think that if you

4   ever had a trial, had to go to trial, you would want jurors

5   who would go out of their way to serve.

6        THE PROSPECTIVE JUROR:  Right now, my little son was

7   sick.  So --

8        THE COURT:  Okay.  Why don't you go back to your

9   seat.

10        THE PROSPECTIVE JUROR:  Okay.

11        (Side bar continues without juror present.)

12        MS. HARRIS:  I'm sorry.  I was confused.  Said he

13   couldn't take his children to school?

14        THE COURT:  Yes.

15        MS. HARRIS:  That wasn't very well expressed either.

16   I think there are language issues.

17        MR. KAZEMI:  He was very nervous.

18        THE COURT:  He was very nervous.

19        MR. KAZEMI:  This is a two or three-day trial.  It

20   is not a tremendous inconvenience.

21        THE COURT:  Next time he comes back, we will talk to

22   him further.  I think we can keep him here for a while.

23        MR. NATHANSON:  Agreed.  He may not want to serve.

24   We can discuss this at the end if it becomes appropriate.

25        MR. KAZEMI:  Thank you.

33

1          MS. HARRIS:  As I mentioned, I think if we can ask

2     20 if he raised his card before.

3          THE COURT:  20?  You said 20 or 28?

4          MS. HARRIS:  20.

5          THE COURT:  I asked him.  You were talking to

6     Mr. Kazemi.  He said no.

7          MS. HARRIS:  Okay.

8          (In open court.)

9          THE COURT:  Now, I missed a name on the list of

10    potential witnesses or persons whose names you might hear at

11    trial.  One more name and that is Andrew Hudson.

12          Do any of you know or have had any dealings with

13    Mr. Andrew Hudson?

14          Have any of you or a close friend or relative of

15    yours ever been a victim of a crime?  By victim of a crime, I

16    mean a matter important enough to warrant a call to the

17    police.

18          Hold your cards up high, please.

19          Juror number 9, 12, 22 and 24.

20          (Continued on next page.)

21

22

23

24

25

34

1          THE COURT:   Juror No. 9, Mr. Veny.

2          THE DEFENDANT:  Yes.  I was broken -- my apartment

3   was broken into several times.

4          THE COURT:  How long ago?

5          THE PROSPECTIVE JUROR:  I got to think for a minute.

6   It's been over 30 years.

7          THE COURT:  Were the perpetrators ever caught?

8          THE PROSPECTIVE JUROR: Not to my knowledge.

9          THE COURT:  Were you satisfied that the police did

10   as good a job as could reasonably be expected?

11          THE PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Would these two experiences in any way

13   effect how you may determine this case?

14          THE PROSPECTIVE JUROR:  No.

15          THE COURT:   Juror No. 12, Ms. Gurt.

16          THE PROSPECTIVE JUROR:  We were broken into in the

17   middle of the night and the police came but the perpetrators

18   never were caught.

19          THE COURT:  How long ago was that?

20          THE PROSPECTIVE JUROR: About 15 years ago.

21          THE COURT:  Were you satisfied that the police did

22   as good a job as could be expected?

23          THE PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Would this experience in any way affect

25   your determination of this case?

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  Juror No. 22, Mr. Basore.

3          THE PROSPECTIVE JUROR: Yes. The beginning of

4   November I've just recently been broken into.  Also, when I

5   was in high school, I had my window -- like in my car, I

6   had -- somebody that the police thought was on meth, like I

7   was in Oregon, punched through my window and started beating

8   me up.  I called the police.

9          THE COURT:  Were the perpetrators caught?

10          THE PROSPECTIVE JUROR:  Both times, no.

11          THE COURT:  Both times no.  Were you satisfied that

12   the police did as good a job as could reasonably be expected?

13          THE PROSPECTIVE JUROR:  For New York, yes, for

14   Oregon, no.

15          THE COURT:  Would this view about the conduct of the

16   police in any way affect how you might evaluate the merits of

17   this case?

18          THE PROSPECTIVE JUROR:  I don't think so.

19          THE COURT:  Do you have any doubt about that?

20          THE PROSPECTIVE JUROR:  No.  I don't.

21          THE COURT:  You had made a statement about what the

22   police had said about the breaking of your window.  Now, would

23   that experience regarding a suspect in your case in any way

24   affect your determination of this kind of case?

25          THE PROSPECTIVE JUROR:  That wouldn't.  But I do

1    have some personal family history.

2          THE COURT:  All right.  We will talk to you later

3    once some questions are brought up regarding your family

4    history.  I'll have a chance do ask everybody questions about

5    their background.

6          Juror No. 24, Miss Valeo.

7          THE PROSPECTIVE JUROR:  Personal issue with my

8    brother.

9          THE COURT:  Go ahead.

10          THE PROSPECTIVE JUROR:  He was arrested for drugs.

11          THE COURT:  Who was arrested?

12          THE PROSPECTIVE JUROR: My brother, younger brother.

13          THE COURT:  I'll talk to you at sidebar.  This

14    actually leads me he to my next question.

15          Juror No. 18.

16          THE PROSPECTIVE JUROR:  This is in connection with

17    the --

18          THE COURT:  Victim of a crime?

19          THE PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Okay.

21          THE PROSPECTIVE JUROR:  About 15 years ago a group

22    of people came to my apartment and mugged me.

23          THE COURT:  Were the perpetrators ever caught?

24          THE PROSPECTIVE JUROR:  I don't think so.  The

25    police weren't there.

1          THE COURT:  Were you ever called to the Police

2    Department to identify the perpetrators?

3          THE PROSPECTIVE JUROR:  No, the police never called

4    me.  I give a description but the police never came to me.

5          THE COURT:  Were you satisfied that the police did

6    as good a job as could reasonably be expected?

7          THE PROSPECTIVE JUROR:  No.

8          THE COURT:  I'll talk to you at sidebar.

9          Have any of you or close friend or relative of yours

10   ever been charged with a crime, been involved in a criminal

11   investigation or trial, received a subpoena in a criminal case

12   or been questioned by law enforcement officers, either from

13   the Police Department, governmental agency, such as the DEA,

14   FBI, or other governmental agency involved in investigations,

15   including the Internal Revenue Service and the Social Security

16   Administration?

17         Juror No. 22.  Juror No. 4, Juror No. 7, Juror No.

18   15, Juror No. 22, Juror No. 25, 26, 27.

19         If any of you have difficulty answering these

20   questions publicly let me know.

21         Juror No. 4?

22         THE PROSPECTIVE JUROR:  Two family members were

23   arrested for drug possession.

24         THE COURT:  Two family members --

25         THE PROSPECTIVE JUROR:  A brother and a cousin.

1          THE COURT:  Were they prosecuted?

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Do you think they were fairly treated?

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  And what kind of charges?

6          THE PROSPECTIVE JUROR:  Both situations were cocaine

7    possession.

8          THE COURT:  Would the fact that you had two brothers

9    who were charged --

10          THE PROSPECTIVE JUROR:  A brother and a cousin.

11          THE COURT:  A brother and a cousin charged with a

12    drug crime in any way affect your ability to determine this

13    case fairly and impartially?

14          THE PROSPECTIVE JUROR:  I don't believe so.

15          THE COURT:  Do you have any doubts about that?

16          THE PROSPECTIVE JUROR:  No.

17          THE COURT:  How long ago did these prosecutions take

18    place?

19          THE PROSPECTIVE JUROR:  I don't know exactly, but

20    both of them were at least ten years ago, if not even longer.

21          THE COURT:  Were these state court prosecution's?

22          THE PROSPECTIVE JUROR:  Sorry?

23          THE COURT:  Were these states court prosecution's?

24          THE PROSPECTIVE JUROR:  Nassau police, Nassau

25    County.

39

1        THE COURT:  Did you sit in on any of the

2   proceedings?

3        THE PROSPECTIVE JUROR:  No.

4        THE COURT:  So you think you could set aside what

5   may have happened and decide this case?

6        THE PROSPECTIVE JUROR:  Yes.

7        THE COURT:  Juror No. 7, Mr. Diedrich.

8        THE PROSPECTIVE JUROR:  Yes, I have a son that was

9   arrested for DUI about 13, 14 months ago.

10        THE COURT:  Was he prosecuted?

11        THE PROSPECTIVE JUROR:  Yes, he was in a rehab

12   program for like 8, 9 months.

13        THE COURT:  Do you have any views about whether or

14   not he was fairly treated?

15        THE PROSPECTIVE JUROR:  He was fairly treated, yes.

16        THE COURT:  Would the fact that he was prosecuted,

17   would that in any way affect your determination of this case?

18        THE PROSPECTIVE JUROR:  No.

19        THE COURT:  It wouldn't make you more inclined to

20   believe the government's case or disbelieve the government's

21   case?

22        THE PROSPECTIVE JUROR:  No.

23        THE COURT:  Do you think you could be a fair and

24   impartial juror in this case?

25        THE PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Juror No. 15?

2          THE PROSPECTIVE JUROR:  My son was arrested for gun

3   possession.

4          THE COURT:  How long ago was that?

5          THE PROSPECTIVE JUROR:  It was more than ten years

6   ago.

7          THE COURT:  Was there a prosecution?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Do you think he was fairly treated?

10          THE PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Do you think the fact that your son went

12   through the criminal justice system in any way affects how you

13   would view this case?

14          THE PROSPECTIVE JUROR:  No.

15          THE COURT:  Or determine this case?

16          THE PROSPECTIVE JUROR:  No.

17          THE COURT:  You think you could be fair and

18   impartial?

19          THE PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Juror No. 22.  Yes?

21          THE PROSPECTIVE JUROR:  I had an uncle arrested when

22   I was in middle school for drug possession.

23          THE COURT:  Do you know if he was prosecuted?

24          THE PROSPECTIVE JUROR:  I don't think he was

25   prosecuted, but I know he went through a number of programs.

1        THE COURT:  Do you have any views about whether or
2    not he was fairly treated?
3        THE PROSPECTIVE JUROR:  I think he was treated
4    fairly, yes.
5        THE COURT:  Would this experience in any way affect
6    your view of this case, which also involves drug charges?
7        THE PROSPECTIVE JUROR:  I think a little, it might.
8        THE COURT:  I'll talk to you at sidebar.
9        Juror No. 24.
10       THE PROSPECTIVE JUROR:  My brother about two years
11   ago for marijuana.
12       THE COURT:  This is the reason you raised your card
13   earlier?
14       THE PROSPECTIVE JUROR:  Yes.  I don't know anything
15   about the trial.  I didn't like go to anything or discuss
16   anything with him about it.  I only know he was in like an
17   outreach program for rehab.
18       THE COURT:  Do you have any views about ---feelings
19   about whether or not he was fairly treated?
20       THE PROSPECTIVE JUROR:  No.  I don't know anything
21   about what happened, honestly.
22       THE COURT:  Would you have any views as a result of
23   your brother's experience about this case?
24       THE PROSPECTIVE JUROR:  No.
25       THE COURT:  Because your brother was prosecuted for

1   drug possession?

2         THE PROSPECTIVE JUROR:  I really honestly don't know

3   like the details of it.  I kind of stayed away from

4   everything.

5         THE COURT:  So you think that --

6         THE PROSPECTIVE JUROR:  I have no point of view as

7   to that.  I don't know what happened with him or whatever.

8         THE COURT:  So do you think you could set aside

9   whatever may have happened and just decide this case based on

10  the evidence you hear?

11        THE PROSPECTIVE JUROR:  Yes.

12        THE COURT:  You could be fair and impartial in doing

13  so?

14        THE PROSPECTIVE JUROR:  Yes.

15        THE COURT:  Juror No. 25.

16        THE PROSPECTIVE JUROR:  Second cousin was arrested

17  for drugs.

18        THE COURT:  How long ago?

19        THE PROSPECTIVE JUROR:  I think it was over ten

20  years.

21        THE COURT:  Was there a criminal trial?

22        THE PROSPECTIVE JUROR:  Yes.

23        THE COURT:  Do you have any views about whether or

24  not he was fairly treated?

25        THE PROSPECTIVE JUROR:  No.  I really didn't follow

43

1    the case.  I read about it in the newspaper.

2          THE COURT:  Would this experience in any way affect

3    your view of this case?

4          THE PROSPECTIVE JUROR:  No.

5          THE COURT:  Can you set aside whatever you may have

6    learned about your cousin's case and decide this case based

7    solely on the evidence given to you at trial?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  And could you be fair and impartial in

10   evaluating the testimony and making your determinations in

11   this case?

12         THE PROSPECTIVE JUROR:  Yes.

13         THE COURT:   Juror No. 26.

14         THE PROSPECTIVE JUROR:  I have a brother who was

15   prosecuted for drug charges over ten years ago.

16         THE COURT:  Do you have any views about whether or

17   not he was fairly treated?

18         THE PROSPECTIVE JUROR: I probably would be a little

19   biased.

20         THE COURT:  I'll talk to you at sidebar.

21         Juror No. 27?

22         THE PROSPECTIVE JUROR:  I misinterpreted you your

23   question.  I don't think that what I have to say has to do

24   with this question.

25         My husband was called in to be interrogated in

1    connection to a criminal case about 15 years ago.  They just

2    found a piece of information that linked him to the person who

3    was murdered, but he didn't know that person, they just --

4    whatever.

5           THE COURT:  You properly raised your hand too.

6           Anybody who has been questioned by a law-enforcement

7    officer about any case?

8           Okay.  Did you, as a result of this experience, in

9    any way formulate any kind of opinion about the criminal

10   justice system?

11          THE PROSPECTIVE JUROR:  No.

12          THE COURT:  Could you set aside whatever you may

13   have learned from this experience and decide this case based

14   solely on the evidence presented at trial?

15          THE PROSPECTIVE JUROR:  It's very little that I

16   know.  I don't think it would in any way affect me.

17          THE COURT:  Have any of you had any other

18   interaction with the police or other law enforcement officers

19   not previously discussed?

20          Juror No. 8.

21          THE PROSPECTIVE JUROR:  I forgot.

22          THE COURT:  Any other contact with law enforcement

23   officers?

24          THE PROSPECTIVE JUROR:  I forgot that at my work,

25   there was an armed robbery and it was actually a drug clinic,

1  a methadone clinic.

2          THE COURT:  You worked for a methadone clinic?

3          THE PROSPECTIVE JUROR: I did, years and years -- I

4  forgot about it, it was years ago.  I went to the police

5  station and I provided them with sketches of the suspect.

6          THE COURT:  When you say years and years ago, ten

7  years, 20 years?

8          THE PROSPECTIVE JUROR: 15.

9          THE COURT:  15 years?

10          THE PROSPECTIVE JUROR: I forgot.

11          THE COURT:  Did you have any other contact with the

12  police after that?

13          THE PROSPECTIVE JUROR:  After that?  No.

14          THE COURT:  Do you know anything about the outcome

15  of this investigation by the police?

16          THE PROSPECTIVE JUROR:  No.

17          THE COURT:  Would you as a result of that experience

18  have any kind of views -- formulate any kind of view about the

19  criminal justice system?

20          THE PROSPECTIVE JUROR:  No.

21          THE COURT:  Do any of you have any views about the

22  criminal justice system not previously expressed that might

23  affect your ability to be fair and impartial in this case?

24          Do any of you or close friend or relative have any

25  dispute with the federal, state or local government?

46

1          I'm going to ask the attorneys to come to sidebar.

2          (Sidebar.)

3          THE COURT:  We will call up juror 18 again.

4          Juror No. 18.

5          (Juror present.)

6          THE COURT:  You said you were dissatisfied with the

7     police.  How long ago was this?

8          THE PROSPECTIVE JUROR:  About 15 to 17 years.  It

9     was 1987.

10         THE COURT:  You think that this would affect your

11    evaluation of this case?

12         THE PROSPECTIVE JUROR:  A little bit.

13         THE COURT:  You understand this is only a short

14    trial and if I send you downstairs you might get selected for

15    a long trial in a civil case.  Would you rather defer your

16    jury service to a more convenient time when you don't have to

17    take your child to school?

18         THE PROSPECTIVE JUROR:  Well, I still feel like

19    somewhat it might affect my sitting as juries.  I feel because

20    of that past experience with the mugging all over the place.

21         THE COURT:  I don't really think in light of what

22    you said before that that's a terribly honest statement.  I

23    think you don't want to serve.

24         Is that correct?

25         THE PROSPECTIVE JUROR:  No, no, I didn't mean that

1  not to serve.  I just say my machine about past, my experience

2  about this incident.

3         THE COURT:  Okay.  Thank you.  You can go back to

4  your seat.

5         (Prospective juror leaves.)

6         THE COURT:  We'll let him go.

7         MS. HARRIS:  Currently on the record I says he can't

8  be fair.

9         MR. NATHANSON:  I think he's lying to us.  He can't

10  be an appropriate juror if he's lied to us.  It bothers me and

11  I'm sure it bothers the court that he's clearly trying to

12  avoid jury service.

13         THE COURT:  We'll keep him for a little longer to

14  ensure that he doesn't get assigned to a different jury

15  selection.

16         Juror No. 22.

17         (Juror present.)

18         THE COURT:  You said you might have certain views.

19         THE PROSPECTIVE JUROR:  When I was in elementary

20  school my uncle got involved in cocaine and  lost his home,

21  his job, his wife and kids and they have all -- family has

22  reconciled, but it seemed like what he's gone through with

23  drugs, and over the years I have had friends that have been

24  involved with drugs and friends that got no trouble.

25         I do have a view.  Even though people who do drugs

1  are nice and law enforcement officers are nice, the fact that

2  they're out there, you know, it's just dangerous.

3         THE COURT:  Would you think these views would affect

4  your ability to listen to the evidence and make a

5  determination whether or not Miss Moreno, who has been charged

6  with a drug crime, is guilty or innocent?

7         THE PROSPECTIVE JUROR: I think --

8         THE COURT:  Whether or not the government has proven

9  her guilt beyond a reasonable doubt in this case?

10        THE PROSPECTIVE JUROR:  I think I could be fair to

11 her.  But I also think it would be fair to show that I do have

12 some bias towards -- I know, if good people get involved in

13 drugs, once they get out there, what they do.  I think I can

14 be fair to her but I just want on record my bias towards

15 drugs.  I don't, you know.

16        THE COURT:  As you you've heard, the charges here

17 involve the distribution of heroin, possession with intent to

18 distribute heroin.

19        Would the nature of these charges affect your

20 ability to be fair and impartial in evaluating the evidence in

21 this case?

22        THE PROSPECTIVE JUROR:  That part of it I do think I

23 would have some bias towards, yes.

24        THE COURT:  Bias towards finding -- what would your

25 bias be?

1        THE PROSPECTIVE JUROR:  I guess I just, you know, if

2   she's been involved and actually dealing drugs, even if she's

3   a nice person that got involved in the wrong thing, I do know

4   how dangerous it is how they get out there and wreck people's

5   lives and stuff.  Yes, in substance, I would be bias.

6        THE COURT:  If the case didn't involve someone

7   actually selling drugs you might have a different view?

8        THE PROSPECTIVE JUROR: Yeah.

9        THE COURT:  You think you could be fair?

10       THE PROSPECTIVE JUROR:  Yes.

11       THE COURT:  All right.  You can go back to your

12   seat, please.

13       (Prospective juror leaves.)

14       MS. HARRIS:  Your Honor, she's accused of

15   distributing a kilo of heroin.  There may be a distinction

16   without a difference in this case.

17       THE COURT:  He makes that distinction.  I don't know

18   if it's possible to separate out the evidence.  I think he's

19   being honest about it.

20       MR. KAZEMI:  It took me awhile to understand what

21   bias was, but I agree.

22       THE COURT:  You have no objection?

23       MR. KAZEMI:  No objection.

24       THE COURT:  All right.  I have no idea how the

25   evidence will play out.  I think it's best in light of the

1  government's agreement to excuse him.

2        Juror No. 26.

3        (Jury present.)

4        THE COURT:  Yes, Miss Reid.  You think your brothers

5  prosecution may affect your ability to sit impartially?

6        THE PROSPECTIVE JUROR:  Yes.  He served 7 years for

7  drugs and weapons charges.

8        THE COURT:  So you think you might not be able to be

9  fair and impartial in evaluating the evidence in this case?

10        THE PROSPECTIVE JUROR:  I sat through his trial and

11  his proceedings and the hearing, and I felt that it was unfair

12  what he got for his first offense.  So I mean it was a lot at

13  stake.  He was guilty and he should have got something, but I

14  thought that was an exorbitant amount.

15        THE COURT:  You thought the sentence was unfair?

16        THE PROSPECTIVE JUROR:  Yes.

17        THE COURT:  Would your feelings about the unfairness

18  of the sentence carry over to your determination in this case

19  regarding whether or not the government has proved the guilt

20  of the defendant beyond a reasonable doubt in this case?

21        THE PROSPECTIVE JUROR:  If the person is guilty

22  they're guilty, but we don't decide --

23        THE COURT:  You don't decide the sentence?

24        THE PROSPECTIVE JUROR:  No, we don't.

25        THE COURT:  You think you could be fair and

1   impartial in listening to the evidence?

2          THE PROSPECTIVE JUROR: Yes.

3          THE COURT:  And could you follow the judge's

4   instructions in determining whether or not the government has

5   met its burden?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  All right.

8          (Prospective juror leaves.)

9          THE COURT:  Is there anybody else we need to call?

10         MR. NATHANSON:  We would move to strike for cause

11  because of the particular issues at stake in this case.

12         The defense, part of the defense, if they are

13  allowed to put it in, is going to get into what the sentence

14  of the defendant might be and particularly there's a ten-year

15  mandatory minimum, and she's specified a bias based on a first

16  time offender, which this offender is, and the length of time

17  her brother got.

18         MS. HARRIS:  The government has objected to it.

19         THE COURT:  All right.  I'm not going to go further.

20  There is a possibility I believe her and I believe she could

21  be fair in the determination at trial.

22         (Open court.)

23         THE COURT:  Jurors No. 22 and 26, you are excused.

24         Please report downstairs to the Central Jury Room

25  when you are excused and they will tell you where next to

1    report.

2              (Prospective jurors excused.)

3              THE COURT:  Now, as I stated earlier, the charges in

4    this case concern the possession with intent to distribute a

5    substance containing heroin.

6              Is there anything in your life or experience that

7    would make it difficult for you to sit in a trial involving

8    such charges?

9              Have any of you or close friend or relative of yours

10   struggled with drug addiction or had a drug abuse problem?

11             Juror No. 4, number 6, number 7, number 9, number

12   24.

13             Juror No. 4, Ms. Tavolacci.

14             THE PROSPECTIVE JUROR:  Brother and cousin.

15             THE COURT:  Those two.  Would the fact that they did

16   suffer from drug abuse in any way affect your consideration of

17   this case?

18             THE PROSPECTIVE JUROR:  No.

19             THE COURT:  Do you have any doubts about that?

20             THE PROSPECTIVE JUROR:  No.

21             THE COURT:  You wouldn't have any views one way or

22   the other regarding someone who has been charged with a drug

23   crime?

24             THE PROSPECTIVE JUROR:  No.

25             THE COURT:  Juror No. 6, Miss Croke.

53

1          THE PROSPECTIVE JUROR:  My husband had a cocaine

2     problem.

3          THE COURT:  Did he receive treatment for that?

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Would this experience in any way -- have

6     you, as a result of this experience, formulated any kind of

7     opinion about drug crimes?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  Do you think you could be fair and

10    impartial in listening to the evidence and determining the

11    charges in this case?

12         THE PROSPECTIVE JUROR:  Yes, I do.

13         THE COURT:  Juror No. 7.

14         THE PROSPECTIVE JUROR:  My son was DWI.  He was in

15    rehab.  He had a prescription drug habit.

16         THE COURT:  Would that experience in any way affect

17    your ability to consider this case?

18         THE PROSPECTIVE JUROR:  No.

19         THE COURT:  So you could be fair?

20         THE PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Juror No. 9?

22         THE PROSPECTIVE JUROR: Yes.  I had two cousins who

23    have been addicted to heroin for about 40 years.

24         THE COURT:  Have they received treatment?

25         THE PROSPECTIVE JUROR:  Yes.

54

1        THE COURT:  Would the fact that these two relatives

2   have had a drug problem with heroin affect your consideration

3   of this case which involves the distribution of heroin?

4        THE PROSPECTIVE JUROR:  No, it would not.

5        THE COURT:  You think you could be fair?

6        THE PROSPECTIVE JUROR: Yes.

7        THE COURT:  Juror No. 24?

8        THE PROSPECTIVE JUROR:  Same.

9        THE COURT:  Your brother, and you think you could be

10   fair notwithstanding his drug problem?

11        THE PROSPECTIVE JUROR:  Yes.

12        THE COURT:  Now, are any of you or a friend or

13   relative involved in the treatment of drug abuse?

14        Juror No. 8, you said you had worked at a methadone

15   clinic?

16        THE PROSPECTIVE JUROR: Yes.

17        THE COURT:  How long ago was that?

18        THE PROSPECTIVE JUROR:  Like 92 or '93.

19        THE COURT:  What was your position?

20        THE PROSPECTIVE JUROR:  Administrative.

21        THE COURT:  Did you have any contact with the

22   persons involved seeking treatment, the patients?

23        THE PROSPECTIVE JUROR:  Not directly, no.

24        THE COURT:  Did you ever talk to the counselors or

25   other persons giving treatment?

1        THE PROSPECTIVE JUROR: Yes.

2        THE COURT:  About their work?

3        THE PROSPECTIVE JUROR:  Yes.

4        THE COURT:  Would you have formulated any kind of

5 opinion as a result of those discussions that might affect how

6 you view the evidence in this case?

7        THE PROSPECTIVE JUROR:  No, I don't think so.

8        THE COURT:  Do you have any doubts about that?

9        THE PROSPECTIVE JUROR:  No.

10       THE COURT:  Could you set aside whatever you might

11 have learned and decide this case based solely on the evidence

12 presented?

13       THE PROSPECTIVE JUROR: Yes.

14       THE COURT:  Do any of you have any strong feelings

15 concerning the control or legalization of drugs?

16       Do any of you have any feelings concerning the

17 severity or leniency or punishment for drug crimes?

18       Is there anything else about the nature of these

19 charges that would make it difficult for you to be a fair and

20 impartial juror?

21       Do any of you hold any religious belief that what --

22 18, sorry.  I will talk to you at a sidebar.

23       Do any of you hold any religious beliefs that would

24 affect your ability to pass judgment on another person?

25       Have any of you or close friend or relative ever

1    worked for a criminal defense lawyer or private investigator?

2            Have any of you or members of your immediate family

3    worked for lawyers or are lawyers?

4            Juror No. 2, 6, 9 and 20.

5            Juror No. 2, Mr. Kurtz.

6            THE PROSPECTIVE JUROR:  My nephew is a litigator.  I

7    don't know the company name.

8            THE COURT:  Civil litigator?

9            THE PROSPECTIVE JUROR:  Yes.

10           THE COURT:  How often do you see your nephew?

11           THE PROSPECTIVE JUROR:  It kind of varies, but a

12   couple of times a year.

13           THE COURT:  Do you ever talk to him about his work?

14           THE PROSPECTIVE JUROR:  Not in detail.  Just in

15   general.

16           THE COURT:  Have you formulated any kind of view

17   about the legal system.

18           THE PROSPECTIVE JUROR:  No.

19           THE COURT:  As a result of those discussions?

20           THE PROSPECTIVE JUROR:  No.

21           THE COURT:  Could you set aside whatever you may

22   have learned and decide this case based solely on the evidence

23   and instructions heard at trial?

24           THE PROSPECTIVE JUROR:  Yes.

25           THE COURT:  Juror No. 6, Miss Croke.

1            THE PROSPECTIVE JUROR:  I work for a law firm.

2            THE COURT:  What do you do?

3            THE PROSPECTIVE JUROR: I work in the word processing

4    department and the training of secretaries.

5            THE COURT:  How large a firm do you work for?

6            THE PROSPECTIVE JUROR:  Large, very large.

7            THE COURT:  Does the work of the law firm involve

8    any kind of criminal defense work?

9            THE PROSPECTIVE JUROR:  There may be 1 or 2 pro bono

10   cases, but that's about it.

11           THE COURT:  Have you as a result of your work

12   formulated any kind of opinion about the --

13           THE PROSPECTIVE JUROR:  No.

14           THE COURT:  Could you set aside whatever you may

15   have learned from your work and decide this case based solely

16   on the evidence and instructions given to you at trial?

17           THE PROSPECTIVE JUROR:  Yes.

18           THE COURT:  Juror number 9.

19           THE PROSPECTIVE JUROR:  My son is an attorney.

20           THE COURT:  What kind of area of practice does he

21   engage in?

22           THE PROSPECTIVE JUROR:  I believe it was education

23   and now it's labor.

24           THE COURT:  Do you ever talk to him about his work?

25           THE PROSPECTIVE JUROR:  Not really, no.

1     THE COURT:  Have you formulated any kind of view
2 about the legal system that might in any way affect your view
3 of this case?
4     THE PROSPECTIVE JUROR:  No.
5     THE COURT:  Juror No. 20, Mr. Sullivan.
6     THE PROSPECTIVE JUROR:  My wife works for a law
7 firm.
8     THE COURT:  What does she do?
9     THE PROSPECTIVE JUROR: She's a paralegal.
10     THE COURT:  How long has she worked for this firm?
11     THE PROSPECTIVE JUROR: Three years.
12     THE COURT:  How long has she worked as a paralegal?
13     THE PROSPECTIVE JUROR:  Three years.
14     THE COURT:  Do you know what kind of practice this
15 law firm has?
16     THE PROSPECTIVE JUROR:  I think civil, criminal,
17 real estate, a couple of things they do.  But mostly civil
18 court.
19     THE COURT:  Did she take any courses before becoming
20 a paralegal?
21     THE PROSPECTIVE JUROR:  I believe so, yes.
22     THE COURT:  Do you talk to --
23     THE PROSPECTIVE JUROR:  I don't think she took any
24 courses, no, she just learned the job.
25     THE COURT:  Do you talk to your wife about any of

59

1  cases she's worked on?

2        THE PROSPECTIVE JUROR:  No, not -- we talk about it,

3  but she doesn't do it.  Mostly attorneys do that.  She just

4  does the paperwork for them.

5        THE COURT:  Have you formulated any kind of opinion

6  about the legal system that might affect your view of this

7  case?

8        THE PROSPECTIVE JUROR:  No.

9        THE COURT:  Could you set aside whatever you may

10  have learned and decide this case based solely on the evidence

11  and instructions given to you by the judge?

12        THE PROSPECTIVE JUROR:  Yes.

13        THE COURT:  Are any of you or close friend or

14  relative of yours employed as a court clerk or any other kind

15  of court personnel?

16        Number 11?

17        THE PROSPECTIVE JUROR:  My sister's husband's father

18  is a judge.  I don't see him.  I don't really know my sister's

19  in-laws that well, but I know he is a Supreme Court judge.

20  Where, I'm not sure.

21        THE COURT:  This is Miss Kappel?

22        THE PROSPECTIVE JUROR: Yes.

23        THE COURT:  Would that in any way --

24        THE PROSPECTIVE JUROR:  He's retired though.  He

25  does some part-time work in the law.

1          THE COURT:  Would this remote relationship in any

2     way affect your ability to sit impartially as a juror?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  Have any of you or close friend or

5     relative of yours ever worked in a penal institution, jail or

6     penitentiary or worked in a parole or criminal rehabilitation

7     program, such as a halfway house, or a narcotics prevention

8     program?

9          Have any of you or close friend or relative of yours

10    worked for a parole board, a crime prevention board, including

11    youth programs or the like?

12         And all of these questions would also be directed at

13    finding out any connection you may have with probation

14    officers or personnel in any of these institutions I've

15    mentioned.

16         Have any of you served on a jury or grand jury

17    before?

18         Number 4, 17, 15, 9.  6.  20, 21.

19         Juror No. 4, MIss Tavolacci.

20         THE PROSPECTIVE JUROR: I was a grand juror in Nassau

21    County.

22         THE COURT:  How long ago?

23         THE PROSPECTIVE JUROR: Five years ago.

24         THE COURT:  How long did you sit as a grand juror?

25         THE PROSPECTIVE JUROR: I believe it was a little

1   over -- I think it wound up being three weeks.

2           THE COURT:  You understand, in a grand jury you only

3   hear one side of the case and your job as a grand juror is to

4   determine whether or not there is probable cause that an

5   accused has committed the crimes charged.  Do you understand

6   that?

7           THE PROSPECTIVE JUROR:  Yes.

8           THE COURT:  Could you set aside your experience as a

9   grand juror and follow the instructions given to you at trial

10  and listen to all of the evidence presented to you at trial?

11          THE PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Juror No. 6, Miss Croke.

13          THE PROSPECTIVE JUROR:  I served on three juries.

14  One was a criminal case, malpractice, and a civil case.

15          THE COURT:  How long ago was the malpractice case?

16          THE PROSPECTIVE JUROR: About five years ago.

17          THE COURT:  Without revealing the outcome, was there

18  a verdict rendered in that case?

19          THE PROSPECTIVE JUROR:  I was actually an alternate

20  juror and it turned out that I knew someone who was part of

21  the family, so I wasn't in there.

22          THE COURT:  The criminal case, how long ago was

23  that?

24          THE PROSPECTIVE JUROR: Over ten years ago.  It did

25  come to a verdict.

1        THE COURT:  Were you satisfied with the outcome?

2        THE PROSPECTIVE JUROR:  Yes.

3        THE COURT:  Now, what kind of charges were involved

4   in that case?

5        THE PROSPECTIVE JUROR:  Stabbing.

6        THE COURT:  And the last case you were involved in?

7        THE PROSPECTIVE JUROR:  It was someone who got hit

8   by a bus.  Again I was an alternate juror there.

9        THE COURT:  Now, did anything occur in your prior

10  jury service that might in any way influence your judgment in

11  this case?

12        THE PROSPECTIVE JUROR:  No.

13        THE COURT:  Could you set aside whatever you learned

14  in your prior jury service and decide this case based solely

15  on the evidence and instructions given to you at trial?

16        THE PROSPECTIVE JUROR:  Yes.

17        THE COURT:  Juror No. 9.

18        THE PROSPECTIVE JUROR:  I served on as an alternate

19  on a jury trial in Nassau County.

20        THE COURT:  Did you participate in the verdict?

21        THE PROSPECTIVE JUROR:  No.

22        THE COURT:  What kind of case was it?

23        THE PROSPECTIVE JUROR:  It was a criminal case

24  involving traffic violation.

25        THE COURT:  Did anything occur in that prior jury

1  service that might in any way influence your judgment in this

2  case?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  Could you set aside whatever you may

5  have learned and decide this case based solely on the evidence

6  and instructions given to you at trial?

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Juror No. 17.  And we have Juror No. 14.

9  We'll start with 14.

10          THE PROSPECTIVE JUROR:  Okay.  I just raised my

11  number because I didn't know you were referring to alternate

12  jurors.  About three years ago I was on a case as an alternate

13  juror, but I was dismissed right after they started the trial.

14          THE COURT:  What kind of case was it?

15          THE PROSPECTIVE JUROR:  It was a case involving

16  theft of some property at a work site.

17          THE COURT:  Did you hear any testimony?

18          THE PROSPECTIVE JUROR:  No, they dismissed the

19  alternates once they started the trial.

20          THE COURT:  Did anything happen in that limited jury

21  service that might in any way affect your judgment in this

22  case?

23          THE PROSPECTIVE JUROR:  No.

24          THE COURT:  Could you set aside whatever you may

25  have learned in that prior service and decide this case based

1   solely on the evidence and instructions given to you at trial?

2          THE PROSPECTIVE JUROR:  Wait, say that again.

3          THE COURT:  Could you set aside whatever you may

4   have learned in that case and decide this case based solely on

5   the evidence and instructions given to you at trial?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Juror No. 15.  Mr. Callier.

8          THE PROSPECTIVE JUROR: Yes.  I served as a juror in

9   a criminal case more than ten years ago.  It involved a

10  robbery.  We did reach a verdict.

11         THE COURT:  Were you satisfied with the outcome?

12         THE PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Did anything happen in that prior

14  service that might in any way influence your judgment in this

15  case?

16         THE PROSPECTIVE JUROR:  No.

17         THE COURT:  Could you set aside whatever you may

18  have learned in that prior service and decide this case based

19  solely on the evidence and instructions given to you at trial?

20         THE PROSPECTIVE JUROR: Yes he.

21         THE COURT:  Juror No. 17, Miss Vines.

22         THE PROSPECTIVE JUROR:  I served a little over three

23  years ago in an injury case.  The case involved a car

24  accident.

25         THE COURT:  Did the jury reach a verdict in that

1    case?

2              THE PROSPECTIVE JUROR: Yes.

3              THE COURT:  Were you satisfied with the outcome?

4              THE PROSPECTIVE JUROR:  Yes.

5              THE COURT:  You understand that in a civil case the

6    instructions of law regarding the burden of proof are very

7    different, and other instruction are very different, and in a

8    civil case the plaintiff generally has the burden of proving

9    its case by a preponderance of the evidence whereas in a

10   criminal case the burden is on the government to prove beyond

11   a reasonable doubt each element of the charge.  Do you

12   understand that?

13             THE PROSPECTIVE JUROR: Yes.

14             THE COURT:  Could you set aside whatever you may

15   have learned in your prior jury service and follow the

16   instructions given to you at trial?

17             THE PROSPECTIVE JUROR: Yes.

18             THE COURT:  Did anything happen in your prior

19   service that might influence your judgment in this case?

20             THE PROSPECTIVE JUROR:  No.

21             THE COURT:  Juror No. 20, Mr. Sullivan?

22             THE PROSPECTIVE JUROR: Actually, I haven't served as

23   a grand jury and juror, but I been called.  When I went there

24   the case was dismissed.

25             THE COURT:  So were you selected to sit on a jury?

1            THE PROSPECTIVE JUROR:  No.

2            THE COURT:  Juror No. 21, Ms. Ramdhan.

3            THE PROSPECTIVE JUROR:  Yes.  Ten years ago I

4    served.  It was an attempted robbery and rape case.

5            THE COURT:  Was there a verdict reached in that

6    case?

7            THE PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Were you satisfied with the outcome?

9            THE PROSPECTIVE JUROR: Yes.

10            THE COURT:  Did --

11            THE PROSPECTIVE JUROR:  Also three years ago I

12    served again.

13            THE COURT:  What kind of case?

14            THE PROSPECTIVE JUROR: A hit and run accident.

15            THE COURT:  Was there a verdict in that case?

16            THE PROSPECTIVE JUROR: They settled the case.

17            THE COURT:  Did anything happen in your prior jury

18    service that might in any way influence your judgment in this

19    case?

20            THE PROSPECTIVE JUROR:  No.

21            THE COURT:  Could you set aside whatever you may

22    have learned in your prior jury experience and decide this

23    case based solely on the evidence and instructions given to

24    you at trial?

25            THE PROSPECTIVE JUROR: Yes.

67

1          THE COURT:  Is that everybody?  All right.

2          Now, at the close of trial, Judge Sifton will give

3    you instructions about the laws applicable to this case.

4    Would any of you have any difficulty following Judge Sifton's

5    instructions and applying the law as instructed, even if you

6    disagree with it?

7          One of the instructions, as I've mentioned before,

8    is that the law presumes the defendant is innocent and this

9    presumption will stay with her unless the government presents

10   evidence in court that convinces you beyond a reasonable doubt

11   that the defendant is guilty.

12         Do any of you have any problems following such an

13   instruction?

14         Related to this concept is that the government has

15   the burden to prove a defendant's guilt and that burden never

16   shifts to a defendant.  In fact, a defendant does not need to

17   present any evidence at all.

18         Do any of you have any difficulty accepting this

19   principle of law?

20         Now, have any of you ever been involved in any other

21   court proceeding, whether as a party, witness, defendant or

22   any other capacity?

23         Have any of you -- number 8.

24         THE PROSPECTIVE JUROR:  Yes.

25         THE COURT:  And number 12 and 15.

1          Juror No. 8?

2          THE PROSPECTIVE JUROR:  It was just a hit and run.

3    I was a witness.

4          THE COURT:  Did you testify?

5          THE PROSPECTIVE JUROR:  Yes.

6          THE COURT:  At a deposition?

7          THE PROSPECTIVE JUROR: Yes.  I did.  In court.

8          THE COURT:  In court.  Okay.

9          Would that experience in any way affect your view in

10   this case or your ability to sit as a juror in this case?

11         THE PROSPECTIVE JUROR: No.

12         THE COURT:  Juror No. 12?

13         THE PROSPECTIVE JUROR:  I was in landlord tenants

14   court.  I was suing the tenant.  I was a little bit upset with

15   the result.

16         THE COURT:  Now, would your unhappiness with the

17   result in any way affect your ability to sit impartially as a

18   juror in this case?

19         THE PROSPECTIVE JUROR:  No.

20         THE COURT:  No?

21         THE PROSPECTIVE JUROR: No.

22         THE COURT:  Juror No. 15.

23         THE PROSPECTIVE JUROR:  I testified in a child abuse

24   case as a guidance counselor.

25         THE COURT:  Was that in a criminal prosecution or

1  Family Court?

2  THE PROSPECTIVE JUROR: Family Court.

3  THE COURT:  Would this experience in any way affect

4  your ability to sit impartially as a juror in this case?

5  THE PROSPECTIVE JUROR: No.

6  THE COURT:  Have any of you -- Juror No. 17?

7  THE PROSPECTIVE JUROR:  It was a criminal case.  It

8  was over ten years ago and a bunch of us had to testify.  I

9  don't really remember the details of it.

10  THE COURT:  Were you aware of the outcome of that

11  case?

12  THE PROSPECTIVE JUROR: I think they were prosecuted.

13  THE COURT:  Were you satisfied with the outcome?

14  THE PROSPECTIVE JUROR:  Yes.

15  THE COURT:  And would that experience in any way

16  affect your ability to sit impartially as a juror in this

17  case?

18  THE PROSPECTIVE JUROR: No.

19  THE COURT:  Have any of you or any members of your

20  immediate family served in the military?

21  7, 9, 17, 13, 21.

22  Juror No. 7.

23  THE PROSPECTIVE JUROR:  My father-in-law is a World

24  War II veteran.

25  THE COURT:  What was the highest rank he achieved?

1    THE PROSPECTIVE JUROR: I think he was an airman.

2    THE COURT:  So you don't know the rank?

3    THE PROSPECTIVE JUROR: I don't know the rank.

4    THE COURT:  Juror No. 9?

5    THE PROSPECTIVE JUROR:  I have one brother in the

6 Army and another brother in the Navy.

7    THE COURT:  Do you know what the highest rank they

8 reached was?

9    THE PROSPECTIVE JUROR: The one in the Navy was E-2,

10 I think.  I forget what the classification meant.  He was an

11 electrical engineer.

12    THE COURT:  The other one?

13    THE PROSPECTIVE JUROR: I don't remember.

14    THE COURT:  How long did they serve?

15    THE PROSPECTIVE JUROR:  The one in the Army was two

16 years, or 3 years and the one in the Navy was 7.

17    THE COURT:  Juror No. 13.

18    THE PROSPECTIVE JUROR:  My father was a sergeant in

19 the Army for four years -- -- my father was a sergeant in the

20 army.  He did eight years and then four years in the reserve.

21    THE COURT:  We have two more cards.  10, 11.

22    Juror No. 10?

23    THE PROSPECTIVE JUROR:  My father was in the naval

24 reserves from 1959 to 1963.  He got an honorable discharge.

25 Highest rank was chief petty officer.

1    THE COURT:  Juror No. 11?

2    THE PROSPECTIVE JUROR: My dad, World War II, but I

3  don't know rank, years, I honestly don't.  He didn't like to

4  talk about it so we never really questioned him about it.

5    THE COURT:  You didn't get any war stories?

6    THE PROSPECTIVE JUROR: No.

7    THE COURT:  Juror No. 17?

8    THE PROSPECTIVE JUROR: My father is a retired

9  colonel from the National Guard and my brother was an officer.

10  He also retired.

11    THE COURT:  Juror No. 21?

12    THE PROSPECTIVE JUROR: My nephew is in the Marines.

13    THE COURT:  In the Marines?

14    THE PROSPECTIVE JUROR: Yes.

15    THE COURT:  Do you know what rank?

16    THE PROSPECTIVE JUROR:  I'm not sure.

17    THE COURT:  Juror No. 25?

18    THE PROSPECTIVE JUROR: I have an uncle and two

19  cousins that are in the Navy and a step nephew that just

20  graduated from boot camp.

21    THE COURT:  Do you know the highest rank they

22  reached?

23    THE PROSPECTIVE JUROR: No.

24    THE COURT:  27.

25    THE PROSPECTIVE JUROR:  I've worked in the military

1  for three years in my native country of Romania.

2          THE COURT:  Did you become an officer?

3          THE PROSPECTIVE JUROR:  Yes, I graduated with the

4  rank of sergeant.

5          THE COURT:  Do any of you speak Spanish or any other

6  foreign language?

7          2, 5, 12, 20, 24, 27 and 18.

8          Juror No. 2.

9          THE PROSPECTIVE JUROR:  Portuguese.

10          THE COURT:  Number five?

11          THE PROSPECTIVE JUROR: Chinese.

12          THE COURT:  Juror No. 12?

13          THE PROSPECTIVE JUROR:  Russian, Polish, Hebrew,

14  Yiddish.

15          THE COURT:  Juror No. 20?

16          THE PROSPECTIVE JUROR: Albanian, Serbian, Croatian,

17  Montenegrin.

18          THE COURT:  Juror No. 24?

19          THE PROSPECTIVE JUROR:  Spanish.

20          THE COURT:  Juror No. 27?

21          THE PROSPECTIVE JUROR: Romanian, Hungarian and

22  Spanish, French.

23          THE COURT:  Have any of you traveled outside of this

24  country or were born in another country.

25          THE PROSPECTIVE JUROR:  Born or traveled?

73

1          THE COURT:  Born or traveled to a foreign country.

2          1, 2, 5, 7, 8, 9, 10, 11, 12, 13, 15, 16, 20, 21,

3    24, 25, 27, 18.

4          I'm going to ask you how often and where and when.

5          Juror No. 1?

6          THE PROSPECTIVE JUROR:  About 20 years ago, and

7    30 years ago, Israel, Venezuela, France, Italy, England.  I

8    believe that's it.

9          THE COURT:  Juror No. 2?

10         THE PROSPECTIVE JUROR:  I traveled to Brazil a

11   number of times.  I lived there for several years but I

12   haven't been there for 20 years.  I visit Canada at least once

13   a year.

14         THE COURT:  Juror No. 5?

15         THE PROSPECTIVE JUROR:  I been twice to Taiwan.

16         THE COURT:  You traveled there twice a year?

17         THE PROSPECTIVE JUROR:  No, twice through the three

18   years.

19         THE COURT:  Two times in the last three years?

20         THE PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Juror No. 7?

22         THE PROSPECTIVE JUROR:  I traveled to Aruba about

23   ten years ago, about five years ago to Aruba again, and Canada

24   in the last maybe four years.

25         THE COURT:  Number 8?

74

1          THE PROSPECTIVE JUROR:  A bunch of places.  London,

2   Ireland -- I mean England, Ireland, France, Spain, Cayman

3   Islands, Caribbean.  That's about it.

4          THE COURT:  How many times?

5          THE PROSPECTIVE JUROR:  France five times,

6   everywhere else just once.

7          THE COURT:  Juror No. 9?

8          THE PROSPECTIVE JUROR:  I have been to Mexico one

9   time and Canada maybe 5 or 6 times.

10         THE COURT:  Juror No. 10?

11         THE PROSPECTIVE JUROR:  England and Ireland 15 years

12  ago and in the last three years I have been to Canada twice.

13         THE COURT:  Juror No. 11?

14         THE PROSPECTIVE JUROR:  Canada about 7 years ago

15  growing up as a child yearly to visit relatives, and the West

16  Indies maybe twice within the last five years.

17         MS. HARRIS:  I'm having some trouble hearing.

18         THE COURT:  West Indies?

19         THE PROSPECTIVE JUROR:  St. Kit, Nevis.

20         THE COURT:  Twice?

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  In the last two years?

23         THE PROSPECTIVE JUROR:  Right.

24         MR. NATHANSON:  What was the first one?

25         THE PROSPECTIVE JUROR:  Canada like 7 years ago, and

1  growing up also.

2      THE COURT:  Juror No. 12?

3      THE PROSPECTIVE JUROR:  I was born in Russia, lived

4  in Poland and Israel, and I'm traveling to Israel almost twice

5  a year every year.

6      THE COURT:  Since coming to the United States?

7      THE PROSPECTIVE JUROR:  Right.

8      THE COURT:  Juror No. 13?

9      THE PROSPECTIVE JUROR: I have been to Belgium,

10  Germany, the Netherlands.  That was probably about 12 years

11  ago.  Eight years ago I was in the Philippines, Canada, Mexico

12  on and off.  I lived in Southern California.  And England two

13  years ago and spent 7 months in Ireland this year, just came

14  back in September.

15      THE COURT:  Juror No. 13?  Did you raise your hand?

16      THE PROSPECTIVE JUROR:  That was me.

17      THE COURT:  I'm sorry.  Juror No. 15, Mr. Callier?

18      THE PROSPECTIVE JUROR:  England, France, Canada,

19  England several times, my daughter was living in England.  One

20  time in France, one time in Canada -- no, several times in

21  Canada, but that was over a period of 15 years.

22      THE COURT:  16?

23      THE PROSPECTIVE JUROR:  England one time and

24  Bangladesh every other two years.

25      THE COURT:  Juror No. 18 -- 17?

76

1          THE PROSPECTIVE JUROR:  Puerto Rico six years ago
2     and Canada one year ago.
3          THE COURT:  Juror No. 18?
4          THE PROSPECTIVE JUROR:  I born in India and travel
5     for four years.  And Canada.  I was in Middle East.
6          THE COURT:  Juror No. 20?
7          THE PROSPECTIVE JUROR:  Mostly Montenegro.  I was
8     once a year Germany, Italy, France.
9          THE COURT:  Juror No. 21?
10          THE PROSPECTIVE JUROR:  I was born in Guyana and I
11     traveled to Guyana three times in the past six years.
12          THE COURT:  Juror No. 24?
13          THE PROSPECTIVE JUROR:  20 years ago El Salvador and
14     about eight years ago Mexico.
15          THE COURT:  25?
16          THE PROSPECTIVE JUROR:  Jamaica about 7 years ago,
17     Mexico a couple of times, including six months ago, Caribbean
18     six months ago and Scotland last year.
19          THE COURT:  27?
20          THE PROSPECTIVE JUROR: I've traveled extensively
21     throughout the Europe and some Asian countries.  My most
22     recent trip was to Canada last year.
23          THE COURT:  Do you have any other -- do any of you
24     have any problems with your sight or hearing or other
25     impairments that might interfere with your jury service?

1          Juror No. 2?

2          THE PROSPECTIVE JUROR:  I'm slightly hard of hearing

3  but I don't think it will interfere.  I have been able to hear

4  everything so far.

5          THE COURT:  If you can't hear would you have any

6  problems raising your hand and letting that be known?

7          THE PROSPECTIVE JUROR:  No.

8          THE COURT:  Okay.  If you're selected, we'll try to

9  make a note to ask that you sit as close to the witness and

10  the judge as possible.

11          Now, is there anything else in your life not

12  previously brought out which you think might affect your

13  ability to sit impartially as a juror in this case?

14          (Continued next page)

15

16

17

18

19

20

21

22

23

24

25

78

1          THE COURT:  (Continuing)

2          Would any of you have any difficulties setting aside

3     any sympathy -- sympathies or biases you may have in reaching

4     a verdict in this case?

5          Juror number 18?  Yes.  I will talk to you later.

6          Okay.  I am going to ask the attorneys to come to

7     side bar.

8          (Side bar.)

9          THE COURT:  Are there any follow-up questions before

10    I call up juror number 18 and excuse him?

11         Now we are going to --

12         MS. HARRIS:  16 might be holding up her card now.

13         THE COURT:  Okay.  I was a little concerned about

14    juror number five.  We will catch her in the individual

15    questioning.

16         MR. KAZEMI:  Language?

17         THE COURT:  Her ability to understand.

18         Okay.

19         (In open court.)

20         THE COURT:  Juror number 18 -- juror number 16?

21         THE PROSPECTIVE JUROR:  Can I come up?

22         THE COURT:  Come on up.

23         (Side bar.)

24         (Juror joins side bar.)

25         THE PROSPECTIVE JUROR:  Yes, ma'am.  I am Muslim.

1    Today our holiday.  If you please excuse me, so I can go.

2         THE COURT:  I am going to ask you to go down to the

3    central jury room and change your jury service to some other

4    time when it won't conflict with your holiday.  Okay?

5         THE PROSPECTIVE JUROR:  Okay.  I have also pick up

6    my daughter from school.  That's why I need to go.

7         THE COURT:  Okay.  Have you had any problems

8    understanding me?

9         THE PROSPECTIVE JUROR:  No.

10        THE COURT:  No.  Okay.

11        We are going to call downstairs and ask them to

12   reschedule you for jury service at a time when it is

13   convenient for you.

14        THE PROSPECTIVE JUROR:  All right.

15        THE COURT:  Okay.

16        THE PROSPECTIVE JUROR:  Thank you.

17        (Juror leaves side bar.)

18        THE COURT:  She is Muslim?  Ramadan is now?

19        MR. KAZEMI:  I should know.

20        THE COURT:  I have to look this up.  I know more

21   about Jewish holidays.  Now I am going to have to add Muslim

22   holidays on the list.

23        MR. KAZEMI:  Is it Ramadan?  No.

24        THE COURT:  The attorneys in my civil cases consult

25   me on what days they have to take off.

80

1          (In open court.)

2          THE COURT:  Juror number 18.

3          (Side bar.)

4          (Juror joins side bar.)

5          THE COURT:  Mr. Kunjummen, I am not terribly

6     impressed with your answers.  I will excuse you but you will

7     go into the wheel for another jury selection.  You might be

8     selected for a grand jury and you will not be able to get off

9     of the grand jury service the way you have tried to get off

10    today.

11          Anyway, you clearly are not interested in serving in

12    this selection.  It is probably the easiest jury service you

13    could hope for because we are dealing with only a few days.

14    It is not fair to the parties here that you are so unwilling

15    to serve.

16          I am going to ask you to go down to the central jury

17    room and report downstairs.  They will tell you what you have

18    to do next.

19          THE PROSPECTIVE JUROR:  Okay.

20          (Juror leaves side bar.)

21          THE COURT:  Let me make one suggestion then.

22          It is taking a little longer than I expected.  I

23    will go through the questioning of the individual jurors and

24    then I think that's probably a good time to break for lunch.

25    Then we will come back and finish up and seat the remaining

GR      OCR      CM      CRR      CSR

1  jurors in the box.

2          MS. HARRIS:  All right.

3          MR. KAZEMI:  Yes.

4          THE COURT:  Let me know if you have any follow-up

5  questions.  If you don't, then -- I will ask you at the end of

6  the questioning of the individual jurors if you have -- if you

7  need to meet with me at side bar.  If you don't, then I will

8  break for lunch.

9          MS. HARRIS:  Thank you.

10         MR. KAZEMI:  Thank you.

11         (In open court.)

12         THE COURT:  We are through with the general

13 questions  addressed to all of you.

14         Now I would like to learn a little more about each

15 one of you.

16         As you probably noticed, on the back of your sheets

17 with your juror numbers there is a questionnaire.  All of you

18 will be asked these questions on the questionnaire, so feel

19 free to answer the questions without prompting from me.  I

20 won't be insulted.

21         Juror number one, Ms. Wallach.

22         THE PROSPECTIVE JUROR:  I live in Merrick, Nassau

23 County.

24         I have been there for 23 years.

25         I have a marketing degree -- business degree,

1    marketing major, from the University of Miami.

2             I do not work.

3             THE COURT:  Have you ever worked?

4             THE PROSPECTIVE JUROR:  Yes.

5             I was in advertising many years ago, and real

6    estate.

7             THE COURT:  How long ago?

8             THE PROSPECTIVE JUROR:  Over 20 years ago.

9             THE COURT:  All right.  How long did you work?

10            THE PROSPECTIVE JUROR:  I was in advertising for

11   about three years; in real estate for two.

12            I am not married.

13            I have two children.  My oldest daughter is at

14   Brooklyn Law, second year.  My youngest is a senior at

15   Hofstra.

16            I live with my daughter.

17            What magazines?  Town and Country, New York

18   Magazine, Vogue, Bazaar, People.

19            I get the New York Times.

20            I am on the Internet, AOL.

21            I watch all the TV stations, two, four, seven,

22   thirteen, twenty-four.

23            THE COURT:  You are a channel surfer?

24            THE PROSPECTIVE JUROR:  Yes.

25            THE COURT:  Okay.

83

1          THE PROSPECTIVE JUROR:  I go to the gym.

2          Yes, I would be fair.

3          THE COURT:  Juror number two, Mr. Kurtz.

4          THE PROSPECTIVE JUROR:  Okay.  I live in Brooklyn,

5  East Midwood.

6          I have lived there for 20 years.

7          My highest formal degree is BA in economics.

8          I have extensive data processing certificates.

9          No formal degree other than ordination.  I study

10  Taldum and related subject for about 14 years.

11          Currently employed as a data processing manager for

12  the Long Island Rail Road.

13          Prior to that, I was a -- briefly a programmer for

14  the Long Island Rail Road.  Before that I was a consultant,

15  data processing, for about 20 years at -- 14 of them at Long

16  Island Rail Road.

17          THE COURT:  How long have you held your current job?

18          THE PROSPECTIVE JUROR:  My current job?

19  Technically, since September.

20          THE COURT:  Okay.

21          THE PROSPECTIVE JUROR:  This year.

22          THE COURT:  How long have you worked for this

23  particular employer?

24          THE PROSPECTIVE JUROR:  I have been at the Long

25  Island Rail Road for about 15 years.

84

1           THE COURT:  Okay.

2           THE PROSPECTIVE JUROR:  In some capacity.

3           THE COURT:  Okay.

4           THE PROSPECTIVE JUROR:  I am married.

5           My wife is library chair at a yeshiva, yeshiva

6   Flatbush.

7           We have six children.  The oldest is 17.  They are

8   all students.

9           Most of my reading is in Talmud law.

10          My sources of news is New York Times, the Internet.

11  Most of the Yahoo, Fox, CNN, Jerusalem Post.

12          Most of my -- most of my activities outside the

13  house is involved in community, synagogue, et cetera.

14          I feel I could be fair and impartial in rendering a

15  verdict.

16          THE COURT:  Juror number three, Ms. Jacobs?

17          THE PROSPECTIVE JUROR:  I live in Brooklyn.  I have

18  been there for six years.

19          THE COURT:  What part of Brooklyn?

20          THE PROSPECTIVE JUROR:  East New York.

21          THE COURT:  Okay.

22          THE PROSPECTIVE JUROR:  Before then I was in Queens,

23  Queens Village.

24          I have a high school diploma, some college.

25          I am currently employed with the New York City

1   Housing Authority, 23 years.

2          THE COURT:  What's your job title?

3          THE PROSPECTIVE JUROR:  Secretary.

4          I am not married, no children.

5          Magazines?  Essence; any kind of magazine that's

6   entertaining.  Mystery books, Sci fi.

7          Television?  Radio?  1010, TV, ABC News.

8          THE COURT:  So you get the news from television?

9          THE PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Okay.

11         THE PROSPECTIVE JUROR:  Channel five sometimes.

12         Spare time?  Plays, movies handball, horseback

13  riding when I can.

14         Yes, I can be fair and impartial.

15         THE COURT:  Where do you go horseback riding?

16         THE PROSPECTIVE JUROR:  Van Cortlandt, it's in the

17  Bronx.

18         THE COURT:  Juror number four, Ms. Tavolacci?

19         THE PROSPECTIVE JUROR:  I live in Farmingdale.

20         I have lived there for 20 plus years.

21         I have a masters degree in education, in school

22  counseling.

23         I am currently employed as a school guidance

24  counselor in middle school in Nassau County.  I have been

25  there for seven years.

86

1          Prior to that, I was a teacher's assistant in a
2    school for special needs children.

3          I am not married.

4          I do not have children.

5          My father lives at my home with me, in Farmingdale.

6          In terms of magazines or books?

7          THE COURT:  What kind of work does your father do?

8          THE PROSPECTIVE JUROR:  He retired.  He did drive an
9    oil truck.

10         Magazines and books?  I am not a big reader.  I am
11   reading Barack Obama's book right now.

12         In magazines, for entertainment purposes.

13         As far as the news, I usually get my news from
14   television, MSNBC, NBC, and on line.

15         In terms of my spare time, I also coach in the
16   district that I work in.

17         THE COURT:  What do you coach?

18         THE PROSPECTIVE JUROR:  Cheerleading.

19         THE COURT:  Okay.

20         THE PROSPECTIVE JUROR:  And I feel I could be fair.

21         THE COURT:  Juror number five, Ms. Huang?

22         THE PROSPECTIVE JUROR:  I am living on Queens.

23         THE COURT:  What part of Queens?

24         THE PROSPECTIVE JUROR:  Five years.

25         THE COURT:  What part of Queens?

87

1          THE PROSPECTIVE JUROR:  Fresh Meadow.

2          THE COURT:  Okay.

3          THE PROSPECTIVE JUROR:  And I have a bachelor

4    degree, hospitality.  I work in the restaurant.

5          THE COURT:  How long have you worked at the

6    restaurant?

7          THE PROSPECTIVE JUROR:  Six year.

8          THE COURT:  Okay.  Where did you work before?

9          THE PROSPECTIVE JUROR:  Pardon?

10         THE COURT:  Where did you work before?  What other

11   job did you have in the last ten years?

12         THE PROSPECTIVE JUROR:  Restaurant.

13         THE COURT:  Different restaurant for the last ten

14   years?

15         THE PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Where did you live before your current

17   residence in Queens?

18         THE PROSPECTIVE JUROR:  Brooklyn.

19         THE COURT:  Okay.  What part of Brooklyn did you

20   live?

21         THE PROSPECTIVE JUROR:  Kings Highway.

22         THE COURT:  How long did you live there?

23         THE PROSPECTIVE JUROR:  Five years.

24         I am married, no kids.

25         Usually I read magazine cookbook.

1          THE COURT:  What kind of work does your husband do?

2          THE PROSPECTIVE JUROR:  Restaurant.

3          THE COURT:  Okay.  Is he a cook or manager?

4          THE PROSPECTIVE JUROR:  Server.

5          THE COURT:  He is a server too.

6          Magazines or books?

7          THE PROSPECTIVE JUROR:  I have free time I watch TV

8 and the news from the TV, yes.  Channel Seven.

9          THE COURT:  Channel Seven.  You get your news from

10 Channel Seven?

11          THE PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Any magazines or books you like to read?

13          THE PROSPECTIVE JUROR:  Usually cookbook.  About

14 food, yes.

15          THE COURT:  Okay.  Do you watch the Food Network?

16          THE PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Could you be fair and impartial?

18          THE PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Juror number six, Ms. Croke?

20          THE PROSPECTIVE JUROR:  Yes.

21          I live in Staten Island.

22          I have lived there for a little over two years.

23 Prior to that I lived in Brooklyn.

24          I have a high school education.

25          I am currently employed in a law firm, and I do the

1  training of secretaries and I manage the word processing

2  department.

3          I have been there for a little over 26 years.

4          I am married.

5          My husband is retired.  He was in construction.

6          I have two grown children, one who works as a

7  paralegal, a real estate paralegal, and another who is a stay

8  at home mom.

9          My husband lives with me.

10         I read Time Magazine.  I like -- I don't know --

11  various books, mysteries, love -- you know, love stories.

12         I watch the news, like Channel One, Channel Seven,

13  Channel Eleven, and I listen to 1010 news.

14         I like to crochet and spend time with my

15  grandchildren.

16         I think I could be fair and impartial in reaching a

17  verdict.

18              THE COURT:  Okay.  Juror number seven, Mr. Diedrich?

19              THE PROSPECTIVE JUROR:  Yes.

20         I live in the Town of Hampton Bays.  We have been

21  there for about a year and a half.  Before that we lived

22  Massapequa, for 25 years.

23         I have a high school diploma.

24         I was -- I just recently retired from Con Edison

25  after 40 years.  I am working in a supermarket part-time out

1   in Hampton Bays.

2           THE COURT:  What was your last job title at Con Ed?

3           THE PROSPECTIVE JUROR:  Senior electrical

4   technician.

5           THE COURT:  Okay.

6           THE PROSPECTIVE JUROR:  I am married.  We have seven

7   children.

8           THE COURT:  Does your wife work?

9           THE PROSPECTIVE JUROR:  Yes.

10          My wife is a registered nurse.  She is at East End

11  Hospice out in Hampton Bays.  She worked in the OR for many

12  years at the North Shore Hospital.

13          We have seven children, yes.

14          I have two daughters, two married daughters, school

15  teachers, one high school, one grammar school.

16          I have a younger son, an engineer, and I have

17  another one is a private contractor.  He is not doing too well

18  now.  And I have John, my son, he's a computer technician --

19  computer engineer.

20          THE COURT:  Okay.  Following in your footsteps.

21          THE PROSPECTIVE JUROR:  Books and magazines?  I do

22  read my bible every day and I do read different books and I

23  get most of my -- I guess from channel -- Channel Four, Good

24  Day New York.  My wife likes to watch that.

25          Spare time, I started volunteering for East End

1   Hospice where my wife works and I take care -- you know,

2   visiting the kids, the grandkids and going to the beach.  We

3   are close to the beach now.  We like the beach.

4           I could be fair and impartial.

5           THE COURT:  Thank you.

6           Ms. Duff, juror number eight?

7           THE PROSPECTIVE JUROR:  I live in Queens.  I have

8   been there for 14 years.

9           THE COURT:  What part of Queens?

10          THE PROSPECTIVE JUROR:  Astoria.

11          I have a bachelors, fine arts, from -- and

12  illustration.

13          I am not currently employed.

14          But I have been products designer and a graphic

15  artist for the past 15 years.

16          THE COURT:  For what kind of company?

17          THE PROSPECTIVE JUROR:  The last company is a

18  seasonal giftware company.

19          THE COURT:  How long did you hold that position?

20          THE PROSPECTIVE JUROR:  That one was

21  three-and-a-half.

22          I worked at a company before that, five-and-a-half.

23  The company before that was five.

24          THE COURT:  What kind of companies?

25          THE PROSPECTIVE JUROR:  I worked for the graphic art

1   and design for a costume company.  Before that, children's

2   accessory company.

3           I am not married.

4           I have no children.

5           I live alone.

6           I read various magazines and I like fiction and

7   non-fiction as well.

8           I read the newspaper every day and I get my online

9   news like New York Times and Washington Post, CNN.

10          I watch the political shows on Channel Four on

11  Sunday.

12          My spare time, I paint and I like to travel.

13          And eat and I can be perfectly partial -- impartial.

14  Impartial.  I need coffee.

15          THE COURT:  We will let you deal with that issue

16  very shortly.

17          Juror number nine, Mr. Veny?

18          THE PROSPECTIVE JUROR:  I lived in the Town of

19  Hempstead for the last 30 years.

20          My education is I have a bachelors of science in

21  mathematics.

22          I have a masters of science in education.

23          Currently I am employed by the Board of Education of

24  New York City, where I teach high school mathematics.

25          As far as my job history is concerned, I had one job

1    for in excess of 11 years as a customs broker, licensed by the

2    Treasury Department.

3             THE COURT:  How long ago was that?

4             THE PROSPECTIVE JUROR:  That had to be about 16,

5    17 years ago.

6             THE COURT:  All right.

7             THE PROSPECTIVE JUROR:  I am married.  I have two

8    children.

9             THE COURT:  Does your wife work?

10           THE PROSPECTIVE JUROR:  Yes.

11         She works for the Romance Language Department as an

12    assistant to the chairperson at Hofstra University.

13         My two children, I had mentioned previously that one

14    is an attorney and the other one is a professional drummer.

15         My wife and I are now empty-nesters.

16         As far as books are concerned, I enjoy reading

17    mysteries.

18         I get my news from New York Times on line, from News

19    12, Newsday, so forth.

20         In my spare time, if I am not fixing the house, I

21    might be at the gym playing basketball.

22         I can be a fair and impartial person.

23         THE COURT:  Juror number ten, Mr. Randazzo.

24         THE PROSPECTIVE JUROR:  I live in Mineola, Long

25    Island for eight years.

94

1          Prior to that, I was in Queens Village for two

2   years.

3          I have a bachelors of science in accounting.

4          I currently am employed.  I have been there for

5   eight months.

6          Previous to that, I was with a real estate

7   developer.  Prior to that, I was with a public accounting

8   firm.

9          I am married.

10         My wife doesn't work.

11         I have four children.

12         Nobody else lives in my house.

13         Books and magazines, I mostly read professional

14  publications.  For pleasure reading, I read science fiction

15  and other fiction.

16         My primary source of news is the Wall Street Journal

17  and the Internet.

18         My spare time, I am involved with Cub Scouting and I

19  coach soccer.

20         And I could be fair and impartial.

21         THE COURT:  Juror number 11, Ms. Kappel?

22         THE PROSPECTIVE JUROR:  Yes.

23         I live in Queens, Queens Village, for the last eight

24  years.  Prior to that, in Bayside all the other years.

25         I have a BA in speech and hearing science.  That's a

1   BA and a masters in special education.

2          I have been employed with the Board of Ed as a

3   special therapist for 26 years.

4          I'm divorced, 11 years divorced.

5          I have one living son now.  I had two children.  My

6   daughter passed away five years ago with cancer.  She was 18

7   when she passed.  I am left with my son.  He is 16.  He lives

8   with me.

9          Magazines and books?  A lot of teachers' magazines

10  and the newspapers and inspirational books.

11         I watch basically Channel Five and CNN.

12         I listen to 1010 WINS also.

13         In my spare time I like to cook, bake, do a lot of

14  baking and working out, some exercise tapes and then taking my

15  son to movies and just trying to do recreational things with

16  my son.

17         And yes, I can be fair and impartial.

18         THE COURT:  Do you know what kind of work your

19  ex-husband engaged in?

20         THE PROSPECTIVE JUROR:  He is a technical engineer,

21  something, yes.  He works in electronic field.

22         THE COURT:  Juror number 12, Ms. Gurt?

23         THE PROSPECTIVE JUROR:  I live in Midwood, Brooklyn.

24         I am there 37 years.

25         I don't have much formal schooling, only nine

96

1   grades.

2          I never worked.  I was a housewife all the years

3   that I have been married.

4          I have three children, which live in Israel.  They

5   are married.

6          My daughter, she writing children books in Israel

7   and Hebrew.  My son, my older son he is a contractor, and my

8   middle child is perpetual student in Hebrew and Torah.

9          THE COURT:  What kind of work does your husband

10  engage in?

11         THE PROSPECTIVE JUROR:  I am a widow.  My husband

12  was a factory.  He worked in a factory, making caps.

13         I get my news from radio.  I usually listen to

14  Bloomberg and 1010 WINS.

15         I like to read science fiction, mysteries.  Anything

16  that is in print, I get hands-on it.

17         Okay.  Spare time?  I like gardening, cooking and

18  baking.

19         I could be fair and impartial in rendering a

20  verdict.

21         THE COURT:  Thank you.

22         Juror number 13, Ms. Dowling?

23         THE PROSPECTIVE JUROR:  I live in Stapleton, Staten

24  Island.

25         I have lived there for three-and-a-half years.

GR      OCR      CM      CRR      CSR

1          Before that I lived in Riverside, California.

2          Currently I am not employed.  I am job hunting.

3    So --

4          Prior to this I was a building inspector.  I had

5    taken time off to return to school to get the degree.

6          I am not married.

7          I do not --

8          THE COURT:  How long did you hold the position as a

9    building inspector?

10         THE PROSPECTIVE JUROR:  Three years.

11         THE COURT:  For the city?

12         THE PROSPECTIVE JUROR:  I worked as a contract

13   inspector, mainly I worked for the City of Moreno Valley but I

14   worked for several municipalities during that timeframe.

15         THE COURT:  How long ago was that?

16         THE PROSPECTIVE JUROR:  Three years ago.

17         THE COURT:  So you were -- you recently stopped?

18         THE PROSPECTIVE JUROR:  Yes, because I returned here

19   to take some classes.

20         THE COURT:  Before that?

21         THE PROSPECTIVE JUROR:  Before that?  I worked for a

22   warehouse for 17 years.

23         THE COURT:  What did you do?

24         THE PROSPECTIVE JUROR:  I was assistant warehouse

25   manager.  It was a building supply warehouse.

98

1          Okay.  No, I don't have any children.

2          What magazines and books I read tend to be more

3   technical.

4          THE COURT:  Are you married?

5          THE PROSPECTIVE JUROR:  No, I am not.

6          THE COURT:  Okay.  When you say technical books?

7          THE PROSPECTIVE JUROR:  Dealing with codes and

8   specifications and new types of construction.

9          And then for levity it will be a trashy romance

10  novel.

11         For news, CNN and the BBC.

12         Spare time, I make jewelry and stained glass.

13         Could you be fair?  I could be fair and impartial.

14         THE COURT:  Okay.  Do you sell your works?

15         THE PROSPECTIVE JUROR:  Yes, I do.

16         THE COURT:  Okay.  At fares?

17         THE PROSPECTIVE JUROR:  Yes.  Online and with

18  friends, networks.

19         THE COURT:  So you have your own website?

20         THE PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Okay.  Good.  I am impressed.

22         Juror number 13 -- no.  14, Ms. Walton?

23         THE PROSPECTIVE JUROR:  Okay.  I currently live in

24  Manhattan.

25         THE COURT:  Manhattan?

1          THE PROSPECTIVE JUROR:  I have been here --

2          THE COURT:  Manhattan, New York?

3          THE PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Across the river?

5          THE PROSPECTIVE JUROR:  Well, not quite.  I am in

6  Harlem.

7          THE COURT:  Okay.

8          THE PROSPECTIVE JUROR:  I am in the West Side in

9  Harlem.

10          THE COURT:  Thank you for responding to our call.

11  But you are not a member of this district anymore.

12          THE PROSPECTIVE JUROR:  Oh, I am not?

13          THE COURT:  No.  We will send your name right

14  over --

15          THE PROSPECTIVE JUROR:  I was living in Queens.  So

16  then I -- I moved from Queens to Manhattan.

17          THE COURT:  Okay.

18          THE PROSPECTIVE JUROR:  So then I don't have to -- I

19  could go?  Oh, wow.

20          THE COURT:  Come on up and talk to Ms. Park.  She

21  will ask you to report downstairs to the central jury room.

22  We will send your name right over to the Southern District of

23  New York.

24          THE PROSPECTIVE JUROR:  Oh, God.

25          THE COURT:  Juror number 15?

1          THE PROSPECTIVE JUROR:  Yes.  I want --

2          THE COURT:  Wait one second, please.  I'm sorry.  I

3    am jumping the gun.

4          (Pause.)

5          THE PROSPECTIVE JUROR:  I live in Cambria Heights,

6    Queens.

7          I have been living there for over 30 years.

8          I have two masters degrees, one in guidance and

9    counseling.  The other in health and physical education.

10          I am retired from the Board of Education after

11    working 37 years.

12          THE COURT:  How long have you been retired?

13          THE PROSPECTIVE JUROR:  Since 2003.

14          Married.  My wife is a teacher in District 20 --

15    District 20, I believe, in Queens.

16          THE COURT:  What does she teach?

17          THE PROSPECTIVE JUROR:  Elementary education.

18          I have three children.  Oldest child is also a

19    teacher, after being a headmaster in England.  Then she came

20    back to America where she is now teaching in Nevada.

21          My youngest child -- I have two daughters and a son.

22    My youngest child is working for Citicorp.  My son is -- he

23    was unemployed briefly because he worked for Geico and

24    Allstate and so forth and so on, but he's -- hopefully he's

25    getting a job today, as a matter of fact, as I speak.  He is

1    going to his job.  This is his first day.

2              THE COURT:  What kind of work does your son do and

3    also your --

4              THE PROSPECTIVE JUROR:  My son was a claims analyst.

5              THE COURT:  And the youngest child at Citigroup?

6              THE PROSPECTIVE JUROR:  My daughter, my oldest

7    daughter.

8              THE COURT:  No.  The one at Citicorp?

9              THE PROSPECTIVE JUROR:  Citicorp?  Yes.  She -- she

10   has an MBA.  She worked not as a trader but, you know, she

11   worked in that --

12             THE COURT:  In the financial end?

13             THE PROSPECTIVE JUROR:  Financial, yes.

14             THE COURT:  Okay.

15             THE PROSPECTIVE JUROR:  No one else besides my wife

16   and my kids are -- two of them are married.  They are out of

17   the house, all three of them.

18             What magazines and books?  I like to write poetry,

19   more than reading books.

20             My book of poems is being published by Vanders

21   Press, titled God Lives II.  Three of the poems are made into

22   CDs.  One I'm selling.  One of the poems from the CD, The

23   Light of the World, is what I am currently selling.  The other

24   two, one just came out.  One is -- they haven't made the CD

25   yet.  It's about ready to be made.

1           What you like to do in your spare time?  I like to

2    watch two shows on TV, Gunsmoke and Bonanza.  I try to make it

3    back at 2:00 o'clock to watch those shows because they are

4    great, as far as I am concerned.

5           I also read the Times online.

6           And could you be fair and impartial?  Yes.

7           THE COURT:  Juror number 17?

8           THE PROSPECTIVE JUROR:  Okay.  I live on Staten

9    Island.  I was born there.  So I have lived at my current

10   residence for almost 19 years.

11          I have a bachelors in English, minor in education.

12   I am currently working on my masters in education.

13          I am a New York City public schoolteacher.  I teach

14   eighth grade language arts.

15          I have been doing that for eight years at that

16   public school.  Before that I worked at private school.

17          I am married.  My husband is an elevator mechanic.

18          I have two children.  I have a two-year old.  I

19   have -- and I have a junior in high school.

20          I also have a stepdaughter who is attending William

21   and Mary.

22          Nobody else lives with me.

23          I don't really read any magazines.  I read fiction

24   all the time.

25          I read the Staten Island Advance, New York Times

103

1    online, listen to 1010 WINS.

2              In my spare time, like to cook or spend time with

3    family.

4              And yes, I can be fair and impartial.

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:   Juror No. 20, Mr. Sullivan.

2          THE PROSPECTIVE JUROR:   I live in Staten Island.

3    I've been there for eight years.   I have A high school

4    diploma.   Right now I I just work as a real estate broker.

5          THE COURT:   Where did you live before you lived in

6    Staten Island?

7          THE PROSPECTIVE JUROR:   I lived in the Bronx five

8    years.

9          THE COURT:   All right.

10         THE PROSPECTIVE JUROR:   I work for a real estate

11   broker.   I'm a real estate broker in Staten Island and I have

12   been there for like eight years -- actually, seven years now.

13         I'm married, live with my wife.   She works for a law

14   firm.   She been there working for three years.   Her job was

15   real estate secretary.

16         I don't have any children.   I read sometimes

17   magazines, read Staten Island Advance, New York Times, watch

18   TV, you know, news, sports.   My spare time mostly play soccer.

19   I can be fair.

20         THE COURT:   Juror No. 21, Ms. Ramdhan.

21         THE PROSPECTIVE JUROR:   I live in Ozone Park,

22   Queens.   I've lived there for the past 13 years.   I have a

23   high school diploma.   I work for the Queens library.   I have

24   been there for the past 14 years as a customer service

25   representative.

1          I'm married.  I don't have any children.

2          THE COURT:  What kind of work does your husband do?

3          THE PROSPECTIVE JUROR:  My husband is a graphics

4    designer in the sign industry.

5          Magazines.  I like reading the National Geographic.

6    For news, mostly CNN.  Spare time, I do have a jewelry

7    business.  I think I can be fair and impartial.

8          THE COURT:  Do you have any doubts about that?

9          THE PROSPECTIVE JUROR:  No.

10          THE COURT:  Juror No. 23, Mr. Hogan.

11          THE PROSPECTIVE JUROR:  I currently live in New Hyde

12    Park.  I lived there since January.  Before that I was in

13    Middle Island four years and then Smithtown for about 18.

14          I have a bachelor's degree in phys ed, a master's

15    degree in education.  I'm currently employed in Hauppauge

16    School District and I'm a coach there.  This is my third year

17    there.

18          THE COURT:  What do you coach?

19          THE PROSPECTIVE JUROR:  Basketball, soccer,

20    baseball.  I don't have much of a life.

21          THE COURT:  You love basketball, soccer and

22    baseball?

23          THE PROSPECTIVE JUROR:  Yes.  I'm married.  My wife

24    is a pediatric oncologist in the city.  I have a

25    three-year-old, and they all live with me so far.

1              Magazines that I read?  I just read really sports

2      novels.  TV shows, newspapers, anything that's on ESPN.  Spare

3      time I spend it with my daughter and I would be impartial.

4              THE COURT:  Juror No. 24, Miss Valeo.

5              THE PROSPECTIVE JUROR:  I've lived in Bellmore for

6      over 20 years.  I have a high school degree and I am in

7      internet listing.

8              I currently work for North Shore LIJ.  Previously I

9      was in retail for about seven years.  I was operations manager

10     for Best Buy and Sears.

11             THE COURT:  How long have you worked for LIJ?

12             THE PROSPECTIVE JUROR:  It will be two years.  Not

13     married.  I have no children.  My parents -- I live with my

14     parents and my brother.  My mom works for the town of

15     Hempstead.  My dad is retired.  He used to work for a tomato

16     company as a manager.

17             THE COURT:  The company grows tomatoes?

18             THE PROSPECTIVE JUROR:  Yeah, they used to like

19     distribute tomatoes and stuff.  My brother, younger brother is

20     unemployed.  Magazines, In Touch.  Books, like all different

21     types from religious to nonfiction, fiction.

22             TV, all different types of movies.  Channel 12 News.

23     I read The Post and New York Daily News.  Spare time.  I like

24     to bake.  I travel.  And I could be fair and impartial.

25             THE COURT:  Juror No. 25, Miss Aurora.

1          THE PROSPECTIVE JUROR:  I live in Staten Island.

2    I've lived there for over 25 years.  I have my associate's

3    degree in marketing.

4          I'm currently employed with a hedge fund company.  I

5    have been there for about three and a half years in the

6    accounting department.  Before that I worked for a Japanese

7    bank for over seven years in an accounting department.

8          I am currently married.  My husband is an elevator

9    and escalator mechanic.  I don't have any children.  I read

10   any type of magazines, mystery and romance novels.

11         I usually watch Channel 4 News.  I read the Staten

12   Island Advance.  I'm all over the Internet, and I'm a channel

13   surfer.  In the spare time its usually sports or spending time

14   with my family and I can be fair and impartial.

15         THE COURT:  Juror No. 27, Ms. Timis-Kuhnle.

16         THE PROSPECTIVE JUROR:  I've lived in Shoreham, New

17   York, Suffolk County for the past 16 years.

18         Prior to that I was residing in Europe.  I have a

19   bachelor's degree in physical education and a master's degree

20   in education.

21         I am currently employed in the East Port South Manor

22   School District.  I am an English as a second language

23   teacher.  I have been there for seven years.  Prior to that I

24   was employed in the Rocky Point School District for five

25   years.

1      I am married.  I have two children, 10 and 9.  My

2  husband is a stay-at-home-dad.  I enjoy reading professional

3  related magazines and books.  I get my news from BBC mainly,

4  sometimes CNN.

5           THE COURT:  Online --

6           THE PROSPECTIVE JUROR:  And online, yes.

7      I have very little spare time; however, I like to

8  travel and I enjoy skiing and skating.  The answer to number

9  12 is yes.

10          THE COURT:  Do the attorneys want to meet with me at

11 sidebar?

12          Come up.

13          (Sidebar.)

14          MS. HARRIS:  I wanted to ask a follow-up question of

15 Juror No. 9.  His job is a customs broker.  There is a customs

16 border patrol officer who will be testifying.

17          THE COURT:  Customs broker, that has nothing to do

18 with that.  They check the papers to go through Customs.  I'll

19 ask him to explain.

20          Anything else? .  Any challenges for cause?

21          MS. HARRIS:  No.  We did 18.

22          THE COURT:  After we get the explanation then we'll

23 excuse the jurors for lunch and ask them to come back maybe at

24 about five of two so we can begin at two.

25          MS. HARRIS:  We're going to replace the seats?

1       THE COURT:  I'll go over that with you later after I

2   excuse them.

3       (Open court.)

4       THE COURT:  Juror No. 9, I know what a customs

5   broker does, but could you explain to the attorneys what

6   customs brokers do.

7       THE PROSPECTIVE JUROR:  Sure.  Metropolitan New York

8   is the major port in the United States of America.  A customs

9   broker is licensed by the US Treasury department to represent

10  importers who want to bring goods into the United States.

11      They can counsel them as to classification and the

12  harmonized tariffs.  They can also represent them with the

13  Food and Drug Administration and also let them know all the

14  requirements that is needed to bring goods into the United

15  States.

16      Some people just bring goods in and think they can

17  get it automatically.  It doesn't work that way.  They have to

18  know the rules and regulations.

19      The other thing that the broker does is to resolve

20  some disputes as far as valuation is concerned on those items

21  that are being imported.  The customs broker represents people

22  from all over the world.

23      THE COURT:  Thank you.  Now, this will conclude our

24  questioning of those of you sitting in the jury box.  It seems

25  to be a good time to break for lunch.

1        I'm going to excuse all of you and ask you to report

2   downstairs to the Central Jury Room at 5 minutes before

3   2 o'clock.  So I'm giving you a little more than an hour to go

4   out to lunch.

5        I'd like you to try and be prompt so we can begin

6   promptly at 2 o'clock and finish up.  I expect the next phase

7   of jury selection to go a little more quickly since all of you

8   sitting in the back have been attentive and have knowledge of

9   all the questions and perhaps have even formulated some of

10  your answers.

11       Remember what I have said about not talking to each

12  other about this case or acquiring any knowledge about this

13  case except in this courtroom.  So if you see any of the

14  attorneys and they don't want to talk to you, that's good

15  because they are following the court's instructions not to

16  have any contact with you.

17       A VOICE:  What time?

18       THE COURT:  Go downstairs at 1:55, and at 2:00 okay

19  I'd like to start promptly in here.  Go down to the Central

20  Jury Room and then come back up.

21       I just want to make clear so there is no confusion.

22  You should report to the Central Jury Room on the second floor

23  where you reported this morning.  Once you are all assembled,

24  we will bring you upstairs to this courtroom.  So enjoy your

25  lunch.

1          There is a cafeteria on the third floor and lots of

2    places around the courthouse where you can catch a quick bite.

3          (Prospective jurors leave.)

4          THE COURT:  What we're going to do is seat jurors

5    number 28 through 54 in the jury box.  We may even not need to

6    seat so many.  Right now we have 21 qualified jurors, so we

7    need another 11.  It might just be easier to seat the 27 and

8    go through all the questions again and then I will have my law

9    clerk lay the numbers for the three rows of jurors that we

10   have in the back so they will stay in the same order that they

11   are sitting in right now.

12         Do you have any questions?

13         MS. HARRIS:  No.

14         THE COURT:  All right.  Have a good lunch.

15         (Luncheon recess.)

16

17

18

19

20

21

22

23

24

25

1          (The following occurred in the absence of the

2    prospective jurors.)

3          THE COURT:  Just to make it clear, since you were

4    just asking me, Ms. Harris, about the alternates.  I

5    understand Judge Sifton would like two alternates.  So you

6    each get one peremptory challenge.  I will begin with the

7    government.  No.  With the defendant and then the government,

8    proceeding in our alternating fashion as to who goes first in

9    exercising the challenge.

10          Ask the first twenty-seven jurors to come in first.

11          THE CLERK:  Yes, Your Honor.

12          (Prospective jurors now all present.)

13          THE COURT:  You may all be seated.

14          Good afternoon, everybody.

15          We are going to resume jury selection and I am going

16    to call up jurors number 28 through 54.

17          Juror number 28 will sit in the first row closest to

18    me.  Ms. Park will direct you to where you should sit.

19          James Whitfield.

20          Carlos Fernandez.

21          Christina Castellani.

22          James Campbell.

23          Jacqueline Applewhite.

24          I'm sorry.  Jacqueline Applewhite is juror number

25    32.

1          Mr. Campbell is juror number 31.

2          Ms. Castellani is juror number 30.

3          Mr. Fernandez is juror number 29.

4          Of course, Mr. Whitfield is number 28.

5          Juror number 33, Mr. Chudnovski.

6          Juror number 34, Mr. Bullock.

7          Juror number 35, Ms. Laurie Ann Lazaro.

8          Juror number 36, Loretta Temple.

9          Juror number 39, who will sit in the third seat in

10   the second row here, closest to me, will be David Rassner.

11          Juror number 38 is Preeti Torres.

12          Juror number 37 is Jaime Kahn.

13          Juror number 40 is Christine Jay.

14          41 is Joan Meaney.

15          Juror number 42 is Joseph Cacchioli.

16          Juror number 43 is Helen Sipos.

17          Juror number 44 is P.J. Cornacchiulo.

18          Juror number 25 is Ida Brown.

19          In the last row, beginning with juror number 48 will

20   be Denise Morgan, who will sit in the third seat in.

21          Juror number 47 is Alan Kapsack.

22          Juror number 46 is Marva Peters.

23          Beginning in the third row inside the confines of

24   the box is Juilly Aranja, juror number 49.

25          Juror 50 is Timothy Shands.

1          51 is Ellen Devine.

2          52 is Robert Dalia.

3          53 is Salvatore De Rosa.

4          And 54 is Floyd Dillon.

5          I am going to direct my questions to the

6     twenty-seven of you sitting in the box and they are jurors

7     number 28 through 54.  We are going to follow the same

8     procedures.  But I would like to move this along a little more

9     quickly.

10          Did any of you miss any of the questions I asked of

11    the first 27 jurors?

12          Okay.  Do any of you know anything about this case?

13          Anybody know the defendant or any of the attorneys

14    here?

15          Any of you have any dealings with the offices of the

16    Federal Defenders of New York or the United States attorney's

17    office?

18          Do any of you know Agent Aceves or have had any

19    dealings with the Drug Enforcement Administration?

20          Juror number 40?

21          THE PROSPECTIVE JUROR:  My cousin is a DEA agent.

22          THE COURT:  Okay.  How often do you see this cousin?

23          THE PROSPECTIVE JUROR:  Major holidays.

24          THE COURT:  Do you consider yourself close to this

25    cousin?

1    THE PROSPECTIVE JUROR:  Yes.

2    THE COURT:  Do you ever talk to him about his work?

3    THE PROSPECTIVE JUROR:  Yes.

4    THE COURT:  Have you as a result of your discussions

5  formulated any kind of opinion?

6    THE PROSPECTIVE JUROR:  Yes.

7    THE COURT:  Okay.  I will talk to you at side bar.

8    THE PROSPECTIVE JUROR:  Okay.

9    THE COURT:  Juror number -- okay.  Have any of you

10 had any other involvement with any federal law enforcement

11 agency, whether in a criminal case, civil case, an

12 investigation, as a party or as a witness?

13    Did all of you hear the list of witnesses I

14 initially read?

15    Yes?  Okay.  I see you are nodding.

16    Did anyone miss the list of witnesses?

17    I added one additional witness during the course of

18 jury selection.  That is Andrew Hudson.

19    Do any of you know any of the persons whose names I

20 read during the first half of this selection?

21    Do any of you know anything about the Metro Hotel in

22 Queens, or Tulua, Colombia?

23    Are any of you or your close friends or relatives

24 involved in law enforcement, with either -- with the federal,

25 state or city government agency?

1          That will include the police and the FBI and other

2    agencies.

3          Okay.  Keep your numbers up, please.

4          34, 37, 42, 45, 46, 49, 50, 51, 52, 53.

5          Juror number 34, Mr. Bullock, can you tell me about

6    your connection with law enforcement?

7          THE PROSPECTIVE JUROR:  Two of my brother-in-laws

8    are retired cops.  One worked for Long Island Rail Road and

9    one worked for the Southhampton police force out on Long

10   Island.

11         My niece is currently a city cop.

12         THE COURT:  Do you see any of these individuals

13   frequently?

14         THE PROSPECTIVE JUROR:  No.

15         THE COURT:  How often do you see them?

16         THE PROSPECTIVE JUROR:  Major holidays.

17         THE COURT:  Have you ever talked to them about their

18   work?

19         THE PROSPECTIVE JUROR:  In passing, generalities.

20   Nothing specific.

21         THE COURT:  Do you know how long they were law

22   enforcement officers?

23         THE PROSPECTIVE JUROR:  My two brother-in-laws, I

24   would venture to say they are twenty, twenty-five year

25   veterans.

1        And my niece just joined New York City force.

2        THE COURT:  Do you ever talk to them about cases?

3        THE PROSPECTIVE JUROR:  No.

4        THE COURT:  Have you ever talked to them about their

5   work generally?

6        THE PROSPECTIVE JUROR:  In general terms.  Nothing

7   specifics.

8        THE COURT:  Have you as a result of your discussions

9   formulated any kind of opinion about the criminal justice

10  system or people involved?

11       THE PROSPECTIVE JUROR:  No, I haven't.

12       THE COURT:  Would you be able to treat a law

13  enforcement officer just like any other witness and not give

14  that witness additional credit or penalize him for the fact?

15       THE PROSPECTIVE JUROR:  Yes, I could.

16       THE COURT:  So you think you could be fair as a

17  juror in this case?

18       THE PROSPECTIVE JUROR:  Yes, I do.

19       THE COURT:  Juror number 37, Ms. Kahn?

20       THE PROSPECTIVE JUROR:  My cousin is an agent for

21  Customs.

22       THE COURT:  Do you know how long this cousin has

23  been an agent?

24       THE PROSPECTIVE JUROR:  Like eleven or twelve years.

25       THE COURT:  Have you ever talked to this cousin

1   about his work?

2           THE PROSPECTIVE JUROR:  Used to when we saw each

3   other more frequently.

4           THE COURT:  How often do you see this cousin?

5           THE PROSPECTIVE JUROR:  I see him now once a year.

6           THE COURT:  Do you know if this cousin has ever been

7   involved in drug arrests?

8           THE PROSPECTIVE JUROR:  That is what he primarily

9   did, was --

10          THE COURT:  Drug arrests?

11          THE PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Did he talk specifically about arrests

13  he had made?

14          THE PROSPECTIVE JUROR:  Generally.  Never -- he

15  couldn't talk about specifics of the case.

16          THE COURT:  Have you formulated any kind of opinion

17  about the criminal justice system or persons who have been

18  involved?

19          THE PROSPECTIVE JUROR:  No.

20          THE COURT:  Involved in the criminal justice system?

21          THE PROSPECTIVE JUROR:  No.

22          THE COURT:  As a result of the discussions with your

23  cousin?

24          THE PROSPECTIVE JUROR:  No.

25          THE COURT:  Would you be able to treat a law

GR       OCR       CM       CRR       CSR

1    enforcement officer just like any other witness?

2            THE PROSPECTIVE JUROR:  Yes.

3            THE COURT:  As you probably heard me read off the

4    list, one of the persons testifying will be a customs

5    enforcement officer.  Would you be able to listen to that

6    person and listen -- and evaluate his testimony carefully?

7            THE PROSPECTIVE JUROR:  Yes.

8            THE COURT:  You wouldn't give him greater credit

9    because he might remind you of your cousin?

10           THE PROSPECTIVE JUROR:  If it was my cousin,

11   probably.

12           THE COURT:  Can you set aside whatever you may have

13   learned and decide the case solely on the evidence presented?

14           THE PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Do you think you could be fair and

16   impartial as a juror?

17           THE PROSPECTIVE JUROR:  Yes.

18           THE COURT:  Juror number 42, Mr. Cacchioli.

19           THE PROSPECTIVE JUROR:  I have two brother-in-laws

20   and a sister-in-law who are in the New York City Police

21   Department.

22           THE COURT:  How often do you see these individuals?

23           THE PROSPECTIVE JUROR:  Social occasions.  Maybe

24   ten, twelve times a year.

25           THE COURT:  Do you ever talk to them about their

120

1    work?

2              THE PROSPECTIVE JUROR:  No.

3              THE COURT:  Do you know how long they have been

4    officers?

5              THE PROSPECTIVE JUROR:  Maybe five and eight years.

6              THE COURT:  Do you know if they've ever been

7    involved in drug arrests or drug investigations?

8              THE PROSPECTIVE JUROR:  I wouldn't know.

9              THE COURT:  Have you talked generally about their

10   work?

11             THE PROSPECTIVE JUROR:  No.  I've heard them

12   speaking at times amongst themselves, but I've never really

13   been part of the conversation.

14             THE COURT:  Have you formulated any kind of opinion

15   about the criminal justice system as a result of these

16   discussions you have heard?

17             THE PROSPECTIVE JUROR:  No.

18             THE COURT:  Would you be able to treat a law

19   enforcement officer just like any other witness and not give

20   him greater credit or penalize him for that?

21             THE PROSPECTIVE JUROR:  Sure, yes.

22             THE COURT:  Could you set aside whatever you may

23   have heard and decide this case based solely on the evidence

24   presented at trial?

25             THE PROSPECTIVE JUROR:  Yes.

1        THE COURT:  Do you think you could be a fair and

2   impartial juror?

3        THE PROSPECTIVE JUROR:  Yes.

4        THE COURT:  Juror number 45, Ms. Brown?

5        THE PROSPECTIVE JUROR:  Yes.

6        I have a nephew that's a New York City -- that works

7   for the New York City Police Department for over

8   twenty-five years.

9        THE COURT:  How much did you see this nephew?

10       THE PROSPECTIVE JUROR:  I don't.  We don't see each

11  other too often.

12       THE COURT:  Have you ever talked to him about his

13  work?

14       THE PROSPECTIVE JUROR:  No, I didn't.  No, I

15  haven't.

16       THE COURT:  Do you know if he's ever been involved

17  in drug arrests or investigations?

18       THE PROSPECTIVE JUROR:  No.

19       THE COURT:  Could you treat a law enforcement

20  officer just like any other witness?

21       THE PROSPECTIVE JUROR:  Yes, I could.

22       THE COURT:  Do you think you could be fair and

23  impartial?

24       THE PROSPECTIVE JUROR:  Yes.

25       THE COURT:  Juror number 46, Ms. Peters?

122

1          THE PROSPECTIVE JUROR:  I have an uncle who is a

2   retired NYPD detective.

3          THE COURT:  How long has he been retired?

4          THE PROSPECTIVE JUROR:  I would say, five to

5   ten years.

6          THE COURT:  How often do you see this uncle?

7          THE PROSPECTIVE JUROR:  Once a month.

8          THE COURT:  Do you ever talk to him about his work?

9          THE PROSPECTIVE JUROR:  Not really.  He don't say

10  much.

11         THE COURT:  Do you know if he's ever been involved

12  in drug arrests or investigations?

13         THE PROSPECTIVE JUROR:  I don't know.

14         THE COURT:  Would you be able to treat a law

15  enforcement officer just like any other witness?

16         THE PROSPECTIVE JUROR:  I believe so.

17         THE COURT:  Do you have any doubts about that?

18         THE PROSPECTIVE JUROR:   No.

19         THE COURT:  Okay.  Do you think you could be fair

20  and impartial as a juror?

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Juror number 49, Ms. Aranja?

23         THE PROSPECTIVE JUROR:  My best friend is an NYPD.

24         THE COURT:  How long has this friend been in the

25  NYPD?

GR      OCR      CM      CRR      CSR

123

1        THE PROSPECTIVE JUROR:  He just graduated in June.

2        THE COURT:  Has he ever talked to you about his

3   work?

4        THE PROSPECTIVE JUROR:  In general.  Whenever

5   something frustrates him, he'll just vent.

6        THE COURT:  Has he ever talked to you about drug

7   arrests or drug cases?

8        THE PROSPECTIVE JUROR:  No.

9        THE COURT:  Have you formulated any kind of view

10  about the criminal justice system as a result of your

11  discussions with your cousin?

12       THE PROSPECTIVE JUROR:  No.

13       THE COURT:  Your friend.  I'm sorry.

14       THE PROSPECTIVE JUROR:  My best friend.

15  No.

16       THE COURT:  Do you think you could set aside

17  whatever you have learned from your discussions and decide

18  this case based solely on the evidence presented?

19       THE PROSPECTIVE JUROR:  Yes.

20       THE COURT:  Would you be able to treat a law

21  enforcement officer just like any other witness?

22       THE PROSPECTIVE JUROR:  Yes.

23       THE COURT:  Could you be fair and impartial?

24       THE PROSPECTIVE JUROR:  Yes.

25       THE COURT:  Okay.  Juror number 50, Mr. Shands?

1          THE PROSPECTIVE JUROR:  Yes.

2          My sister-in-law works for the FBI in an

3   administrative capacity.

4          THE COURT:  How long has she worked for the FBI?

5          THE PROSPECTIVE JUROR:  At least fifteen years.

6          THE COURT:  Have you ever talked to her about her

7   work?

8          THE PROSPECTIVE JUROR:  In strictly general terms.

9          THE COURT:  Have you learned anything about the

10  criminal justice system as a result of your discussions?

11         THE PROSPECTIVE JUROR:  No.

12         THE COURT:  Have you -- do you have any opinions

13  about law enforcement officers as a result of your discussions

14  with her?

15         THE PROSPECTIVE JUROR:  No.

16         THE COURT:  Would you be able to treat a law

17  enforcement officer just like any other witness?

18         THE PROSPECTIVE JUROR:  Yes, I would.

19         THE COURT:  Do you think you could be fair and

20  impartial as a juror?

21         THE PROSPECTIVE JUROR:  Yes, I can.

22         THE COURT:  Would you be able to decide this case

23  based solely on what you hear at trial and not on anything you

24  heard from your cousin?

25         THE PROSPECTIVE JUROR:  Yes, ma'am.

1        THE COURT:  Juror number 51, Ms. Devine?

2        THE PROSPECTIVE JUROR:  Yes.

3        I have two sister-in-laws who are currently serving

4  as New York City police officers.  I have a nephew who is in

5  the academy.  Many friends who are on the department.  And I

6  have very strong opinions about criminals.

7        THE COURT:  I will talk to you at side bar.

8        Juror number 52?

9        THE PROSPECTIVE JUROR:  Yes.  I have a

10 brother-in-law that was a lieutenant in New York City Police

11 Department, retired.  He became a criminal justice lawyer

12 after that.

13       And he -- I also have a -- a bunch of people.

14       THE COURT:  A bunch of people involved in law

15 enforcement?

16       THE PROSPECTIVE JUROR:  I have a couple.  A friend

17 of my -- my son's -- the father is in the police department --

18 is New York City police officer.

19       I also have a cousin that's -- she is retired from

20 the IRS.  She was an agent.

21       THE COURT:  How often do you see these individuals?

22       THE PROSPECTIVE JUROR:  On occasions.  Special

23 occasions we get together.

24       THE COURT:  A few times a year.

25       THE PROSPECTIVE JUROR:  Yes, a couple of times a

1    year.

2            THE COURT:  Do you know how long they have worked

3    for their various agencies?

4            THE PROSPECTIVE JUROR:  My brother-in-law was

5    twenty years.  And my sister -- my cousin was also

6    twenty years.

7            THE COURT:  Did you ever talk to them about their

8    work?

9            THE PROSPECTIVE JUROR:  In conversation we spoke,

10   you know, here and there.  But nothing in depth.

11           THE COURT:  Were they ever involved in drug arrests

12   or drug cases?

13           THE PROSPECTIVE JUROR:  Not that I know of, no.

14           THE COURT:  Have you as a result of your discussions

15   with all of these individuals formulated any kind of opinion

16   about the criminal --

17           THE PROSPECTIVE JUROR:  I have my opinions, though.

18           THE COURT:  You have your own opinions?

19           THE PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Do you think you could be fair and

21   impartial?

22           THE PROSPECTIVE JUROR:  I think -- I'll try to be.

23           THE COURT:  I will talk to you at side bar.

24           Juror number 53, Mr. De Rosa?

25           THE PROSPECTIVE JUROR:  I have three close friends

1  that one is a corrections officer, NYPD, and one is a

2  Nassau -- they are all retired Nassau -- one is a retired

3  Nassau County cop.

4          THE COURT:  How often do you see these individuals?

5          THE PROSPECTIVE JUROR:  The correction officer twice

6  a week.  The NYPD cop, two, three times a year.  The Nassau

7  County cop, twice a week, three times a week.

8          THE COURT:  Do you talk to them about their work?

9          THE PROSPECTIVE JUROR:  In general.

10         THE COURT:  Do you know if any of them have been

11  involved in drug cases?

12         THE PROSPECTIVE JUROR:  The Nassau County cop was an

13  undercover drugs cop.

14         THE COURT:  Have you formulated any kind of opinion?

15         THE PROSPECTIVE JUROR:  No.

16         THE COURT:  About the criminal justice system or

17  people involved in the criminal justice system?

18         THE PROSPECTIVE JUROR:  No.

19         THE COURT:  Would you be able to treat a law

20  enforcement officer just like any other witness?

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Do you think you could be fair and

23  impartial in evaluating the evidence in this case?

24         THE PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Some of the witnesses in the case will

1   be law enforcement officers.  Do any of you have any feelings

2   that would make you inclined to believe or disbelieve the

3   testimony of a witness who happens to be a law enforcement

4   officer?

5          Juror number 33, 47 and 51.

6          I will hear you all at side bar.

7          My next question is, have any of you or a close

8   friend or relative of yours been the victim of a crime?

9          31, 32, 41, 42, 43, 47, 48 and 52.

10         Juror number 31?

11         THE PROSPECTIVE JUROR:  Yes.  My garage was broken

12  into, stole some power tools, my snow blower, about three

13  years ago.

14         THE COURT:  Was the perpetrator ever caught?

15         THE PROSPECTIVE JUROR:  No.

16         THE COURT:  Were you satisfied that the police did

17  the job as could reasonably be expected?

18         THE PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Would this experience in any way affect

20  your ability to sit impartially as a juror?

21         THE PROSPECTIVE JUROR:  No.

22         THE COURT:  Juror number 32?

23         THE PROSPECTIVE JUROR:  I was mugged about

24  forty years ago.

25         THE COURT:  Was the perpetrator ever caught?

129

1        THE PROSPECTIVE JUROR:  No.

2        THE COURT:  Were you satisfied that the police did

3  as good a job as could reasonably be expected?

4        THE PROSPECTIVE JUROR:  Yes.

5        THE COURT:  Would this experience in any way affect

6  your ability to sit impartially as a juror in this case?

7        THE PROSPECTIVE JUROR:  No.

8        THE COURT:  Juror number 41.

9        THE PROSPECTIVE JUROR:  About five years ago, my

10 house was robbed.  Turned out to be a neighbor's son, who did

11 it, and he was caught right away.

12       THE COURT:  Were you satisfied that the police did a

13 good job in this case?

14       THE PROSPECTIVE JUROR:  Yes.

15       THE COURT:  Would your feelings about the conduct of

16 the police in any way affect --

17       THE PROSPECTIVE JUROR:  Excuse me?

18       THE COURT:  Would your feelings about the conduct of

19 the police in this -- in your robbery case -- in your burglary

20 case or your experience in having been burglarized in any way

21 affect your view of this case?

22       THE PROSPECTIVE JUROR:  Oh, no, not at all.

23       THE COURT:  Would it in any way affect your ability

24 to view this case impartially?

25       THE PROSPECTIVE JUROR:  No.

1          THE COURT:   Juror number 42?

2          THE PROSPECTIVE JUROR:   I had a car stolen once and

3    the house was burglarized once, both I guess within about

4    three years of each other.

5          THE COURT:   How long ago?

6          THE PROSPECTIVE JUROR:   About eight, ten,

7    twelve years ago.

8          THE COURT:   Were the perpetrators ever caught?

9          THE PROSPECTIVE JUROR:   No.

10         THE COURT:   Were you satisfied that the police did

11   as good a job as could reasonably be expected?

12         THE PROSPECTIVE JUROR:   In the case of the car I

13   actually found my car about a day later.   Somewhere off -- not

14   too far in our neighborhood.   There really wasn't much work to

15   be done there.

16         In terms of the house, I'll be honest with you, I

17   don't think they did much of anything.   They pretty much told

18   us when they came to the house that it would be difficult to

19   track them down.   So it was pretty much over when it started.

20         THE COURT:   Would these experiences in any way

21   affect your ability to sit impartially as a juror in this

22   case?

23         THE PROSPECTIVE JUROR:   No.

24         THE COURT:   You wouldn't -- would you be affected by

25   the fact that there had been a defendant caught in this case

1   but not in your cases?

2          THE PROSPECTIVE JUROR:  No.

3          THE COURT:  So you think you could be fair?

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Juror number 43?

6          THE PROSPECTIVE JUROR:  Yes.  I was also held up but

7   it was long, like a long, long time ago.  My pocketbook was

8   taken.  Also we were burglarized, the garage.  And my mother's

9   tools were taken, you know, gardening tools.  But it's not

10  going to affect me.

11         THE COURT:  How long ago were these incidents?

12         THE PROSPECTIVE JUROR:  The pocketbook mugging was

13  thirty -- over thirty years ago.  That's all.

14         THE COURT:  Were you satisfied that the police did

15  as good a job as --

16         THE PROSPECTIVE JUROR:  As best they could.  They

17  couldn't catch them, you know.

18         THE COURT:  Okay.

19         THE PROSPECTIVE JUROR:  It was fine.

20         THE COURT:  Would these experiences in any way

21  affect your ability to sit impartially as a juror?

22         THE PROSPECTIVE JUROR:  Not at all.

23         THE COURT:  Juror number 48, Ms. Morgan.

24         THE PROSPECTIVE JUROR:  Yes.  My -- I too was

25  mugged, probably over ten years ago.

1                Okay.

2                THE COURT:  Was the perpetrator caught?

3                THE PROSPECTIVE JUROR:  No.

4                THE COURT:  Were you satisfied that the police did

5     as good a job as could reasonably be expected?

6                THE PROSPECTIVE JUROR:  Yes.  They did as best as

7     they could.

8                THE COURT:  Would this experience in any way affect

9     your ability to sit impartially as a juror?

10               THE PROSPECTIVE JUROR:  No.

11               THE COURT:  Could you be fair and impartial?

12               THE PROSPECTIVE JUROR:  Yes.

13               THE COURT:  I see I have skipped juror number 47.

14               THE PROSPECTIVE JUROR:  That's all right.

15               THE COURT:  Mr. Kapsack.

16               THE PROSPECTIVE JUROR:  Yes.  Over the summer, a

17    friend of mine was robbed at his store, a pharmacist.  They

18    stole drugs, prescription pads and money.  They beat him up

19    pretty good.

20               THE COURT:  Was the perpetrator ever caught?

21               THE PROSPECTIVE JUROR:  No.

22               THE COURT:  Were you satisfied that the police did

23    as good a job as could reasonably be expected?

24               THE PROSPECTIVE JUROR:  No.

25               THE COURT:  Would these feelings in any way sway

GR      OCR      CM      CRR      CSR

1   your evaluation of the testimony of any witness or --

2           THE PROSPECTIVE JUROR:  They might.

3           THE COURT:  Okay.  I will talk to you at side bar.

4           THE PROSPECTIVE JUROR:  All right.

5           THE COURT:  Juror number 52, Mr. Dalia?

6           THE PROSPECTIVE JUROR:  I had two -- my

7   mother-in-law was mugged and robbed and my brother-in-law, he

8   was working at a gas station and they -- somebody came in to

9   steal, they took a shot at him.  Missed him, thank God.  But

10  never caught either.

11          THE COURT:  Were you satisfied that the police did

12  as good a job as could reasonably be expected?

13          THE PROSPECTIVE JUROR:  They did -- as good as they

14  are going to do, given the circumstances, I guess.

15          THE COURT:  Would these experiences in any way

16  affect your determination of this case?

17          THE PROSPECTIVE JUROR:  Like I said before, you

18  know, not really.

19          THE COURT:  Okay.  Do you think you could be fair

20  and impartial?

21          THE PROSPECTIVE JUROR:  I will try to be.

22          THE COURT:  Have any of you or close friend or

23  relative of yours ever been charged with a crime that involved

24  a criminal investigation or trial, received a subpoena in a

25  criminal case, or been questioned by any law enforcement

134

1    officer?

2              Juror 29, juror number 30, 32, 33, 34, 40, 43, 46,

3    48, 49, 52 and 54.

4              Juror number 29, Mr. Fernandez?

5              THE PROSPECTIVE JUROR:  My father, drug possession.

6              THE COURT:  Excuse me.

7              THE PROSPECTIVE JUROR:  I had drug possession, my

8    father.

9              THE COURT:  Your father?

10             THE PROSPECTIVE JUROR:  Yes.

11             THE COURT:  He was arrested and tried for drug

12   possession?

13             THE PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Do you have any feelings about whether

15   or not he was treated fairly?

16             THE PROSPECTIVE JUROR:  I think it was fair.  I

17   really don't know much about the case.

18             THE COURT:  How long ago did this occur?

19             THE PROSPECTIVE JUROR:  About eight years ago.

20             THE COURT:  As you know, this case involves

21   possession with intent to distribute heroin.  Would the fact

22   that your father was previously charged and convicted of a

23   drug crime in any way affect your ability to sit impartially

24   as a juror in this case?

25             THE PROSPECTIVE JUROR:  No.

1          THE COURT:  You wouldn't sympathize with the

2    defendant in this case?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  Juror number 30, Ms. Castellani?

5          THE PROSPECTIVE JUROR:  Yes.

6          I had two cousins that were arrested for being in a

7    bar fight in Arizona.  So I think they just got probation.  I

8    don't even know if they went to trial.  They live in New York.

9    So I don't think too much came out of it other than just

10   probation.

11         THE COURT:  Do you have any feelings about whether

12   or not they were treated fairly?

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  Would the fact that they have gone

15   through the criminal justice system in any way effect your

16   ability to sit impartially as a juror in this case?

17         THE PROSPECTIVE JUROR:  No.

18         THE COURT:  Juror number 32, Ms. Applewhite.

19         THE PROSPECTIVE JUROR:  I had a cousin who was a

20   drug user.  I am not certain as to the reason for his arrest,

21   but I think his intent along with some others was to rip off a

22   buyer, which happened to be an undercover officer.  I don't

23   know exactly what the charges were.

24         THE COURT:  Do you have any views about whether or

25   not this cousin was treated fairly?

1          THE PROSPECTIVE JUROR:  Considering the
2   circumstances, I think he was treated fairly.
3          THE COURT:  Would the fact that you have a cousin
4   who was involved in some sort of drug crime in any way affect
5   your ability to sit impartially as a juror in this case?
6          THE PROSPECTIVE JUROR:  No.
7          THE COURT:  You don't think you'd be more
8   sympathetic towards the defendant because you had a cousin who
9   had been charged with similar crime?
10         THE PROSPECTIVE JUROR:  Not at all.
11         THE COURT:  So do you think you could be fair and
12  impartial?
13         THE PROSPECTIVE JUROR:  Yes.
14         THE COURT:  Juror number 33, Mr. Chudnovski.
15         THE PROSPECTIVE JUROR:  Yes.  I was falsely
16  arrested.
17         THE COURT:  Do you have any views about this?
18         THE PROSPECTIVE JUROR:  Yes.
19         THE COURT:  Okay.  That might affect your ability to
20  sit impartially as a juror?
21         THE PROSPECTIVE JUROR:  Definitely.
22         THE COURT:  Okay.  I will talk to you at side bar.
23         Juror number 34?
24         THE PROSPECTIVE JUROR:  Yes.  I was subpoenaed to
25  give testimony before a grand jury and the subsequent trial.

1   It was an acquaintance.  Actually, it was a coworker at one

2   time.  He was caught doing something wrong.  Supposedly.  I

3   don't know what the charges were.  But they called me to give

4   testimony at the grand jury and the subsequent trial.

5           THE COURT:  Would this experience in any way affect

6   your ability to sit impartially as a juror?

7           THE PROSPECTIVE JUROR:  No, I don't think so.

8           Like I said, I don't even know what the charges

9   were.  I couldn't envision this individual even being brought

10  up on any charges.  I didn't know his personal life.

11          THE COURT:  Can you set aside whatever you might

12  have learned from that experience and decide this case based

13  solely on the evidence and the instructions given to you at

14  trial?

15          THE PROSPECTIVE JUROR:  Yes, I can.

16          THE COURT:  Juror number 40, Ms. Jay?

17          THE PROSPECTIVE JUROR:  Yes.

18          My little brother has been in and out of jail

19  multiple times, burglaries, drug related offenses.

20          THE COURT:  Do you have any views about whether or

21  not he has been fairly treated?

22          THE PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Would those views in any way effect your

24  ability to sit impartially as a juror in this case?

25          THE PROSPECTIVE JUROR:  Possibly.

138

1          THE COURT:  Okay.  I will hear you at side bar.

2          Juror number 43, Ms. Sipos?

3          THE PROSPECTIVE JUROR:  Could I request a side bar?

4    To explain my situation.

5          THE COURT:  Sure.

6          Juror number 46?

7          THE PROSPECTIVE JUROR:  Yes.  I was just subpoenaed

8    as a representative of my company for a check fraud issue.

9    The defendant pled guilty and so I never had to serve.

10         THE COURT:  Would this experience any way affect

11   your ability to sit impartially as a juror?

12         THE PROSPECTIVE JUROR:  No.

13         THE COURT:  Juror number 48?

14         THE PROSPECTIVE JUROR:  Hi.

15         My son was convicted of drug, substance.

16         THE COURT:  Do you have any views about whether or

17   not he was fairly treated?

18         THE PROSPECTIVE JUROR:  Well, yes.

19         THE COURT:  Would those views affect your ability to

20   sit impartially as a juror in this case?

21         THE PROSPECTIVE JUROR:  Probably.

22         THE COURT:  Okay.  I will hear you at side bar.

23         Juror 49?

24         THE PROSPECTIVE JUROR:  I work in a pharmacy.  About

25   eight months ago we were burglarized.  A technician was

1   stealing narcotics from the safe.  So the police came around

2   and they took everyone's statement.  Whoever worked with him,

3   at the station.

4           THE COURT:  Would this experience in any way affect

5   your ability to sit impartially as a juror in this case?

6           THE PROSPECTIVE JUROR:  No.

7           THE COURT:  Juror number 52?

8           THE PROSPECTIVE JUROR:  I would like to --

9           THE COURT:  Okay.  Sure.

10          Juror number 54?  Mr. Dillon?

11          THE PROSPECTIVE JUROR:  Side bar?

12          THE COURT:  Sure.

13          Before we go to side bar, let me just finish up with

14  these few questions.

15          Have any of you had any other experience with the

16  police or other law enforcement officers not previously

17  discussed?

18          Juror number 48?

19          THE PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Okay.  Why don't you talk to me at

21  side bar.

22          THE PROSPECTIVE JUROR:  All right.

23          THE COURT:  Do any of you have any other -- views

24  about the criminal justice system that have not been

25  previously expressed to me or at side bar that might affect

140

1    your ability to be fair and impartial?

2            Have any of you or close friend or relative of yours

3    ever been involved in a dispute with the federal, state or

4    city government?

5            I am going to ask the attorneys to come to side bar,

6    please.

7            (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following took place at side bar)

2          THE COURT:  We will just take them in numerical

3    order beginning with the lowest number.

4          (Open court).

5          THE COURT: Juror number 33.

6          (Side-bar)

7          PROSPECTIVE JUROR NO.  33:  In October of 1977 I was

8    involved in an incident with some of the youngsters in front

9    of the house.  I was attempting to help the police restrain

10   and I was brutalized.  I was arrested falsely, detained and my

11   case was thrown out at arraignment. They lied. The police lied

12   and I just don't believe them.

13         THE COURT:  So this would affect your ability to be

14   --

15         PROSPECTIVE JUROR NO.  33:  Totally.  I don't

16   believe them.  I think they all lie.

17         THE COURT:  Step back.

18         (Prospective juror 33 complied).

19         He is definitely very upset I assume even Ms. Harris

20   is not going to object.

21         MS. HARRIS:  I could but it wouldn't do much good.

22         THE COURT:  That's juror number 33.

23         (Open court).

24         THE COURT:juror number 40.

25         (Side-bar)

1          THE COURT:  You had a brother arrested many times?

2          PROSPECTIVE JUROR NO.  40:  Yes, numerous times.

3          THE COURT:  On drug charges?

4          PROSPECTIVE JUROR NO.  40:  He is a drug addict,

5   yeah.

6          THE COURT:  Would you as a result of your

7   relationship with your brother have --

8          PROSPECTIVE JUROR NO.  40:  I'm also the one who has

9   a cousin who is the DEA agent and the two things together

10  caused a lot of heated family debates.

11         THE COURT:  Do you think it would be difficult for

12  you --

13         PROSPECTIVE JUROR NO.  40:  I think it would be

14  inappropriate for me to struggle with what's I've been exposed

15  to.

16         THE COURT:  Do you have any preconceived notions?

17         PROSPECTIVE JUROR NO.  40:  Yes.

18         THE COURT:  And so, you think you couldn't be fair

19  and impartial in hearing the evidence?

20         PROSPECTIVE JUROR NO.  40:  Yeah, I don't think I

21  could.

22         THE COURT:  Thank you.

23         PROSPECTIVE JUROR NO.  40:  Thank you.

24         MS. HARRIS:  We don't know what those issues are.

25         MR. NATHANSON:  She is going to favor one side or

1   the other.

2          THE COURT:  It is difficult to predict but she is

3   definitely upset, particularly about her brother, so I'm going

4   to excuse her, too.

5          (The following took place in open court).

6          THE COURT: Juror number 43.

7          (Side-bar).

8          THE COURT:  I don't know.  I don't remember why she

9   wants to talk to me at side-bar.

10         PROSPECTIVE JUROR NO.  43:  I just didn't want to

11  air my personal issues with the law that I had.  I was twice

12  -- drinking but that's all cleared up.  That was one in '86

13  and one in 2000 and no more. And other issues, I had an

14  alcoholic boyfriend and I would call 911 a lot but that's it.

15  That's all I wanted to get out. I didn't want to say it out

16  loud.

17         THE COURT:  Okay. Well, do you have any feelings

18  about whether or not you were fairly treated?

19         PROSPECTIVE JUROR NO.  43:  I did wrong, you know,

20  that's I have to --

21         THE COURT:  Okay.  Now, would this past experience

22  affect your view?

23         PROSPECTIVE JUROR NO.  43:  I don't think so.

24         THE COURT:  Do you have any doubts about that?

25         PROSPECTIVE JUROR NO.  43:  No and I do watch a lot

1    of court TV.

2           THE COURT:  Now, can you -- did you learn a lot from

3    court TV?

4           PROSPECTIVE JUROR NO. 43:  I learned a lot but that

5    is something that I watch.

6           THE COURT:  Could you set aside what you you've

7    learned on TV and listen to the evidence and listen to Judge

8    Sifton's instructions at trial and follow them to the T?

9           PROSPECTIVE JUROR NO. 43:  Yes, yes.

10          THE COURT: And so, you won't at this point, without

11   having heard any evidence, have any preconceived notions about

12   this case, the fact that the defendant has been arrested?

13          PROSPECTIVE JUROR NO. 43:  No.

14          (The following took place in open court).

15          THE COURT: Juror number 47.

16          (Side-bar).

17          THE COURT:  This is the law enforcement personnel

18   question that came up.

19          Yes.

20          PROSPECTIVE JUROR NO. 47:  My friend owned a

21   pharmacy.  Basically he had fired someone that he thought was

22   stealing from him and he told the police who did nothing about

23   it, and then a few days after that he was robbed, and they did

24   steal drugs, prescription and everything like that, and the

25   police department accused him of not having the proper

1    security cameras around.  Basically nothing was done. So --

2         THE COURT:  How long ago was. This?

3         PROSPECTIVE JUROR NO.  47:  Last summer.

4         THE COURT: And do you think that this experience

5    would affect how you view this case?

6         PROSPECTIVE JUROR NO.  47:  Yes, the way they

7    handled it, they were actually accusing him of possibly being

8    involved in it.

9         THE COURT:  So you think you couldn't be fair

10   listening to the testimony of a law enforcement officer?

11        PROSPECTIVE JUROR NO.  47:  No, not at all.

12        THE COURT:  Most of these officers are federal

13   officers?

14        PROSPECTIVE JUROR NO.  47:  I understand.  I know.

15   It's just the way it works. They're actually accusing him.

16        THE COURT:  How often do you see this friend?

17        PROSPECTIVE JUROR NO.  47:  Twice a week.  We play

18   ball together. He's a good friend.

19        THE COURT:  Do you want to excuse him?

20        MS. HARRIS:  Yes, Judge.

21        THE COURT:  From the government.

22        MR. NATHANSON: We would move.

23        (The following took place in open court).

24        THE COURT: Juror number 48.

25        (Side-bar).

1          THE COURT:  Hi.

2          PROSPECTIVE JUROR NO.  48:  Hi.

3          THE COURT:  You had a son who had encounters with

4    the law.

5          PROSPECTIVE JUROR NO.  48: My oldest son's

6    currently serving about eight years for transporting heavy

7    substances.

8          THE COURT:  Heavy substances?

9          PROSPECTIVE JUROR NO.  48: That is correct, and I

10   also have a son who is away for life for murder. So, as far as

11   me sitting on a jury, I don't think that I will be the

12   candidate because I had to go through, you know, that with my

13   son on the trial for murder.  So it would be very difficult

14   for me to serve as a juror.

15         THE COURT:  Okay. Could you go back to your seat.

16         MR. NATHANSON:  We move to strike.

17         THE COURT:  There are no objections but I do note

18   she was quite upset.

19         MS. HARRIS:  Yes.

20         THE COURT:  Okay.

21         (Open court).

22         THE COURT: Juror number 51.

23         (Side-bar).

24         THE COURT:  This is another person with many

25   connections to law enforcement, juror 51.

1           Yes.

2           PROSPECTIVE JUROR NO. 51:

3           THE COURT:  You know many people in law enforcement.

4           PROSPECTIVE JUROR NO. 51:  I do.  I have a lot of

5    relatives and friends -- personal friends that are police

6    officers, and who are -- my issue is really the wives, that is

7    to say, know of police officers in particular who have been

8    very abused by their husbands and not able to get any support

9    or help from the department because their husbands had high

10   positions. I just have very strong beliefs how they protect

11   one another.

12          THE COURT:  Now, this is a case involving -- it is a

13   federal prosecution and the charges involve federal agents --

14   the witnesses are federal agents who will testify.  Do you

15   think your views about the police department might affect your

16   ability to be fair and impartial in this listening to the

17   evidence in this case?

18          PROSPECTIVE JUROR NO. 51:  Not exclusively, but it

19   will add to it because there's lots of things in my particular

20   history that I think would make this a very difficult case for

21   me to sit on.

22          THE COURT:  Okay.

23          MS. HARRIS:  I mean it's not -- the Court may ask

24   follow-up questions as to what those particular views are.

25          MR. NATHANSON:  I think essentially what she was

1   saying was most of her experience, wives, well, law

2   enforcement officers, that they lie to protect each other and

3   that experience would color the way she would view the

4   testimony.

5           THE COURT:  Ordinarily, if she hadn't seemed so

6   upset talking about her friends who have been abused by the

7   police I would question her further but she did acknowledge

8   there was a difference between federal officers and federal

9   agents and the police officers but she was genuinely upset in

10  discussing what the police did, and I agree with Mr. Nathanson

11  that this would color her ability to listen to the evidence,

12  so I'll excuse her. That's juror number 51.

13          (The following took place in open court)

14          THE COURT: Juror number 52.

15          PROSPECTIVE JUROR NO.  52:  :  My cousin is in

16  Florida. My cousin's husband was running drugs and he was

17  using his son and I forget what they call it.

18          THE COURT:  Courier.

19          PROSPECTIVE JUROR NO.  52:  Yeah.  Thank God he got

20  caught but that was as far as I got.  They caught him, and

21  it's water under the bridge.

22          THE COURT:  You think this experience would affect

23  your ability --

24          PROSPECTIVE JUROR NO.  52:  It happened a long time

25  ago but you know it did happen.

149

1          THE COURT:  Do you think this experience would

2     affect your ability to be a fair and impartial juror?

3          PROSPECTIVE JUROR NO.  52:  I am not a big sport of

4     people giving drugs to people, no.

5          THE COURT:  So you have --

6          PROSPECTIVE JUROR NO.  52:  I have my -- that's why

7     I said before I have my three opinions.

8          THE COURT:  So without having heard any evidence, do

9     you have some preconceived notions?

10          PROSPECTIVE JUROR NO.  52:  It would have to be

11     strong.

12          THE COURT:  What would have to be strong?

13          PROSPECTIVE JUROR NO.  52:  Either way when they

14     present it, so I can form an opinion on it.

15          THE COURT:  If you were to hear some evidence about

16     drugs would you have any views one way or the other about the

17     guilt of the defendant?

18          PROSPECTIVE JUROR NO.  52:  Possibly. I don't know

19     at this time.

20          THE COURT:  Do you have any preconceived notions

21     about her guilt?

22          PROSPECTIVE JUROR NO.  52:  No, no, not at this

23     point. Like I said before, I just -- I guess I'm trying to

24     keep an open mind whether it will, yeah.

25          THE COURT: Do you think you will have difficulty

1  keeping an open mind?

2          PROSPECTIVE JUROR NO.  52:  I think I will, you

3  know, at this point.

4          THE COURT:  You will be able to keep -- do you think

5  you will be able to keep an open mind?

6          PROSPECTIVE JUROR NO.  52:  Yes.

7          THE COURT:  Do you have any doubts about that?

8          PROSPECTIVE JUROR NO.  52:  Probably not.  I

9  probably would be all right.

10          THE COURT: Now, you had previously -- I think your.

11          MR. NATHANSON:  Brother-in-law.

12          THE COURT:  Brother-in-law in law enforcement and

13  you think you might be affected in your view about how you

14  evaluate the testimony of a law enforcement officer?

15          PROSPECTIVE JUROR NO.  52:  No, ma'am, you know, we

16  talked in general about things. So --

17          THE COURT:  Would you be more inclined to believe a

18  law enforcement --

19          PROSPECTIVE JUROR NO.  52:  Possibly.

20          THE COURT:  Thank you. Go back to your seat please.

21          MS. HARRIS:  Move to strike, Your Honor.

22          THE COURT:  Yes.

23          MR. KAZEMI: The last part was the problem.

24          THE COURT:  It's hard to figure out where he's

25  coming from.

1          MR. KAZEMI:  He doesn't like drug dealers but nobody

2     really likes drug dealers.

3          MS. HARRIS:  But to hard to say it --

4          MR. KAZEMI:  Something about not being impartial

5     about listening to law enforcement testify.

6          THE COURT:  It's hard to tell where he's coming from

7     so I am going to excuse him because I think he has hesitated

8     in saying that he could be.

9          MS. HARRIS:  Yes, too many times.

10         THE COURT: He's juror number 52, and then all I have

11    left is juror number 54.

12         (Open court).

13         THE COURT:  Juror number 54.

14         Okay. You wanted to talk to me at side-bar.

15         PROSPECTIVE JUROR NO.  54:  I have a brother.  That

16    he's been convicted of drugs and later deported him.

17         THE COURT:  Deported too?

18         PROSPECTIVE JUROR NO.  54:  Yes.

19         THE COURT:  Would this experience affect your

20    ability to sit impartially as a juror?

21         PROSPECTIVE JUROR NO.  54:  No.

22         THE COURT: So do you think you could listen to the

23    government's case and if you found there was sufficient

24    evidence enter a verdict of guilty?

25         PROSPECTIVE JUROR NO.  54:  Yes.

1          THE COURT: Do you think your brother was unfairly

2   treated?

3          PROSPECTIVE JUROR NO. 54:  No.

4          THE COURT:  How long ago was this?

5          PROSPECTIVE JUROR NO. 54:  About 15 years ago.  He

6   served eight years.

7          THE COURT:  Was he prosecuted here in federal court?

8          PROSPECTIVE JUROR NO. 54:  I don't know what court

9   he was.  I was not really bothering with that.  I didn't go to

10  trial.

11         THE COURT:  This was in New York?

12         PROSPECTIVE JUROR NO. 54:  Yes, Brooklyn.

13         (Prospective Juror No. 54 returned to his seat)

14         THE COURT: I think at the rate we are going we

15  probably won't have to reach him, but you will remind me to

16  call him back to side-bar if we have to consider him we will

17  question him further about this.

18         MS. HARRIS: Okay.

19         THE COURT:  So I'm going to excuse 33, 40, 47, 47 48

20  51 and 52.

21         Juror number 33 Mr. Chudnovski, number 40 Ms. Jay,

22  Mr. Kapsack, juror number 48 Ms. Morgan, juror 51 Ms. Devine

23  and juror number 52 Mr. Dalia, you are excused.

24         Please report downstairs to the central jury room.

25         THE COURT:  As I mentioned earlier, the charges in

1    this case concern the possession of intent to distribute a

2    substance containing heroin. Is there anything in your life or

3    experience that would make it difficult for you to be a fair

4    and impartial juror in such a case?  Juror number 35.

5            PROSPECTIVE JUROR NO.  35:  It is personal.  I would

6    like to request a side -- bar.

7            Have any of you or close friends or relatives

8    struggled with drug addiction or had a drug abuse problem?

9            Juror number 29, juror number 32, juror 42, 50.

10           THE CLERK:  35.

11           THE COURT:  35.  Yes, I already have that.

12           Juror number 29.

13           PROSPECTIVE JUROR NO.  29:  My father again.

14           THE COURT:  Okay.

15           PROSPECTIVE JUROR NO.  29:  It was a few years he

16   was --

17           THE COURT:  And was the fact that he was involved in

18   -- that he had a drug abuse problem in any way affect your

19   ability to sit impartially as a juror?

20           PROSPECTIVE JUROR NO.  29:  No.

21           THE COURT:  You know that this case involves drugs?

22           PROSPECTIVE JUROR NO.  29:  Yes, it won't affect me.

23           THE COURT:  Juror number 32.

24           PROSPECTIVE JUROR NO.  32:  Yes.

25           THE COURT: Do you want to talk to me at side-bar or

154

1      --

2                PROSPECTIVE JUROR NO. 32:  No, no.

3                THE COURT:  Can you tell me why you raised your

4      card?

5                PROSPECTIVE JUROR NO. 32:  He's the same cousin I

6      mentioned.  He is deceased.  I thought it a question about

7      a relative who --

8                THE COURT:  Struggled with drug abuse?

9                PROSPECTIVE JUROR NO. 32:  Yes.

10               THE COURT:  And do you think the fact that this case

11     does involve drugs and the fact that your cousin has a drug

12     abuse problem make it difficult for you to be seated as a

13     juror in this case?

14               PROSPECTIVE JUROR NO. 32:  No.

15               THE COURT:  Do you have any doubts about that?

16               PROSPECTIVE JUROR NO. 32:  No.

17               THE COURT:  Juror number 42.

18               PROSPECTIVE JUROR NO. 42:  I have a cousin.  I had

19     a cousin who died of an overdose of drugs and I have a

20     brother-in-law who is currently fighting addiction.

21               THE COURT:  And would this experience in any way

22     affect your ability to sit impartially as a juror in this

23     case?

24               PROSPECTIVE JUROR NO. 42:  No.

25               THE COURT:  Do you have any doubts about that?

1          PROSPECTIVE JUROR NO.  42:  No.

2          THE COURT:  Juror number 50.

3          PROSPECTIVE JUROR NO.  50:  I'm a recovered drug

4   addict and alcoholic.  I have been clean and sober for over

5   15 years now.

6          THE COURT:  And would the fact that you have

7   overcome a drug addiction problem in any way affect your

8   ability to sit in a case involving narcotic?

9          PROSPECTIVE JUROR NO.  50:  Not in any shape or

10  form.

11         THE COURT:  Do you think you can be fair and

12  impartial in evaluating the evidence?

13         PROSPECTIVE JUROR NO.  50:  Yes.

14         THE COURT:  Either your or any of your close friends

15  or relatives involved in the treatment of drug abuse?

16         Any of you have any strong feelings concerning the

17  control or legalization of drugs?

18         Do any you have any feelings about the severity and

19  leniency of the punishment for drug crimes?

20         Is there anything else not previously discussed

21  about the nature of these charges that would affect your

22  ability to be a fair and impartial juror?

23         Do any of you hold religious beliefs that would

24  affect your ability to pass judgment on another person?

25         Is your card up juror number 28?

1        PROSPECTIVE JUROR NO. 28: Yes.

2        THE COURT: Anybody else? Juror number 28,

3   Mr. Whitfield, do you have a religious belief that might

4   affect your ability to make a determination in this case?

5        PROSPECTIVE JUROR NO. 28: I'm a Free Mason. I've

6   arisen to -- I couldn't, you know --

7        THE COURT: I will hear you at side bar.

8        Have any of you or a close friend or relative ever

9   worked for a criminal defense attorney or private

10  investigator.

11       Any of you or members of your immediate family

12  worked for lawyers? Prospective juror 34, 37, 38, 39, 44, 46

13  and 63. Juror number 34.

14       PROSPECTIVE JUROR NO. 34 : My wife works for

15  attorneys, paralegal, family practice.

16       THE COURT: Does she work for a solo practitioner?

17       PROSPECTIVE JUROR NO. 34: Just there are two

18  attorneys, proprietor and associate.

19       THE COURT: Do either of them handle any criminal

20  cases?

21       PROSPECTIVE JUROR NO. 34: No, strictly family

22  practice.

23       THE COURT: Can you set aside whatever you may have

24  learned from your wife and decide this case --

25       PROSPECTIVE JUROR NO. 34: I don't remember too

much. She doesn't discuss cases at home.

THE COURT:  Will you follow the instructions of Judge Sifton?

PROSPECTIVE JUROR NO.  34:  Yes.

THE COURT:  Juror number 37.

PROSPECTIVE JUROR NO.  37:  A friend of mine is a corporate lawyer.  She's been that way, I think, for three or four years, but she does primarily research.  No trial.

THE COURT:  Could you set aside whatever you may have learned and decide this case based solely on the evidence and instructions at trial?

PROSPECTIVE JUROR NO.  37:  Yes.

THE COURT:  Juror number 38.

PROSPECTIVE JUROR NO.  38:  I am an attorney for the Washington Post Company.  I work for one of their educational subsidiaries here in New York.

THE COURT:  Have you had any training in criminal law?

PROSPECTIVE JUROR NO.  38:  No, I do intellectual property employment law and I'm their deputy general counsel and also have 10,000 employees over the country.

THE COURT: Could you set aside whatever you may have learned about the law and follow Judge Sifton's instructions at trial?

PROSPECTIVE JUROR NO.  38:  Yes, I don't believe

1   being an attorney should give me a free pass to seek an

2   exemption here but having said that, if the lawyers here would

3   like to excuse me, I would like to leave and return to work.

4            THE COURT:  Well, welcome to this Court.

5            Juror number 39, Mr. Rassner.

6            PROSPECTIVE JUROR NO. 39: My father is an attorney.

7   Semi-retired.

8            THE COURT:  Do you know what kind of law he

9   practices?

10           PROSPECTIVE JUROR NO.  39:  Civil.  No criminal.

11           THE COURT:  Was he involved in any kind of

12  litigation.

13           PROSPECTIVE JUROR NO.  39:  Yes, as civil attorney,

14  yes.

15           THE COURT:  What kind  of firm does he work for, how

16  large?

17           PROSPECTIVE JUROR NO.  39:  Just him and his

18  partner.

19           THE COURT:  Did he ever talk about the cases he

20  handled?

21           PROSPECTIVE JUROR NO.  39:  On occasion.

22           THE COURT:  Could you set aside whatever you may

23  have learned from your father and follow Judge Sifton's

24  instruction at trial?

25           PROSPECTIVE JUROR NO.  39:  Yes.

1          THE COURT: Juror number 44.

2          PROSPECTIVE JUROR NO.  44:  My brother-in-law and

3    sister-in-law are both lawyers. My sister-in-law actually

4    worked for one of the judges in the Brooklyn system.  I don't

5    know who.  My brother-in-law works in private practice up in

6    Buffalo.

7          THE COURT:  Do you know if either of them were

8    engaged in criminal law?

9          PROSPECTIVE JUROR NO.  44:  I think they both are. I

10   don't discuss exactly what they do.

11         THE COURT:  Have you ever talked to them about their

12   work or the cases they handle?

13         PROSPECTIVE JUROR NO.  44:  Yeah, sometimes you hear

14   about some of the bad stuff, but I mean it sounds like it is

15   criminal.  Definitely not civil.

16         THE COURT: Now, would these discussions in any way

17   affect your view of this case or your ability to sit

18   impartially as a juror?

19         PROSPECTIVE JUROR NO.  44:  No.

20         THE COURT:  Have you formulated any kind of an

21   opinion about the criminal justice system or people involved

22   in the criminal justice system as a result of these

23   discussions?

24         PROSPECTIVE JUROR NO.  44:  He said they are good,

25   brother and law an sister-in-law.

1    THE COURT:  Could you set aside whatever you may

2 have learned from these in-laws and decide this case solely on

3 the evidence and instructions given to you at trial?

4    PROSPECTIVE JUROR NO. 44:  Yes.

5    THE COURT:  Juror number 46.

6    PROSPECTIVE JUROR NO. 46:  My sister's a word

7 processor for a law firm in Manhattan and my daughter is an

8 apprenticing for paralegal.

9    THE COURT:  Did either of them receive any kind of

10 legal training?

11    PROSPECTIVE JUROR NO. 46:  Well, she's in school.

12    THE COURT:  The paralegal?

13    PROSPECTIVE JUROR NO. 46:  The paralegal.

14    THE COURT:  Okay. Have you ever talked to them about

15 what they know?

16    PROSPECTIVE JUROR NO. 46:  Not really.

17    THE COURT:  Could you set aside whatever you might

18 have acquired from them and decide this case based solely on

19 the evidence and instructions given at trial?

20    PROSPECTIVE JUROR NO. 46:  Yes.

21    THE COURT: Juror number 53, Mr. DeRosa.

22    PROSPECTIVE JUROR NO. 53:  My son is a union lawyer

23 for doctors and attorneys.

24    THE COURT:  Okay. And does he ever handle any

25 criminal cases?

1              PROSPECTIVE JUROR NO.  53:  No.

2              THE COURT:  Dose handle civil cases in court?

3              PROSPECTIVE JUROR NO.  53:  No.

4              THE COURT:  Do you talk to him about his work?

5              PROSPECTIVE JUROR NO.  53:  Not much. Very little.

6  Mostly work related incidents.

7              THE COURT:  Could you set aside whatever you may

8  have learned from your son?

9              PROSPECTIVE JUROR NO.  53:  Yes.

10             THE COURT:  Could you decide this case based solely

11  on the evidence and instructions given to you at trial?

12             PROSPECTIVE JUROR NO.  53:  Yes.

13             THE COURT: Are any of your close friends or

14  relatives employed in the court system either as judges, law

15  clerks, court attendants or court clerks or other type of

16  personnel?

17             Please hold up your number.

18             Juror number 41.

19             PROSPECTIVE JUROR NO.  41:  My two bother-in-laws,

20  my sister-in-law and cousin are clerks -- court clerks in the

21  Bronx.

22             THE COURT:  In the Bronx. Do you know if they are

23  involved in criminal cases or civil cases?

24             PROSPECTIVE JUROR NO.  41:  I have no idea.  They

25  don't really talk about it.

1          THE COURT:  So --

2          PROSPECTIVE JUROR NO.  41:  I see them holidays and

3   whatnot and just --

4          THE COURT:  Have you formulated -- has your contact

5   with them in any way affected your view of the criminal

6   justice system?

7          PROSPECTIVE JUROR NO.  41:  No.

8          THE COURT:  Can you set aside whatever you might

9   have learned from them and decide this case based solely on

10  the evidence and the instructions given to you at trial?

11         PROSPECTIVE JUROR NO.  41:  Sure.

12         THE COURT:  Juror number 42.

13         PROSPECTIVE JUROR NO.  42:  I'm going to answer the

14  question before because I didn't put my number up.

15         THE COURT:  Okay. We will take you.

16         PROSPECTIVE JUROR NO.  42:  My wife actually works

17  part time for an attorney, but he's in real estate, and I also

18  work closely with attorneys at work.  That's why I didn't

19  raise the card initially, and I'm a CFO of my company, and I

20  work closely with corporate attorneys in the area of SEC law,

21  FDC, Foreign Trade Commission law, things like that.

22         THE COURT: Has any of your work involved criminal

23  investigations?

24         PROSPECTIVE JUROR NO.  42:  No.

25         THE COURT:  Could you set aside whatever you may

1   have learned and follow the instructions given to you at trial

2   by Judge Sifton?

3           PROSPECTIVE JUROR NO.  42:  I can.

4           THE COURT:  Let me get started.  Any of you or close

5   friends or relatives ever worked in a penal institution, jail,

6   or penitentiary, in a parole, or criminal rehabilitation

7   program, such a halfway house, narcotics prevention program,

8   parole program, a crime prevention board, including youth

9   program or are the like, this kind of auxiliary jury criminal

10  justice services?  Juror number 37 and 50. Juror number 37.

11          PROSPECTIVE JUROR NO.  37:  I worked in substance

12  abuse field for about seven years. Substance abuse and HIV.

13          THE COURT:  And have you been involved with people

14  who have had involvement in the criminal justice system?

15          PROSPECTIVE JUROR NO.  37: I worked in an inpatient

16  program for my first year in the field and outpatient program

17  with a parole program.  Involved with it for about year.

18          THE COURT:  Were you ever involved in court

19  proceedings?

20          PROSPECTIVE JUROR NO.  37: No, I've assisted the

21  case manager, writing court letters and whatnot, but I've

22  never had it go to the court.  I have talked to POs and

23  whatnot.

24          THE COURT:  Now, would you as a result of your work

25  formulate any kind of a view about the criminal justice system

164

1    or people who are charged with drug related crimes?

2              PROSPECTIVE JUROR NO. 37: Possibly.

3              THE COURT:  I'll talk to you at side bar.

4              Juror number 50.

5              PROSPECTIVE JUROR NO. 50: My step-daughter

6    currently works for the VERA Institute of Justice and she

7    formerly worked for an organization, the acronym is CEO, and

8    they work to prevent -- help prevent recidivism among young

9    inmates, and also, prepare them for re-entry back into

10   society. And she's heavily involved in that type of work.

11   She's working on her master's degree.  Criminal justice.

12             THE COURT:  Have you ever talked to her about the

13   work that she's involved in?

14             PROSPECTIVE JUROR NO. 50: All the time.

15             THE COURT:  And have you formulated any kind  of a

16   view as a result of your discussions about the criminal

17   justice system and persons who are arrested or drug cases?

18             PROSPECTIVE JUROR NO. 50: Not drug cases in

19   particular, but as far as the criminal justice system and

20   youth are concerned, yes.

21             THE COURT:  Well, I'll talk to you at side bar.

22             I'd like the attorneys to come up please.

23             THE COURT:  Juror number 28.

24             Juror number 28, could you please come up.

25             (Side-bar)

1          THE COURT:  You say are you a Freemason.

2          PROSPECTIVE JUROR NO. 28:  Yes, I took an oath not

3  to pass judgment on -- I can't any harm -- no harm to anyone

4  -- to after -- to do trials, examination and strict

5  examination.

6          THE COURT: So are you telling me that you want --

7          PROSPECTIVE JUROR NO. 28:  I would be fair,

8  whatever, I will be fair and impartial, whatever, you know,

9  Judge, depending on what I hear.

10          THE COURT:  Could you be fair in judging what you

11  hear?

12          PROSPECTIVE JUROR NO. 28:  Yes.

13          THE COURT:  Could you render a decision?

14          PROSPECTIVE JUROR NO. 28:  Yes.

15          THE COURT:  Whether or not there's sufficient

16  evidence?

17          PROSPECTIVE JUROR NO. 28:  Right.

18          THE COURT:  And would the oath of the Freemasons

19  that you have taken --

20          PROSPECTIVE JUROR NO. 28:  The oath, I cannot do no

21  wrong.

22          THE COURT:  Well, does that mean --

23          PROSPECTIVE JUROR NO. 28:  To anyone.

24          THE COURT:  Does that mean that would prevent you

25  from rendering a verdict?

1      PROSPECTIVE JUROR NO.  28:  No, it wouldn't. I try

2   to be fair as I can but you know what I mean.

3      THE COURT: You will try to be as fair as you can but

4   you said you can't?

5      PROSPECTIVE JUROR NO.  28:  Do no wrong to anyone

6   until after I hear all the verdict.

7      THE COURT:  Until after you have heard?

8      PROSPECTIVE JUROR NO.  28:  Both sides.

9      THE COURT: Now, tell me about your Mason's oath.

10  Can you just be a little clearer that there's principles that

11  you can't judge anybody?

12     PROSPECTIVE JUROR NO.  28:  Yes, some  of the

13  bylaws.

14     THE COURT:  That you can't judge anything?

15     PROSPECTIVE JUROR NO.  28:  Not until, like, I hear

16  the full --

17     THE COURT:  Story?

18     PROSPECTIVE JUROR NO.  28:  Right.

19     THE COURT:  You can't judge but after you hear the

20  full story you're permitted to make judgment?

21     PROSPECTIVE JUROR NO.  28:  No harm.  I took an oath

22  not to do no harm to anyone.

23     THE COURT:  As you know, this is a criminal

24  prosecution and a defendant could go to jail if convicted.

25     PROSPECTIVE JUROR NO.  28:  Well --

1          THE COURT:  Would your Mason's oath prevent you from

2   making a determination that could result in someone's

3   incarceration?

4          PROSPECTIVE JUROR NO.  28:  Well, I have to hear

5   both sides of everything I mean but --

6          THE COURT:  Could you -- if the evidence were

7   sufficient to prove beyond a reasonable doubt that the

8   defendant was guilty, could you render a verdict of guilty?

9          PROSPECTIVE JUROR NO.  28:  I will be as fair as I

10  could be.

11         THE COURT:  My question is could you render a

12  verdict of guilty?

13         PROSPECTIVE JUROR NO.  28:  Well, I have to hear.  I

14  would really have to hear everything before I can make that

15  judgment.

16         THE COURT:  No, but if the evidence were sufficient?

17         PROSPECTIVE JUROR NO.  28:  If the evidence were

18  sufficient, yes.

19         THE COURT:  You can find the defendant guilty?

20         PROSPECTIVE JUROR NO.  28:  Yes, if it was -- if it

21  come to that, yeah.

22         THE COURT:  Even if that could result in a prison

23  sentence for the defendant?

24         PROSPECTIVE JUROR NO.  28 :  I would be fair as I

25  could be.

1          THE COURT:  But if you knew that could you would be

2     sending someone to jail by finding the defendant guilty could

3     you make a reasoned decision in accordance with Judge Sifton's

4     --

5          PROSPECTIVE JUROR NO. 28:   Reasoned, yes, I could.

6          THE COURT:  Could you find the defendant guilty?

7          PROSPECTIVE JUROR NO.  28:  If it come to --

8          THE COURT:  Yes.

9          PROSPECTIVE JUROR NO.  28:  If you are innocent I

10    could -- within a reasonable doubt, yes, I could. If not --

11         THE COURT:  If the evidence is so clear?  If it is

12    clear?

13         PROSPECTIVE JUROR NO.  28:  If it is clear, yes, but

14    it's not, I can do no harm.

15         THE COURT:  Okay. Thank you.

16         MR. NATHANSON:  Can I just ask a follow-up question?

17         THE COURT:  Sure.

18         MR. NATHANSON:  Put yourself in the position, you

19    heard the evidence in the case and you are sitting there in

20    the jury room, would you -- I mean would you be -- because of

21    your Freemason's oath be thinking about what the Freemason

22    oath was, whether or not you could do harm, is that something

23    that would enter into your thoughts?

24         PROSPECTIVE JUROR NO.  28:  I would have to look at

25    it clearly. Of course, 'cause sometime things look not always

1  clear.  So I would have to definitely look into really clear,

2  complete and say.

3      MS. HARRIS:  If I could ask a question. Would you be

4  able to follow the Judge's instruction as to the to the law?

5      PROSPECTIVE JUROR NO.  28:  Yes, I would.

6      MS. HARRIS:  If he instructed you not to consider

7  the possible punishment you wouldn't consider the possible

8  punishment?

9      PROSPECTIVE JUROR NO.  28:  Yes, I could.

10     MR. KAZEMI:  If I could ask a brief follow-up.  If

11  that instruction conflicts in any way with the Freemason's

12  code would that affect your determination?

13     PROSPECTIVE JUROR NO.  28:  Well, if they are guilty

14  they are guilty. I don't care if it is a Freemason or no, but

15  as far as I say, I couldn't do no wrong to no one; not unless

16  they've proven beyond a shadow of a doubt they are guilty.

17  Then I would find them guilty.

18     THE COURT:  Now, the legal standard is beyond a

19  reasonable doubt but it doesn't mean 100 percent.  It probably

20  means 99.999 percent.  So even if there's less than reasonable

21  doubt could you convict?

22     PROSPECTIVE JUROR NO. 289:  That would be kind of

23  hard to do, less than a reasonable doubt, yes.

24     THE COURT: No, no. No. Well, do you understand

25  there's a difference between --

1          PROSPECTIVE JUROR NO.  28:  Yes.

2          THE COURT:  Between reasonable doubt and less than

3    reasonable doubt?

4          PROSPECTIVE JUROR NO.  28:  Yes. Like 99 percent of

5    this way and just like one percent that way.

6          THE COURT:  I can't give you percentages as to what

7    reasonable doubt constitutes, but sometimes you can have a

8    little doubt, but not have enough doubt to constitute

9    reasonable doubt; do you understand?

10         PROSPECTIVE JUROR NO.  28:  I understand what you

11   are saying.

12         THE COURT:  Do you understand that there could be a

13   difference?

14         PROSPECTIVE JUROR NO.  28:  Yes, there could be a

15   difference.

16         THE COURT:  Okay. Now, could you make that

17   distinction in making your determination as a juror?

18         PROSPECTIVE JUROR NO.  28:  Well, if just -- like I

19   say, if leaning the other way I couldn't, you know --

20         THE COURT:  So if you have some doubt you would more

21   likely than not, not render a verdict?

22         PROSPECTIVE JUROR NO.  28:  Until I hear further

23   evidence.

24         THE COURT:  Okay.  Thank you.

25         (Prospective juror number 28 returned to his seat)

1          MR. KAZEMI:  We move to strike the juror.

2          MS. HARRIS:  I object.  I mean he -- clearly

3    everything he said was actually consistent with how you come

4    to the -- before making a decision.  He seems to embody the

5    presumption of innocence in his, you know, the way he operates

6    which, frankly, in reality, although we hope that few jurors

7    do he's clearly saying he's willing to follow the Judge's

8    instructions and the evidence before making a decision.

9          MR. KAZEMI:  The first thing he said was he would

10   have difficulty passing judgment on another person which is

11   exactly what he was being called upon to do at this

12   proceeding.

13         THE COURT:  He did clarify himself without having --

14         MR. KAZEMI:  I really don't understand what his

15   position is.

16         MS. HARRIS:  He said he doesn't judge against his

17   enemies before hearing the evidence and knowing the facts

18   that's what -- how he articulated.  That was exactly what we

19   want the jurors to do.

20         MR. KAZEMI:  He also framed it as 99.9 percent

21   probability of guilt which is not the actual standard here.

22         THE COURT:  I said we couldn't quantify. I have to

23   say it's very difficult to find out -- to get a handle on his

24   views and I think he's struggling.

25         MS. HARRIS:  Instead of us trying to articulate what

1   the standard is we should ask would you be able to follow the

2   Judge's instructions about the law and that is what we ask

3   other jurors who come up here and about issues.

4        MR. KAZEMI:  When Your Honor asked that question the

5   first thing he said was that he would have difficulty passing

6   judgment on another person.

7        THE COURT:  Based on the sequence of his answers I

8   think that Mr. Kazemi is correct in his assessment of Mr.

9   Whitfield, that he will have difficulty.  When he says he will

10  have difficulty passing judgment on another person it means he

11  will have difficulty finding that person committed a wrong and

12  should there be any kind  of doubt and I have to say I'm ill

13  equipped to discuss cogently the difference between some doubt

14  and reasonable doubt, but I think that he is prepared to, if

15  there is any doubt, to render a verdict of not guilty.

16       MS. HARRIS:  Your Honor, I guess I will just ask

17  that he be asked whether he could follow whatever his views

18  that will be -- he will be to follow the Judge's instructions.

19  When asked those questions directly he answered yes and when

20  he talked about passing judgment he clarified what that meant

21  and that it did not mean he would have difficulty reaching a

22  verdict.  It means he has a code not to prejudge, which is, as

23  I said, surprisingly consistent with what the presumption of

24  innocence is all about, and I mean it is almost like

25  qualifying a death penalty juror.  We are saying are you able

1   to convict.  He said he will able to convict and I think that

2   is sufficient.

3         THE COURT: I think we have asked him that question

4   and his responses have come with qualifications each time, but

5   I certainly have no problems calling him back up and asking

6   him one last time.

7         (Open court)

8         Mr. Whitfield, could you come back up again.

9         (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Side bar with juror, Mr. Whitfield.)

2          THE COURT:  Okay.  You will be instructed by Judge

3   Sifton that you have to make a determination whether or not

4   the government has proved each element of the crime charged

5   beyond a reasonable doubt.  That doesn't mean your doubts or

6   the Freemasons code.  It means that you have to follow the

7   judge's instruction on what proof is required and what

8   reasonable doubt is.

9          THE PROSPECTIVE JUROR:  Right.

10         THE COURT:  Do you understand that?

11         THE PROSPECTIVE JUROR:  I understand.

12         THE COURT:  Do you think you could follow Judge

13   Sifton's instructions even if you think it might be

14   inconsistent in some way with your Freemasons beliefs?

15         THE PROSPECTIVE JUROR:  I could follow the

16   instruction of the judge.

17         THE COURT:  Yes?

18         And you would do so in rendering a verdict in this

19   case?

20         THE PROSPECTIVE JUROR:  I would eventually render a

21   verdict.  After I -- I have to hear both sides.

22         THE COURT:  When you render a verdict, will you

23   render that verdict based on the instructions you hear?

24         THE PROSPECTIVE JUROR:  Based on the instructions

25   that I hear.

1          THE COURT:  Okay.  Even if it does not necessarily

2    comport with every facet of your Freemasons belief?

3          THE PROSPECTIVE JUROR:  Like I say, I have to be

4    fair.  Either way, I have to be fair.  So I can't just like --

5    if the verdict is guilty, it is guilty.  If it's not, I

6    couldn't just say he was guilty.  Whoever is guilty, if he is

7    not guilty.

8          THE COURT:  Okay.  You could follow the instructions

9    in doing so?

10          THE PROSPECTIVE JUROR:  Yes, right.

11          MR. NATHANSON:  I don't want to -- I want to be

12    clear.  If there is a situation where the Freemasons code for

13    whatever reason it is hard to predict was inconsistent with

14    the judge's instructions, for some reason, none of us are very

15    familiar as you are with the Freemasons code, would you be

16    able to follow the judge's instructions?

17          THE PROSPECTIVE JUROR:  Right.

18          MR. NATHANSON:  As opposed to the Freemasons code?

19          THE PROSPECTIVE JUROR:  Right.

20          MR. NATHANSON:  Is that it, you would be able to do

21    it?

22          THE PROSPECTIVE JUROR:  I could do it, just like I

23    said.  I could follow the judge's rule.  Like I -- if I see

24    one way, I have to be fair and honest.  That's what I mean

25    saying.  I have to be fair and honest.

1          THE COURT:  When you see it one way, could you make

2     your determination as to what you see based on the fair

3     evaluation of the evidence?

4          THE PROSPECTIVE JUROR:  Right.

5          THE COURT:  Just sitting down and listening to the

6     evidence.

7          THE PROSPECTIVE JUROR:  As an observer, yes.

8          MR. NATHANSON:  I'm sorry.  You had talked about

9     seeing both sides.  If there is a defendant -- the defendant

10    doesn't have to testify.  Right?

11         THE PROSPECTIVE JUROR:  Right.

12         MR. NATHANSON:  What if the defendant doesn't

13    testify, chooses to exercise her right not to testify?  Then

14    what happens?  Since you don't have her --

15         THE PROSPECTIVE JUROR:  You see, some cases it is

16    just like -- you know how the case is, right?

17         MR. NATHANSON:  We are asking what your view, not

18    mine.

19         THE COURT:  We can't at this point predict how the

20    evidence is going to come out.

21         THE PROSPECTIVE JUROR:  I say to -- until after the

22    trial, I -- examination, everything have to be done by the

23    book.

24         THE COURT:  Can you sit and listen to all the

25    evidence?

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Without any preconceived notions?

3          THE PROSPECTIVE JUROR:  Right.

4          THE COURT:  Okay.

5          THE PROSPECTIVE JUROR:  I'd be an observer.  That's

6     what it is.  Like --

7          THE COURT:  Okay.  Thank you.

8          THE PROSPECTIVE JUROR:  You are welcome.

9          (Juror leaves side bar and side bar continues.)

10          MR. KAZEMI:  We would renew the motion to strike.

11     He is just not able to articulate his position.  It is taken

12     fifteen minutes for him to state a simple position which is

13     that he can review the evidence.  His initial statement was

14     that he'd have to be passing judgment on another person.

15          THE COURT:  Part of the problem in the beginning was

16     that he was very turgid in his answers and didn't give a

17     complete answer.  I was myself was concerned about I think on

18     the further questioning I -- I think he understands what his

19     obligations are and he said, quite clearly, that he would

20     follow the judge's instructions.

21          I am going to deny the government's application.

22          (In open court.)

23          THE COURT:  Juror number 35.

24          (Side bar.)

25          (Juror number 35 joins side bar.)

1          THE PROSPECTIVE JUROR:  Hi.

2          THE COURT:  Yes.

3          THE PROSPECTIVE JUROR:  Okay.  Due to what happened

4    to me when I was fifteen years old, I am not going to be able

5    to render a fair impartial verdict.  My uncle molested me

6    because of drugs and it's a very sensitive issue for me and I

7    don't want to be emotional.

8          THE COURT:  Okay.

9          THE PROSPECTIVE JUROR:  Okay.  Thank you.

10          (Juror leaves side bar.)

11          THE COURT:  I assume there is no objections?

12          MS. HARRIS:  No objection.

13          (In open court.)

14          THE COURT:  Juror number 35, juror number 35, you

15    are excused.  Please come up and talk to Ms. Park.

16          Juror number 37.

17          (Side bar.)

18          (Juror number 37 joins side bar.)

19          THE COURT:  Okay.

20          THE PROSPECTIVE JUROR:  I guess my field, I guess

21    being in the field I also have a lot of empathy for

22    individuals in and out of incarceration and with drug

23    histories.  But I have had to put my judgment aside to work

24    where I work.  So I could put them aside.  But my empathy

25    is -- has gone down some for the population.

1     THE COURT:  Has gone down?

2     THE PROSPECTIVE JUROR:  Yes.  My empathy level has

3  gone down.  I always have to put my judgments aside and still

4  work with the population.

5     THE COURT:  If you are selected as a juror, you will

6  be asked to listen to the evidence and make a determination

7  whether or not the government has presented sufficient

8  evidence to prove the defendant's guilt.  Do you think,

9  whatever feelings you have as a result of your job, may affect

10  your ability to evaluate the evidence?

11     THE PROSPECTIVE JUROR:  I don't think so.  I

12  constantly have to advocate for my clientele anyway.  So I

13  don't think --

14     THE COURT:  Do you have any doubts about that?

15     THE PROSPECTIVE JUROR:  I would like to think I

16  would be able to listen to the evidence and make a non-biased

17  decision.  That's all I can say.

18     THE COURT:  Do you think you'd have any kind of

19  hesitancy in making the determination one way or the other in

20  this case?

21     THE PROSPECTIVE JUROR:  Maybe a little hesitancy.

22     THE COURT:  Okay.

23     THE PROSPECTIVE JUROR:  Thank you.

24     (Juror leaves side bar and the side bar continues.)

25     MS. HARRIS:  I move to strike, Your Honor.

1          THE COURT:  I think she --

2          MS. HARRIS:  She is a burned out case worker.

3          THE COURT:  I wouldn't quite say that.  She is

4    trying really hard.

5          MS. HARRIS:  She is trying not to be.

6          MR. KAZEMI:  I don't know which way she is leaning.

7          THE COURT:  I think she struggled with having to

8    state whether or not she could perform her duties in an

9    appropriate manner.

10          (In open court.)

11          THE COURT:  Juror number 50.  Juror number 50,

12    please.

13          (Side bar.)

14          (Juror number 50 joins side bar.)

15          THE COURT:  Okay.  Yes?

16          I wanted to talk to you about side bar because I

17    guess you had -- it is your niece who --

18          THE PROSPECTIVE JUROR:  My stepdaughter.

19          THE COURT:  Your stepdaughter?  Okay.

20          THE PROSPECTIVE JUROR:  She works for Institute

21    Adjusters.  She formerly worked for CEO on Rikers Island.  She

22    works with incarcerated youths.

23          THE COURT:  Okay.  You said you developed a certain

24    view about the criminal justice system as a result of your

25    discussions.

1          THE PROSPECTIVE JUROR:  In regard to youths.  You

2    know, especially in New York City, certain demographics seem

3    to be targeted more than others.  You know, maybe there may be

4    more appropriate methods for -- I am searching for the right

5    words.  For rehabilitating these youths.

6          THE COURT:  For dealing with their cases?

7          THE PROSPECTIVE JUROR:  Yes.  Alternatives to

8    incarceration.  Things of that nature.

9          THE COURT:  In this case, as you can see, Ms. Moreno

10   isn't a youth, but this is a criminal prosecution.  Would your

11   views about alternatives to criminal prosecutions affect your

12   ability to sit in judgment of someone who has been accused in

13   this case of possession with intent to distribute heroin?

14         THE PROSPECTIVE JUROR:  No.

15         THE COURT:  Do you think you could listen to the

16   evidence?

17         THE PROSPECTIVE JUROR:  Yes.

18         THE COURT:  And if you found the evidence was

19   sufficient to find the defendant guilty -- if you found the

20   evidence is sufficient beyond a reasonable doubt of her guilt,

21   could you render a verdict of guilty knowing that she is most

22   likely to be incarcerated?

23         THE PROSPECTIVE JUROR:  Yes, I could.

24         THE COURT:  Even if it could be a long prison

25   sentence?

1    THE PROSPECTIVE JUROR:  Yes.

2    THE COURT:  Okay.

3    THE PROSPECTIVE JUROR:  Thank you.

4    (Juror leaves side bar and side bar continues.)

5    THE COURT:  Okay.  Then we have juror number 54.

6 But I think perhaps just to save time, we will just skip him

7 for the time being and go on because even though I have

8 dwelled on these larger -- the jurors with the larger number,

9 we probably don't have to reach them.  We've gotten through

10 the most difficult questions.

11    MR. KAZEMI:  Okay.

12    MR. NATHANSON:  We are up to juror 42 by my count.

13    THE COURT:  We need another eleven jurors.

14    MR. NATHANSON:   42.  We are up through 42 with

15 eleven.

16    THE COURT:  If we don't excuse anymore jurors.

17    MR. NATHANSON:  Exactly.

18    MS. HARRIS:  We are good.

19    THE COURT:  I might in the interest of moving things

20 along cease questioning jurors in the last row and just say we

21 will get back to you if we need you.

22    MS. HARRIS:  That's fine.

23    THE COURT:  Okay.  Then once we finish the

24 questions, I will go into the individual questions, but I

25 will -- I suspect I will need you at side bar before then.  If

1   we don't, I will ask you if you need to meet with me.

2   Otherwise, I will go into the questioning of each individual

3   juror.

4              MS. HARRIS:  Thank you.

5              (In open court.)

6              THE COURT:  We are ready to resume questioning.  I

7   will -- I am not intentionally ignoring you, juror number 54,

8   in the back.  I had a discussion with the attorneys and I

9   think just based on how things are proceeding, I would like

10  those of you sitting in the last row to continue raising your

11  cards if your answers to my questions are yes.  But I will not

12  question you individually unless we need to go into the final

13  row.

14             Those sit -- those of you who are sitting way in the

15  back, I'm sure you are smiling, I am going to ask you to bear

16  with us for a little while longer, just in case we do need to

17  question you.

18             How many of you have ever served on a jury or grand

19  jury before?

20             31, 32, 39, 41, 42, 44, 45.

21             Juror number 31?

22             THE PROSPECTIVE JUROR:  I served on a jury in

23  Mineola, grand larceny.

24             THE COURT:  How long ago was that?

25             THE PROSPECTIVE JUROR:  About five years ago.

1          THE COURT:  Did you reach a verdict?

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Were you satisfied with the outcome?

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Did anything happen in that jury service

6     that might in any way influence your ability to sit

7     impartially as a juror here?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  Can you set aside whatever you may have

10    learned and decide this case based solely on the evidence and

11    the instructions given to you at trial?

12         THE PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Juror number 32?

14         THE PROSPECTIVE JUROR:  Right.  Here in Brooklyn,

15    served on two criminal and two civil.

16         THE COURT:  Okay.  Beginning with the most recent

17    service, what kind of case was that?

18         THE PROSPECTIVE JUROR:  Criminal.

19         THE COURT:  How long ago was that?

20         THE PROSPECTIVE JUROR:  Maybe eight years ago.

21         THE COURT:  Do you know what the charges were?

22         THE PROSPECTIVE JUROR:  I can't even remember.  It

23    was assault.  I know that much.

24         THE COURT:  Was there a verdict that was rendered?

25         THE PROSPECTIVE JUROR:  Yes, we did.

1        THE COURT:  Were you satisfied with the outcome?

2        THE PROSPECTIVE JUROR:  Yes.

3        THE COURT:  Okay.  The criminal trial before that?

4        THE PROSPECTIVE JUROR:  The --

5        THE COURT:  How long ago was it?  How long ago was

6   the first criminal trial?

7        THE PROSPECTIVE JUROR:  Maybe fifteen.

8        THE COURT:  Do you remember the charges?

9        THE PROSPECTIVE JUROR:  Yes.

10       That was a drug case.

11       THE COURT:  Was there a verdict rendered in that

12  case?

13       THE PROSPECTIVE JUROR:  Yes.

14       THE COURT:  Were you satisfied with the outcome?

15       THE PROSPECTIVE JUROR:  Yes.

16       THE COURT:  And the two civil cases, when did you

17  sit on those cases?

18       THE PROSPECTIVE JUROR:  I can't remember.

19       THE COURT:  Approximately?  Twenty years ago?

20       THE PROSPECTIVE JUROR:  Within that time.

21       THE COURT:  More?

22       THE PROSPECTIVE JUROR:  Within that timeframe.

23       THE COURT:  Twenty?

24       THE PROSPECTIVE JUROR:  Twelve, twenty.

25       THE COURT:  Around there.  Okay.

1           Do you remember what kind of cases they were?

2           THE PROSPECTIVE JUROR:  One involved a skating rink

3   in which --

4           THE COURT:  An accident?

5           THE PROSPECTIVE JUROR:  Yes.

6           THE COURT:  Okay.  And the other one?

7           THE PROSPECTIVE JUROR:  The other -- well, that was

8   a malpractice.

9           THE COURT:  A malpractice case?

10          THE PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Okay.  Were verdicts reached in either

12  of those cases?

13          THE PROSPECTIVE JUROR:  One was settled out and the

14  skating rink, verdict was reached.

15          THE COURT:  Were you satisfied with the verdict?

16          THE PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Did anything happen in your prior jury

18  service that might in any way affect your ability to sit

19  impartially as a juror in this case?

20          THE PROSPECTIVE JUROR:  I don't think so.

21          THE COURT:  Do you have any doubts about that?

22          THE PROSPECTIVE JUROR:  No.

23          THE COURT:  Okay.  Could you set aside whatever you

24  may have learned and decide this case based solely on the

25  evidence and the instructions given to you at trial?

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Juror number 39.

3          THE PROSPECTIVE JUROR:  Two grand juries and an

4    alternate in a regular jury.

5          THE COURT:  When did you have this prior jury

6    service?

7          THE PROSPECTIVE JUROR:  The last jury service was a

8    grand jury.  It was about three or four years ago.  And three

9    years before that, like clock work, they got me again for

10   grand jury.

11         THE COURT:  You are on the list?

12         THE PROSPECTIVE JUROR:  Then three years ago, four

13   years ago, before that, was the regular jury where I was an

14   alternate.

15         THE COURT:  Was that a criminal case?

16         THE PROSPECTIVE JUROR:  Civil, motorcycle accident.

17         THE COURT:  Could you set aside whatever you may

18   have learned in your prior jury service and decide this case

19   based solely on the evidence and instructions given to you?

20         THE PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Did anything happen in that jury service

22   or grand jury service that might in any way influence your

23   ability to sit impartially as a juror in this case?

24         THE PROSPECTIVE JUROR:  No.

25         THE COURT:  Juror number 41, Ms. Meaney?

1        THE PROSPECTIVE JUROR:  Yes.  It was a DWI case.  I
2   guess it was around eight years ago.
3        THE COURT:  Did you render a verdict in that case?
4        THE PROSPECTIVE JUROR:  Yes, we did.
5        THE COURT:  Were you satisfied with the outcome?
6        THE PROSPECTIVE JUROR:  Yes.
7        THE COURT:  Did anything happen in that case?
8        THE PROSPECTIVE JUROR:  No.
9        THE COURT:  Okay.  You could be impartial in this
10  case?
11       THE PROSPECTIVE JUROR:  Yes.
12       THE COURT:  Could you set aside whatever you may
13  have learned and decide this case based solely on the evidence
14  and the instructions given to you at trial?
15       THE PROSPECTIVE JUROR:  Yes.
16       THE COURT:  Juror number 42, Mr. Cacchioli?
17       THE PROSPECTIVE JUROR:  Civil case, personal injury,
18  about eight, ten years ago.  Actually, it settled.  It settled
19  out of -- before trial -- before verdict was rendered.
20       THE COURT:  Could you set aside whatever you may
21  have learned and decide this case based solely on the evidence
22  and instructions given to you at trial?
23       THE PROSPECTIVE JUROR:  Yes.
24       THE COURT:  You understand there is a difference
25  between civil and a criminal case?

1          THE PROSPECTIVE JUROR:  Yes, I do.

2          THE COURT:  Okay.  Juror number 44?

3          THE PROSPECTIVE JUROR:  DWI case, about

4    fifteen years ago.

5          THE COURT:  Was there a verdict?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Were you satisfied with it?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Did anything happen in that prior

10   service that might affect your ability to sit impartially with

11   jurors as a juror in this case?

12         THE PROSPECTIVE JUROR:  No.

13         THE COURT:  Could you set aside whatever you may

14   have learned and decide this case based solely on the evidence

15   and the instructions given?

16         THE PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Juror number 45, Ms. Brown.

18         THE PROSPECTIVE JUROR:  1990, Transit Authority.

19         THE COURT:  It was a case involving the Transit

20   Authority?

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  An accident case?

23         THE PROSPECTIVE JUROR:  Yes.

24         THE COURT:  Was there a verdict rendered in that

25   case?

1              THE PROSPECTIVE JUROR:  Yes, it was.

2              THE COURT:  Were you satisfied with it?

3              THE PROSPECTIVE JUROR:  Yes, I was.

4              THE COURT:  Did anything happen in that prior

5    service that might affect your ability to be an impartial

6    juror in this case?

7              THE PROSPECTIVE JUROR:  No.

8              THE COURT:  You understand that that was a civil

9    case and the instructions are different in civil cases?

10             THE PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Could you set aside whatever you may

12   have learned and decide this case based solely on the evidence

13   and instructions given to you at trial?

14             THE PROSPECTIVE JUROR:  Yes.

15             1992, there was a motorcycle accident.

16   THE COURT:  Okay.

17             THE PROSPECTIVE JUROR:  But it started, but they

18   settled out of court after four days.

19             THE COURT:  Okay.

20             THE PROSPECTIVE JUROR:  They began the trial but it

21   settled after four days.

22             THE COURT:  Any other jury service?

23             THE PROSPECTIVE JUROR:  No.

24             THE COURT:  Okay.  You are not affected by that case

25   either?

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  You will decide this case based solely

3     on what you hear at trial?

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Would any of you have any difficulty

6     following the law that Judge Sifton instructs you at trial,

7     even if you disagree with the law?

8               Do any of you have any difficulty following the

9     instruction that the defendant is presumed innocent and the

10    presumption stays with her until -- unless the government

11    presents evidence beyond a reasonable doubt that she is

12    guilty?

13              Do any of you have any difficulty following this

14    instruction?

15              Do any of you have any problems accepting the

16    principle that the defendant has no burden at all in this case

17    and that the presumption of innocence never shifts to the

18    defendant?

19              Have any of you been involved in any other court

20    proceeding, whether as a party, witness, defendant or other

21    capacity, that you haven't discussed before?

22              How many of you have served in the military?

23              34, 50, 53.

24              Okay.  Juror number 34?

25              THE PROSPECTIVE JUROR:  I served two years in the

192

1   military.  I am Vietnam vet.

2            THE COURT:  What was your highest rank?

3            THE PROSPECTIVE JUROR:  E-five, sergeant.

4            THE COURT:  I will get to you, juror number 50 and

5   53, if I have to.

6            Do any of you have any problems seeing or hearing or

7   other impairment that might interfere with your jury service?

8            Have any of you had any -- juror number 34?  Okay.

9            THE PROSPECTIVE JUROR:  Yes, Judge.

10           I have a cardiologist appointment tomorrow.  If this

11  trial is going to start tomorrow, it will be difficult.

12           THE COURT:  Okay.

13           THE PROSPECTIVE JUROR:  I had that appointment now

14  for six months.  They are difficult to get.

15           THE COURT:  Okay.  We will call downstairs to the

16  central jury room and ask that your jury service be changed.

17  I am sorry that we made you sit through the whole day.  We are

18  happy to change the date of your service.

19           THE PROSPECTIVE JUROR:  Okay.

20           THE COURT:  Why don't you come up and Ms. Park will

21  take your card and go downstairs.

22           Have any of you had any other experience not

23  previously brought up that you think might affect your ability

24  to sit as a fair and impartial juror in this case?

25           Would any of you have any difficulty setting aside

193

1  any sympathies or biases you may have against any of the

2  parties in this case?

3          Okay.  Do the attorneys need to speak to me at

4  side bar?

5          MS. HARRIS:  Yes, Your Honor.

6          THE COURT:  Okay.  Come on up.

7          (Side bar.)

8          THE COURT:  I was going to excuse juror number 37.

9          MS. HARRIS:  That was my question.  I wasn't sure.

10          MR. KAZEMI:  She was making a face when you asked

11  the last question.

12          THE COURT:  Okay.

13          MS. HARRIS:  Who?

14          MR. KAZEMI:  Juror number 37.

15          MS. HARRIS:  You are going to ask the language and

16  travel question as part of the --

17          THE COURT:  Yes.  I forgot.

18          MS. HARRIS:  Okay.

19          THE COURT:  I must have misread.

20          Then we will just go into the individual

21  questioning?

22          MS. HARRIS:  Sure.  Fine.

23          THE COURT:  Assuming you don't lose anymore jurors.

24          MR. NATHANSON:  We are up to 43.

25          MS. HARRIS:  Right.

1          THE COURT:  43.  We will question through 43.

2          I guess we can excuse the ones sitting in the back

3   of the courtroom?  At this point.  We will keep the ones in

4   the back row?

5          MS. HARRIS:  That's fine.

6          THE COURT:  Okay.

7          (In open court.)

8          THE COURT:  Juror number 35, Ms. Lazaro -- no.  I'm

9   sorry.

10          Juror number 37, Ms. Kahn, you are excused.

11          Do any of you speak a foreign language?

12          29, 32 -- is that 36?  Ms. Temple?

13          Okay.  38, 43, 49.

14          Juror number 29?

15          THE PROSPECTIVE JUROR:  Spanish.  So far.

16          THE COURT:  Juror number 32?

17          THE PROSPECTIVE JUROR:  Spanish.

18          THE COURT:  Juror number 36.

19          THE PROSPECTIVE JUROR:  Spanish.

20          THE COURT:  Juror number 38.

21          THE PROSPECTIVE JUROR:  I speak Hindi and my husband

22   is Hispanic so little Spanish as well.

23          THE COURT:  Okay.  Juror number 43?

24          THE PROSPECTIVE JUROR:  Hungarian.

25          THE COURT:  Have any of you traveled outside of the

1    United States?

2            29, 31, 32, 38, 39 --

3            THE CLERK:  36.

4            THE COURT:  36.  I'm sorry.

5            36, 38, 39, 41, 43, 44, 45, 46, 49, 50, 53, 54.

6            THE CLERK:  And 42, Judge.

7            THE COURT:  42, okay.

8            Okay.  Juror number 29, where have you traveled?

9            THE PROSPECTIVE JUROR:  Canada, three times.

10           THE COURT:  Okay.  During what period of time?

11           THE PROSPECTIVE JUROR:  This year.

12           THE COURT:  You never traveled outside the United

13   States before?

14           THE PROSPECTIVE JUROR:  No.

15           THE COURT:  Okay.  Juror number 31.

16           THE PROSPECTIVE JUROR:  Aruba, about three years

17   ago.  Mexico two years ago.  And Canada about three times in

18   the last two years.

19           THE COURT:  Juror number 32.

20           THE PROSPECTIVE JUROR:  Western and eastern

21   Caribbean, England, France.

22           THE COURT:  How often?

23           THE PROSPECTIVE JUROR:  My son played for the USA

24   team in baseball.  So that was just a tour that he did in

25   Europe.

1          Sweden once, I went for a wedding.

2          The Caribbean all the time.

3          THE COURT:  All the time.  That means a couple of

4   times a year?

5          THE PROSPECTIVE JUROR:  At least -- at least once a

6   year.

7          THE COURT:  Okay.  Eastern and western Caribbean,

8   you said?

9          THE PROSPECTIVE JUROR:  I like Grenada.

10         THE COURT:  Okay.  Sounds good to me.

11         Juror number 36?

12         THE PROSPECTIVE JUROR:  Bermuda, Puerto Rico,

13  Mexico, Haiti, Jamaica.

14         THE COURT:  How often?

15         THE PROSPECTIVE JUROR:  Once or twice.

16         THE COURT:  To each place?

17         THE PROSPECTIVE JUROR:  Once most places.  Twice to

18  Puerto Rico.

19         THE COURT:  Okay.  After Jamaica, any other places?

20  I interrupted you.

21         THE PROSPECTIVE JUROR:  Haiti.  That's it.

22         THE COURT:  Juror number 38.

23         THE PROSPECTIVE JUROR:  Mexico about eighteen years

24  ago.  India, Singapore, about fifteen years ago.  Within the

25  past five years, Canada and Puerto Rico.

1          THE COURT:  Once each?

2          THE PROSPECTIVE JUROR:  Twice Canada and two, three

3    times Puerto Rico.

4          THE COURT:  Juror number 39.

5          THE PROSPECTIVE JUROR:  Mexico last year; Europe

6    about three years ago; Dominican Republic four years ago;

7    Europe again like ten years ago; Canada way back.  That's

8    about it.

9          THE COURT:  You're number 41?

10          THE PROSPECTIVE JUROR:  1971 I went to London.  A

11    long time ago.  London, Copenhagen and Denmark.

12          74, I went to Puerto Rico and more recently I have

13    gone to Canada, the past ten years.

14          THE COURT:  Once?

15          THE PROSPECTIVE JUROR:  Twice.

16          THE COURT:  Twice to Canada.  Okay.

17          Juror number 42?

18          THE PROSPECTIVE JUROR:  Mexico twice, Canada about a

19    handful of times for work, work related mostly.  UK, about

20    five times, work related.  France, Italy, once each.  Various

21    spots in the Caribbean from Bermuda down to Turks and Caicos.

22          THE COURT:  How often?

23          THE PROSPECTIVE JUROR:  Once.  Bermuda, probably

24    three, four times, all the others mostly once.

25          THE COURT:  Most of the travel, work related travel

1   been the last ten years.

2           THE PROSPECTIVE JUROR:  Yes, ten, twelve.

3           THE COURT:  Juror number 43?

4           THE PROSPECTIVE JUROR:  Twice to Hungary, also went

5   to Mexico, Acapulco.  Europe, Germany, you know, a couple of

6   places there.  But they were all pleasure trips.

7           THE COURT:  Okay.  I am going to begin the

8   questioning of each of the individual jurors and you will

9   follow the form on the back.  Those jurors who are sitting in

10  the back whom I have not called up, you are excused.

11          Let me read your names so there won't be any

12  confusion over who is excused.  Please report downstairs to

13  the central jury room, second floor.

14          Matthew Cody.

15          Kevin Brady.

16          Basil Forbes.

17          Please report downstairs to the central jury room on

18  the second floor.

19          Linda Nelson.

20          Essa Bateh.

21           And Bibi Abrahams.

22          (Jurors leave courtroom as indicated.)

23          THE COURT:  I am going to ask those of you in the

24  back row to just bear with us just a little longer because

25  lawyers are very superstitious and we like to err on the side

GR      OCR     CM      CRR     CSR

1    of caution so we will make you sit a little while longer and

2    learn about some of your fellow jurors, to make sure we don't

3    need to get to you, but if we do I would like you around.

4               Juror number 28, Mr. Whitfield.

5               THE PROSPECTIVE JUROR:  Okay.  I live in Long

6    Island, Huntington Station, New York.  Suffolk County.

7               I lived in my residence twenty-five years.

8               I have twelve years high school.

9               I am currently employed for North Shore LIJ in

10   Syosset.

11              THE COURT:  North Shore?

12              THE PROSPECTIVE JUROR:  LIJ.

13              THE COURT:  LIG?

14              THE PROSPECTIVE JUROR:  LIJ.

15              THE COURT:  LIJ?

16              THE PROSPECTIVE JUROR:  Yes.

17              THE COURT:  Okay.  We've got someone else from

18   there.

19              THE PROSPECTIVE JUROR:  Yes.

20              THE COURT:  LIJ.  All right.

21              THE PROSPECTIVE JUROR:  Okay.

22              THE COURT:  What do you do for LIJ North Shore

23   Hospital?

24              THE PROSPECTIVE JUROR:  I'm in the food and

25   nutrition business.

1          THE COURT:  How long have you held that position?

2          THE PROSPECTIVE JUROR:  Twenty-four years and a

3     half.

4          THE COURT:  What is your job title there?

5          THE PROSPECTIVE JUROR:  Well, I'm a -- well, I'm a

6     dietary aide.

7          THE COURT:  Okay.

8          Are you married?  The question number six.

9          THE PROSPECTIVE JUROR:  Okay.  I am married.  My

10    wife, she work at -- employed for physical therapy office.

11         THE COURT:  What does she do?

12         THE PROSPECTIVE JUROR:  She is a receptionist.

13         THE COURT:  Okay.  Children?

14         THE PROSPECTIVE JUROR:  Yes, I have -- I have one

15    son.  He's in the military.  So he has been in that

16    twenty years.  He going on his twenty-first year.  He

17    reenlisted.

18         My next son, he's a bus driver and I have a daughter

19    at home.  She is a -- she is just a -- you know, just like

20    nothing much.

21         THE COURT:  Okay.

22         THE PROSPECTIVE JUROR:  Okay.  I don't hardly read

23    no magazines.

24         THE COURT:  Or books?

25         THE PROSPECTIVE JUROR:  I read the Newsday.

1          I watch television.  I watch, you know, mostly the

2  sports channel.

3          My radio station, I listen at WBLS.

4          And my spare time I like music.

5          THE COURT:  Okay.

6          THE PROSPECTIVE JUROR:  I play guitar sometime for

7  the -- for spiritual group.

8          THE COURT:  You play the guitar?

9          THE PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Do you sing?

11          THE PROSPECTIVE JUROR:  Well, a little.  Not that

12  much.

13          THE COURT:  Okay.  Number twelve, could you be fair

14  and impartial?

15          THE PROSPECTIVE JUROR:  I could be fair.

16          THE COURT:  In rendering a verdict?

17          THE PROSPECTIVE JUROR:  Right.

18          THE COURT:  Okay.  Juror number 29, Mr. Fernandez.

19          THE PROSPECTIVE JUROR:  I actually live in

20  Ridgewood, Queens.

21          I have been there for about a year.  Before that, I

22  lived and grew up in Williamsburg, Brooklyn, for about

23  twenty-five years.

24          I have a BS in economics.

25          I am currently self-employed in a start-up and I

202

1    also do contract work, investment banking industry.

2           THE COURT:  What kind of work do you do in your

3    business?

4           THE PROSPECTIVE JUROR:  It's basically retail and

5    new media, both.

6           THE COURT:  What do you sell?

7           THE PROSPECTIVE JUROR:  Clothing, actually.

8           THE COURT:  Okay.

9           THE PROSPECTIVE JUROR:  And new media, it is just

10   covering the New York media market.  Both have audiences, but

11   again, they are start-ups.

12          THE COURT:  How long have you had these businesses?

13          THE PROSPECTIVE JUROR:  For two years.

14          THE COURT:  Your consulting work, when did you start

15   the consulting work?

16          THE PROSPECTIVE JUROR:  Bear Sterns and J.P. Morgan

17   Chase.

18          THE COURT:  When?  During what time period?

19          THE PROSPECTIVE JUROR:  For the last four years.

20          THE COURT:  Is that a part-time job?

21          THE PROSPECTIVE JUROR:  No, full-time both.

22          THE COURT:  Okay.  So your start-up business --

23          THE PROSPECTIVE JUROR:  I do both.

24          THE COURT:  Okay.  What's your job title?

25          THE PROSPECTIVE JUROR:  Analyst.

1    THE COURT:  Okay.  Any other jobs in the last ten

2  years?

3    THE PROSPECTIVE JUROR:  Through college, I did a

4  bunch of just regular positions, FedEx and things.  Just to

5  make --

6    THE COURT:  Okay.

7    THE PROSPECTIVE JUROR:  I don't have -- I am single,

8  in a relationship.  I am not married.

9    I don't have any children.

10    I live by myself.

11    I read the Economist, Newsweek.  I can't read the

12  New York Times.  It's too long.

13    I like reading business books, like Automatic

14  Millionaire, books of that nature.

15    I read the -- for local news I just watch the

16  general Fox Five, NBC.  For more of an international

17  perspective I watch -- I actually read the Internet,

18  NBC, CNN, CNBC.

19    My -- in my spare time, I like watching college

20  basketball.  I also like playing basketball.  I run.

21    I think I'll be fair and impartial.

22    THE COURT:  Thank you.

23    Juror number 30, Ms. Castellani.

24    THE PROSPECTIVE JUROR:  I live in Massapequa, born

25  and bred, lived there all my life.

1          I live -- I lived in my current residence now about

2   a year with my husband.

3          I have a BA in elementary education.

4          I am currently employed at a call center, medical

5   call center.

6          THE COURT:  What do you do there?

7          THE PROSPECTIVE JUROR:  I'm a phone operator.

8          THE COURT:  How long have you worked there?

9          THE PROSPECTIVE JUROR:  Almost a year.

10          I have subbed, substitute taught in -- for two years

11   in Huntington.

12          I am married.  My husband is a social studies

13   teacher, high school social studies teacher.

14          THE COURT:  Any other jobs in the last ten years?

15          THE PROSPECTIVE JUROR:  I have worked at Jones Beach

16   theater for about fifteen, sixteen years.

17          THE COURT:  Doing what?

18          THE PROSPECTIVE JUROR:  I am an usher there.  It is

19   a summer job.

20          I have no children.

21          Just my husband and I living together.

22          Reading, I love mysteries.  Glamor, Cosmo.

23          For the news, Channel Four, CNBC, CNN, the Internet.

24          I watch anything that's on TV pretty much for shows.

25          My spare time, I play softball.  I coach softball as

205

1    well.

2              I watch movies, hang out with my friends and family.

3              And I can be fair and impartial.

4              THE COURT:  Juror number 31, Mr. Campbell.

5              THE PROSPECTIVE JUROR:  I live in Massapequa, out in

6    Long Island, Nassau County.  I have been there for

7    twelve years.

8              I have an associates degree in liberal arts.

9              I am a local three electrician here in the city.

10             I am married.  I have two girls, one eleven, one

11   eight.

12             My wife is second grade schoolteacher out on Long

13   Island.

14             I enjoy reading books about sports.  I am currently

15   reading Jim Tressel's book, who is the Ohio State football

16   coach.

17             I read the Newsday, the Daily News.

18             I watch some news at home, CNN, Fox.

19             My spare time I coach my kids in basketball,

20   LaCrosse.  I am a personal trainer training kids to play

21   La Cross.

22             And I could be fair and impartial.

23             THE COURT:  Juror number 32, Ms. Applewhite.

24             THE PROSPECTIVE JUROR:  I live in Brooklyn.

25             I have lived in Brooklyn for -- born, raised,

GR     OCR     CM     CRR     CSR

1    educated, sixty-three years.

2              I currently live in East Flatbush, but I'm -- I was

3    raised in Bed Stuy.

4              I have a masters plus.

5              I studied architecture, ended up teaching.

6              I am happily retired.

7              THE COURT:  How long have you been retired?

8              THE PROSPECTIVE JUROR:  Excuse me?

9              THE COURT:  How long have you been retired?

10             THE PROSPECTIVE JUROR:  I retired in 2000.

11             Other jobs?  I work for -- in this is a joke.  I

12   work for Biotech.  That's the company of my mother and

13   mother-in-law.

14             THE COURT:  What did you do there?

15             THE PROSPECTIVE JUROR:  Well, my mother's name is

16   Viola and my mother-in-law's name is Teckla.  They are both

17   suffering with dementia, Alzheimer's, so I work 24/7 with

18   them.

19             Yes, I am married.  My husband is also a retired

20   teacher.  Guidance counselor.

21             I have two children.

22             THE COURT:  Okay.  What did you teach?

23             THE PROSPECTIVE JUROR:  I taught math and Spanish.

24             I have two children.

25             My stepdaughter has a Ph.D in psychology and about

1    God knows how much in student loans.  Her husband works for

2    pharmaceutical company.

3              My son has his degree and -- and student loans and

4    he works for UPS.

5              My mother-in-law and husband live at my residence,

6    our residence, and they do nothing.

7              This is my fun time.  I read.  I like mystery books.

8    Mysteries, suspense, a lot of Ludlum.  Sometimes light,

9    Patterson.

10             I am not into magazines.  I like going on the

11   Internet and dealing with the Huffington Post, to see how long

12   it will take either Keith Olbermann or Chris Matthews, but I

13   know Rachel Madden will come out with it.

14             (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1          (PROSPECTIVE JUROR NO. 32 continued:) I like BLS and

2     I like Kiss on Sunday mornings because they have very

3     interesting topics concerning humanity, relationships.

4          In my spare time I give all my time to my

5     granddaughter who is two years old, and I give the rest of my

6     time to the slot machines in Atlantic City, and sometimes I

7     just enjoy having the freedom to do nothing when I want to do

8     nothing. I could be a fair and impartial juror.

9          THE COURT:   Juror number 36, Ms. Temple.

10         PROSPECTIVE JUROR NO.  36:  I live in Brooklyn.

11    I've lived in Brooklyn for 27 years. I have two masters

12    degrees in education. I am a retired teacher for the New York

13    City Department of Education.

14         THE COURT:   How long have you been retired?

15         PROSPECTIVE JUROR NO.  36:  Since 2006.

16         THE COURT:   What did you teach?

17         PROSPECTIVE JUROR NO.  36:  Various things:  English

18    as a second language, composition, English composition,

19    language arts.

20         THE COURT:   How long did you work as a teacher?

21         PROSPECTIVE JUROR NO.  36:  Twenty-five years.  I'm

22    not married. I have no children. No one else lives with me. I

23    like to read non-fiction, all kinds of magazines, except

24    sports. I listen to New York 1, Channel Two News, CNN.  I like

25    the educational channels:  Discovery, learning channels.

1   National Geographic. I like to travel, cook, and draw and

2   sketch and I can be fair and impartial.

3             THE COURT:  Thank you.

4             Juror number 38, Ms. Torres.

5             PROSPECTIVE JUROR NO.  38:  I live in Queens for

6   37 years.  Just moved to Nassau County for the past three

7   months. I work for an education subsidiary, the Washington

8   Post, company called Kaplan here in New York City Times Square

9   area. I worked for them for the past 13 years. Prior to

10  that --

11            THE COURT:  You are in the legal counsel's office?

12            PROSPECTIVE JUROR NO.  38:  Deputy General Counsel

13  for the Counsel Division.

14            Prior to that I worked for the New York City

15  Corporation -- Corporation Counsel defending negligence

16  actions against the City of New York.

17            My husband is also an attorney.  He works for

18  MetLife. We have two children age 17 and 11. No one else lives

19  in our house except those two.  Both students.  Most of my

20  reading material also gets circulated internally through the

21  company.

22            We also own Newsweek so I get are Newsweek

23  publications and articles which are exchanged in the company

24  regarding education, as well as legal updates about the

25  internet.

1       I don't have any spare time.  Still trying to find

2  it and I without hesitation will be impartial.

3       THE COURT:  Any newspapers you read regularly?

4       PROSPECTIVE JUROR NO.  38:  Washington Post, Wall

5  Street Journal.  We had some publications called the

6  Corporation Counsel Magazines in the intellectual property

7  area.

8       THE COURT:  Juror number 39, Mr. Rassner.

9       PROSPECTIVE JUROR NO.  38:  I lived in Sheepshead

10  Bay Brooklyn pretty much most of my life, and I have a B.A. in

11  music. I'm currently employed in information technology as a

12  an engineer for a small computer firm that handles the network

13  needs of other small businesses and not for profits. I've done

14  that for about ten years.  Before that I did massage therapy

15  and I am still a licensed massage therapist. I am not married.

16  I don't have children. My partner lives with me but is

17  currently unemployed and looking for work. I read science

18  fiction, philosophy magazines, mystery.  Pretty much any kind

19  of fiction. I read the New York Times and I get my news from

20  other internet sources. I don't want watch TV for news or

21  anything like that.

22       I don't have much leisure activity because my work

23  includes a lot of overtime and weekend work.  So whatever

24  leisure time is, and quiet activities.  I'm dealing with a lot

25  of angry users a lot of the time, and yes, I can be fair and

1     impartial in rendering a verdict.

2           THE COURT:  Juror number 41, Ms. Meaney.

3           PROSPECTIVE JUROR NO.  41:  I live in Farmingdale.

4     We have lived there for 31 years going on 32. I have my

5     masters in education and employed as New York City -- at New

6     York City schools teaching first grade.

7           THE COURT:  How long have you done that?

8           PROSPECTIVE JUROR NO.  41:  I am starting my 12th

9     year now. I'm working in Woodhaven. Before that I worked in

10    private schools. Yes, I'm married and I have -- my husband

11    works in a small college in Valley Stream and, more or less,

12    manages it.

13          THE COURT: Maintenance?

14          PROSPECTIVE JUROR NO.  41:  No, manages the school.

15    I have two daughters. One is 28 and she's a teacher on the

16    Island, special ed, and the other one works for Morgan Stanley

17    in the city. The younger one who is 28 lives with me.  The one

18    who is 31 lives in the city.

19          Mostly I read the educational magazines, and Time

20    Magazine. As far as news goes, I like Channel 4, CNN. In my

21    spare time I like to do as much student work as I can and I

22    think I will be very fair.

23          THE COURT: Juror number 42 Mr. Cacchioli.

24          PROSPECTIVE JUROR NO.  42:  I live in Manhasset

25    hills in Long Island and the last few years before that we

1   lived in Glen Oaks, Queens just the other side of the

2   Queens/Long Island border.  BS degree in accounting. I am

3   currently employed for and have been for the past 25 years

4   with a mid sized medical manufacturer.  Currently in the

5   position of CFO chief financial officer. I am married, wife of

6   23 years, I have three kids all the age of 12, which means

7   they are triplets.

8           THE COURT:  Congratulations.

9           PROSPECTIVE JUROR NO.  42:  Thank you. 12 years ago.

10           Kids don't allow me to read any books.  I don't have

11   any spare time other than to spend with them. Magazines,

12   basically professional periodicals and some sports magazines.

13   News outlets, basically anything I can, internet, television,

14   radio, mostly newspapers, Wall Street Journal, Times, and New

15   York Post.

16           Sports. My spare time is spent with my kids, as I

17   said.  I do coach them in several sports baseball, basket

18   ball, soccer, both my boys and my daughter, and yes, I can be

19   a fair and impartial juror.

20           Thank you.

21           THE COURT:  Thank you.

22           Juror number 43, Ms. Sipos.

23           PROSPECTIVE JUROR NO.  43:  I have lived in Nassau

24   County for 43 years.  Prior to that five years in Jamaica,

25   Queens.  High school diploma.  I am not employed right now.

213

1        Prior to I worked at Hofstra University Club as a
2   banquette coordinator. Prior to that I worked in Nassau County
3   Court Theodore Roosevelt building.
4        THE COURT:  How long were you a banquette
5   coordinator?
6        PROSPECTIVE JUROR NO.  43:  From -- I believe it was
7   from -- I left the county 2004 to -- I got laid off 2006. Then
8   prior to that is where I had -- was a purchasing coordinator
9   for 15 years in Deco (ph) formally Olsen Corporation and I
10  just finished a course in medical billing and coding and
11  that's where I'm going to further my career now in the medical
12  profession now.
13       I'm not married.  No children. I live with my
14  mother.
15       Magazines.  Books. I really like to read a lot.
16  News.  Channel 7, Channel 12. I do like court TV.
17       Yes, I could be fair and impartial.
18       THE COURT:  What do you like to do in your spare
19  time?
20       PROSPECTIVE JUROR NO.  43:  Read, clean, gardening
21  in the summer.
22       THE COURT:  Does your mother work?
23       PROSPECTIVE JUROR NO.  43:  No, ma'am.
24       I take care of her.
25       THE COURT:  Did she previously work?

1           PROSPECTIVE JUROR NO.  43:  Yes, she did.

2           THE COURT:  What did she do?

3           PROSPECTIVE JUROR NO.  43:  She was in a book

4    bindery and vitamin factory and things like that.

5           THE COURT:  Just hang on a second.  I would like to

6    meet with the attorneys at side bar.

7              (The following took place at side bar)

8           MS. HARRIS:  Are you going to go straight into

9    strikes?

10          THE COURT:  I'll give you a chance to confer.

11          Before I give you a little time to confer about your

12   peremptory challenges, I wanted to ask you if you had any

13   follow-up questions.

14          MR. NATHANSON:  The one question we have is we have

15   a bunch of Spanish language interpreters.  We have a lot of

16   Spanish speakers.  My concern is they don't substitute their

17   own interpretation.  A couple of them are teachers.

18          THE COURT:  I wasn't sure because the government

19   usually asks that question if they will follow the translation

20   of the court interpreter.  So I just assumed there would be no

21   witness speaking in Spanish because you didn't ask for that

22   question. Are there tapes or witnesses?

23          MR. KAZEMI:  There will be two tapes and that aid

24   two witnesses.

25          THE COURT:  All right.  I will address that to

1   everybody and any other follow-up questions?

2           MR. KAZEMI:  No.

3           MR. NATHANSON:  No.

4           THE COURT:  Then I'll ask that one last question.

5   Assuming we don't come up with any issues, then I'll excuse

6   the jurors, number 44 through 54, give you a chance to take a

7   break and we will and then you will look up at me when you are

8   ready to exercise your challenges.

9               (The following took place in open court)

10          THE COURT:  Now, I have one final question to

11  address. All of you up to jurors 43, Ms. Sipos, some of you

12  indicated that you speak Spanish, including those of you

13  sitting in the back of the courtroom, jurors number one

14  through 28, would you please raise your cards up again.

15          Any of you in the back speak Spanish?

16          Jurors number 24, 25, and in the jury box Spanish

17  speakers?  Twenty-nine, 32, 36, and 38.

18          THE CLERK:  Do you have 27?

19          THE COURT:  Twenty-seven.  Okay.

20          Now, I've been advised that there will be some

21  witnesses and some tapes in Spanish, and we will have a

22  certified court interpreter in court translating for us.

23          Would any of you have any difficulty setting aside

24  whatever you may know about Spanish and listening only to the

25  translation given to you by our court interpreter, would any

1    of you have any difficulty following the Court interpreter's

2    translation?  Okay.

3         Then this concludes our questioning and those of you

4    who have not been questioned who are sitting in the jury box,

5    I'm going to excuse you and send you downstairs to the central

6    jury room.

7         Don't be in too much of a rush.  Let me just make

8    sure.  We are beginning with yes juror number 44:

9         Mr. Cornacchiulo, to Ms. Brown  Ms. Peter, Ms.

10   Aranja, Mr. Shands, Mr. DeRosa and Mr. Dillon.  We should be

11   concluding jury selection very shortly.

12        Those of you who are sitting in the jury box, since

13   I had you there for quite a bit of time, if you need to take a

14   quick break, feel free to do so now, but please come back to

15   your seats immediately and then we will finish up.

16        (Pause in the proceeding)

17        THE COURT: Will the attorneys please come up.

18        (The following took place at side bar).

19        THE COURT: So let me just remind you that you should

20   focus your first set of challenges to the first 28 remaining

21   jurors.  So that would be jurors number one through 39 round

22   one.

23        MS. HARRIS:  Round one, through 38.

24        THE COURT:  I am sorry.  One through 38.

25        MS. HARRIS:  May I have one moment, Your Honor?

217

1          THE COURT:  So the government begins in round one.

2          MR. KAZEMI:  Yes, 28.

3          THE COURT:  What a surprise.

4          MR. KAZEMI:  Imagine that, and 36.

5          MS. HARRIS:  Twenty-three and 10.

6          THE COURT:  Okay.  And defendant begins round two.

7     Two challenges.  Has two.

8          MS. HARRIS:   Two and 25.

9          MR. KAZEMI:  Which ones?

10          MR. NATHANSON:  Two and 25.

11          THE COURT:  The government has one challenge for

12    round two.

13          MR. KAZEMI:  Three.

14          MS. HARRIS:  Number three.

15          MR. NATHANSON:  Yes.

16          MR. KAZEMI: Another one?

17          THE COURT:  No.  Round three.

18          MR. NATHANSON:  We go now.

19          MR. KAZEMI:  Did they pick anything?

20          MS. HARRIS:  You get two in a row.

21          MR. KAZEMI:  Oh, 24.

22          MS. HARRIS: Twelve, and 38.

23          MR. NATHANSON:  Twelve and?

24          MS. HARRIS:  An 38.

25          THE COURT:  Round four we begin with the defendant.

1          MS. HARRIS:  Thirty-one and 29.

2          MR. KAZEMI:  Thirty, and four.

3          MS. HARRIS:  And what?

4          MR. KAZEMI:  Four.

5          THE COURT:  That's your last challenge.

6          MS. HARRIS:  Just one moment, Your Honor.  I'm

7   sorry.

8          (Pause)

9          MS. HARRIS:  Thirty-two and five, Your Honor.  I'm

10  sorry.  Can I take that back?

11         THE COURT:  You want to take it back?

12         MS. HARRIS:  Withdrawn.

13         Thank you, Judge.

14         Twenty-seven and 5.

15         THE COURT:  Okay. Are there any Batson challenges?

16         MS. HARRIS:  No, Your Honor.

17         THE COURT:  Okay. That leaves then one, six, seven,

18  eight, nine, 11, 13, 15, 17, 20, 21, and 32.

19         Okay.  Alternates.

20         You each get one beginning with juror number 39. The

21  government?

22         MR. KAZEMI:  Forty-three.

23         THE COURT:  You could have waived.

24         MS. HARRIS:  Forty-two, Your Honor.

25         THE COURT:  Okay. So 39 and 41 are alternates.

1          MS. HARRIS:  Thank you, Judge.

2          THE COURT:  Let me read the names of the jurors who

3   are excused. I would like to ask all of you who are excused to

4   please just stand in the back of the courtroom until we have

5   our jurors and alternates seated, so that we make sure we

6   don't inadvertently lose any of you.

7          So the following jurors are excused. Please stand at

8   the back of the courtroom:

9          Juror number two, Mr. Kurtz; number three,

10   Ms. Jacobs; number four, Ms. Tavolacci; number five, Ms.

11   Huang; number ten, Mr. Randazzo; number 12, Ms. Gurt; number

12   23, Ms. Hogan; number 24, Ms. Valeo; Number 25, Ms. Aurora;

13   number  27, Ms. Timis-Kuhnle; number 29, Mr. Fernandez; number

14   30, Mr. Castellani; number 31, Mr. Campbell; number 36, Ms.

15   Temple; number 38, Ms. Torres; number 42, Mr. Cacchioli; and

16   number 43, Ms. Sipos.  Juror number -- did I miss the second

17   sheet?  Number 28, Mr. Whitfield, you are excused, too.

18          Now, I'm just going to ask the two ladies sitting in

19   the jury box, Ms. Applewhite and Ms. Meaney to step to the

20   side for a minute, and I'm going to ask those of you who will

21   be seated as jurors on this case to sit in the order of your

22   numbers remaining.  So juror number one, Ms. Wallach, could

23   you please come and sit in the first seat in the box.  Next to

24   her juror number six, Ms. Croke, juror number seven,

25   Mr. Diedrich will be next to Ms. Croke, followed by Ms. Duff,

1  Mr. Veny, Mrs. Kappel.  Shift over one please. Yes.

2          In the next row Ms. Dowling, Mr. Callier, Ms. Vines,

3  Mr. Selovic, Ms. Ramdhan, Ms. Applewhite.  I think we have 12

4  jurors in the box, and the two of you remaining outside of the

5  books Ms. Meaney and Mr. Rassner, you are the two alternates.

6          Those of you standing in the back of the courtroom,

7  thank you, for your patience.

8          The central jury room may be closed.  So if it is,

9  they will mail you your jury attendance form and I think --

10 Jeannie, are they supposed to call to find out if they need to

11 come back.

12          (Whereupon, the Deputy Clerk spoke to the remaining

13 jurors)

14          THE COURT: So those of you who are going to be

15 sitting in this case, if I were to impose on you just a little

16 longer.  Mark will take you to the room that will be your home

17 for the rest of this week.  It will be your jury room. There's

18 some kitchen equipment -- microwave and coffee maker, so if

19 you want to make yourselves at home you can bring your

20 supplies.  There's also a little refrigerator, but she would

21 like to take you back there and get your phone numbers just in

22 case there's a change in the court schedule.

23          What I would like you to do is report back to the

24 central jury room promptly at 9:30  tomorrow.

25          Judge Sifton likes to start promptly and he will try

221

1    generally to end the trial date at 4:30, so you can move on

2    with the rest of your lives.

3              Thank you, for your patience, follow Ms. Park to

4    your jury room.

5              I'm going to ask everybody to please rise for our

6    jurors.

7              THE CLERK:  Could you bring your numbers with you.

8              (Prospective jury exited the courtroom).

9              THE COURT:  So I guess that concludes our selection.

10   There will no Batson challenges?  I assume you are all

11   satisfied with the jury selected?  Yes?  Yes, okay .

12             MR. KAZEMI:  Thank you.

13             THE COURT:  Thank you.

14             (Proceedings adjourned as above set forth)

15                    *   *   *   *   *   *   *   *

16

17

18

19

20

21

22

23

24

25