UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X

United States of America,

                                        08-CR-605
                          Plaintiff,    (CPS)

          - against -

                                        MEMORANDUM
                                        OPINION AND
Norby Marin Moreno                      ORDER

                          Defendant.

-------------------------------------------X

SIFTON, Senior Judge.

     Defendant, Norby Marin Moreno, has been found guilty after

trial on both counts of a two-count indictment for conspiracy to

possess with intent to distribute one kilogram or more of heroin,

as well as possession of one kilogram or more of heroin with

intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

Presently before the Court is defendant's pretrial motion to

suppress evidence recovered subsequent to her arrest.  The motion

was denied prior to trial.  What follows sets forth the reasons,

findings of fact, and conclusions of law on which that decision

was based.

                          **BACKGROUND**

     The following facts are drawn from the undisputed portions

of the submissions of the parties in connection with this motion,

and the hearing held before the undersigned on November 25-26,

2008.

     On July 31, 2008, beginning at approximately 10 a.m.,

- 2 -

Special Agent Richard Walsh of the United States Drug Enforcement Administration ("DEA"), based in Bogota, Colombia, provided DEA Special Agent Salvador Aceves, based in New York, with information concerning what Agent Walsh said was an impending heroin delivery scheduled to occur later that same day in Queens. Agent Walsh stated to Agent Aceves that Agent Walsh's information was obtained and relayed to Agent Aceves in real time during multiple phone calls, on the basis of Agent Walsh's monitoring of a wiretap authorized by Colombian courts and established in cooperation with the Colombian National Police ("CNP").[1] Transcript of November 25-26, 2008 Hearing ("Tr.") at 7-9, 13-14. Agent Aceves was also told by his fellow agent that the wiretap was associated with the cellular phone of a high-level member of a drug trafficking organization based in Cali, Colombia, with ties to New York City, Panama, Guatemala, Mexico, and Texas, which is the subject of a joint ongoing investigation by the DEA and the CNP.[2]  *Id.* at 13, 111.  Agent Aceves testified that he

---

[1] Although Colombian courts authorized the wiretap, the government represented at the hearing that instead of requiring an affidavit sufficient to show probable cause for the wiretap, Colombian courts require "a one-page informational report which contains basic information regarding the target, the target's phone, the target's involvement in the organization and the organization's broader activities."  Tr. at 110.  The government submitted this report, along with transcripts and summaries of the telephone calls implicating the defendant that were intercepted via the wiretap, for in camera, ex parte review.  However, as set forth *infra*, I find it unnecessary to review this in camera submission and rest my findings and conclusions on the public record of this case.

[2] Because the investigation of this drug trafficking organization is ongoing and, according to the government, continues to yield valuable information that has lead to further drug seizures, the government has declined to identify the drug trafficking organization in question or the

- 3 -

could not recall the identity of the individual whose phone was
tapped, nor did he actually hear the recorded conversations. *Id.*
at 48, 54-56. However, he testified that he knew Agent Walsh
personally and had worked with him in the past when Agent Walsh
was stationed in New York, including previous investigations
involving wiretaps, that resulted in arrests and convictions and
otherwise yielded reliable information. *Id.* at 7, 90.

Over the course of several phone calls, Agent Walsh informed
Agent Aceves that he had learned the following while monitoring
the wiretaps: (1) a heavy-set Hispanic female courier named
"Norby" would be at Room 166 of the Metro Hotel, 7300 Queens
Boulevard, Flushing, New York on that same day, July 31, 2008;
(2) she would be carrying approximately 1,200 grams of heroin;
(3) a male identified as "Pintor" would give Norby $10,000 in
exchange for the heroin; and (4) before picking up the heroin,
Pintor would call Norby's telephone and state that he was calling
on behalf of "El Tio." Agent Walsh also told Agent Aceves that
the drug transaction "would be taking place at any moment."
Agent Aceves testified that due to the imminence of the
transaction, he did not believe he had sufficient time to obtain
an arrest warrant for Norby. Tr. at 62, 89.

Based on this information, on July 31, 2008, at

---

individual whose wiretapped phone was the source of the information leading to
the defendant's arrest. *See* Tr. at 8, 11, 111.

- 4 -

approximately noon, Agent Aceves and DEA Special Agent David
Samilo established surveillance outside Room 166 of the Metro
Hotel.  The layout of the Metro Hotel is similar to that of a
motel, and the door to Room 166 faces the parking lot.  Agent
Aceves parked a DEA surveillance van in the parking lot,
approximately twenty yards from the door to Room 166.  From this
vantage point, Agent Aceves had a clear view of the entrance to
Room 166, and the surrounding area.  In the next hour, several
additional DEA agents arrived to participate in the surveillance,
including Agents John Francola, Jeff Senn, Orest Zacharisevych,
Romana Sy, and Elizabeth O'Connor.  Three of the agents were
located in a second DEA surveillance van parked in the hotel
parking lot, two agents, including Special Agent O'Connor, were
on foot inside the hotel, and an additional agent was on foot
outside the hotel entrance.

At approximately 12:30 p.m., Agents Aceves and Samilo
observed a heavy-set Hispanic female, later identified as the
defendant, approach Room 166 carrying one or two small plastic
bags, but no luggage.  She opened the door of the room and
entered, and left the door open behind her.  After a few seconds,
the woman stepped back outside of the room, examined the
surrounding area for several seconds while using a cell phone,
and re-entered the room.  A few seconds later, she repeated
substantially the same actions.  The woman then re-entered the

- 5 -

room and closed the door.  At approximately 1:15 p.m., Agent O'Connor discovered, during an examination of the interior of the Metro Hotel, that Room 166 also had an additional door, opening into the interior of the building, that had up to that point not been under surveillance.  At that time, the agents became concerned that Pintor or others may have entered, or the woman may have exited, Room 166 through the interior door.  An agent was then placed in the interior corridor to monitor whether anyone might enter or exit via the interior door.

Shortly before 1:30 p.m., Agents Aceves, Samilo, and O'Connor decided to ask a female hotel maid to knock on the door of Room 166, with Agent O'Connor standing beside her.  Agent O'Connor hoped to look into the room, to determine if "Pintor" or others were in the room with the woman.  The maid agreed, and walked with Agent O'Connor to Room 166.  At this time, Agents Aceves and Samilo exited the van and started walking toward the parking lot door to Room 166.  Before Agents Aceves and Samilo arrived at the exterior door, the cleaning lady knocked on the door and the defendant opened it.

Upon observing the maid, the defendant smiled.  However, when she observed Agent O'Connor standing next to the maid, the defendant immediately attempted to slam the door closed.  Agent O'Connor, unaware of whether the defendant was armed or had another person in the room with her, identified herself as

"police" and pushed the door open.  She grabbed the defendant's
wrist, at which time a struggle ensued.  Agent O'Connor
repeatedly told the defendant in Spanish, "tranquilo," or "calm
down."  Seconds after Agent O'Connor entered the room, Agent
Samilo identified himself as "police" and entered the room, with
his firearm drawn but at his side.  Upon viewing the struggle
between the defendant and Agent O'Connor, Agent Samilo holstered
his weapon and assisted Agent O'Connor with subduing the
defendant.  Agent Aceves entered the room moments later, with his
firearm drawn, and performed a security sweep of the room.  Upon
clearing the room, Agent Aceves holstered his firearm.

After struggling with the defendant for less than a
minute, Agents O'Connor and Samilo restrained her, cuffing her
hands behind her back.  The defendant was then seated in a chair.
Because the information provided by Agent Walsh in Colombia
stated that Pintor might arrive at the location to meet with the
defendant, the agents closed the hotel room doors for their own
security.

After the doors were closed, Agent Aceves, who is fluent in
Spanish, began speaking with the defendant.  Agent O'Connor, who
does not speak Spanish, also questioned her with the assistance
of Agent Aceves.  Agent O'Connor told the defendant that it was
in her best interest to tell the agents anything she wished to
before the agents discovered any incriminating evidence on their

- 7 -

own.  Tr. at 104.  While speaking with the agents, the defendant repeatedly attempted to stand up and walk around the hotel room, although the agents asked her to remain seated.

Approximately 30 to 40 minutes after the agents had entered the room, during which the agents awaited the arrival of "Pintor," Agent Aceves asked the defendant if she would consent to a search of her room and bags.  The defendant immediately consented.  The defendant also stated that her bags had already been searched at John F. Kennedy International Airport.  Agent Aceves provided the defendant with a written "Consent to Search" form.  The form was printed in English but Agent Aceves, who previously worked as a DEA Spanish translator, translated the form in writing for the defendant, and read it to her.  After providing a written Spanish translation of the form to the defendant, and reading the form to her in Spanish, Agent Aceves asked her if she understood the form, and she replied that she did.

The form the defendant signed provided consent to search the defendant's room and luggage.  The form also stated that the defendant had not been threatened in order to obtain consent. After defendant's cuffs were removed, she signed the form.  *See* Declaration of Justine A. Harris dated November 7, 2008 ("Harris Decl."), Ex. C (copy of signed and witnessed DEA "Consent to Search" form, with English boilerplate statements crossed out and

- 8 -

replaced with handwritten Spanish translations).  After signing
the form, the defendant was cuffed again for the agents' safety.
Agent Aceves and the other agents then began searching the
defendant's room and bags, which included a red handbag, a brown
purse, a black suitcase, and another suitcase.  Numerous articles
of clothing and other items were also scattered throughout the
hotel room.

During the search, Agent Aceves began examining four metal
canisters which Agent Samilo removed from the defendant's
luggage.  Initially, Agent Aceves noticed that the canisters were
unbalanced and unusually heavy.  When he examined the canisters
more closely, the defendant stated without prompting that they
were not hers, and that she had never seen them before.  He then
pried open part of the metal cap of the canister.  Stuffed within
the cap of the canister was a plastic-wrapped package.  Agent
Aceves inserted a knife into the package, and when he removed the
knife it was coated with a light brown, powdery substance which
field-tested positive for heroin.  At that point, defendant's
belongings were collected and she was transported, along with her
belongings, to DEA New York's field division office for arrest
processing.  Agent Aceves then completed a standard inventory
search of the defendant's belongings.  *See* Government's
Memorandum of Law in Opposition, Ex. 2 (copy of inventory
generated for defendant's belongings, including luggage,

- 9 -

clothing, personal items, domestic and Colombian currency,
defendant's passport and other identifying documentation).  The
net weight of the heroin recovered from the defendant was 1,209
grams, which was within ten grams of the weight that Agent Walsh
had predicted she would be carrying.  The heroin was 93.5% pure.

**DISCUSSION**

Defendant moved pretrial to suppress the drugs and physical
evidence seized from her hotel room, as well as statements she
made following her arrest, on the grounds that: (1) the DEA
agents lacked probable cause to arrest her; (2) her consent to
allow DEA agents to search her room and belongings was invalid
because it was coerced; and (3) DEA agents did not advise her of
her *Miranda* rights prior to questioning.  By supplemental motion
filed on November 19, 2008, defendant moved to suppress on the
additional ground that (4) there were no exigent circumstances
justifying a warrantless entry into her hotel room.

The government concedes that defendant should have been
advised of her *Miranda* rights, represented in its submission that
it would not seek to offer any of defendant's statements made in
response to illegal questioning, and in fact did not do so at
trial.[3]  Accordingly, I need not consider defendant's arguments

---

[3] The government submitted that it did intend to offer the defendant's
responses to questions concerning "pedigree," including defendant's name and
country of origin.  Defendant made no objection to the introduction of these
statements.

- 10 -

as they relate to her *Miranda* rights.  However, before addressing defendant's other grounds for suppression, I consider the government's argument that defendant's motion should be denied for failure to fulfill basic procedural requirements.

1.   *Whether Defendant's Motion is Procedurally Sound*

The government submits that, because defendant has not submitted an affidavit setting forth specific facts based on her own personal knowledge, defendant's motion is procedurally barred.  An allegation of fact based on personal knowledge which, if proven, would require suppression, is generally a prerequisite to a motion to suppress evidence.  *See, e.g.*, *United States v. Simpkins*, No. CR 96-750, 1996 WL 629567, at *1 (E.D.N.Y. Oct. 16, 1996) (motion to suppress "denied on the ground that defendant has failed to provide an affidavit based on her own personal knowledge"); *United States v. Brumby*, No. 92 CR 721, 1992 WL 373686, at *3 (E.D.N.Y. Nov. 30, 1992) ("The government argues that [defendant's] motions to suppress are not supported by an affidavit based on personal knowledge and therefore insufficient as a matter of law.  This Court agrees"); *United States v. Aparo*, 221 F. Supp. 2d 359, 369 (E.D.N.Y. 2002) (motion to suppress post-arrest statements denied without hearing in part because defendant had failed to submit "an affidavit alleging facts which would require the suppression of statements if those facts were proved at a hearing").  Here, defendant has submitted only a

- 11 -

declaration by her attorney, which is based "upon information and belief" rather than personal knowledge and is therefore insufficient to support defendant's motion.  *See United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967) (defendant's attorney's affidavit was "insufficient in that it does not, for example, allege personal knowledge . . . accordingly, there was no factual issue to be resolved and the denial of a hearing was correct"); *Simpkins*, 1996 WL 629567, at *1 (attorney affidavit insufficient to support motion to suppress).

I decline, however, to dismiss defendant's motion on these grounds.  The facts supporting the government's case for a finding of probable cause were also not before this court in affidavit form at the time of defendant's pretrial motion. Because the government has the burden of establishing probable cause for its admittedly warrantless search, I consider defendant's motion on the merits.

*2.    Whether DEA Agents Lacked Probable Cause to Arrest Defendant*

Defendant argues that the government has not met its burden of establishing that the DEA officers had probable cause to arrest her.  On a motion to suppress on the grounds of an illegal arrest without a warrant, the burden is on the government to show that there was probable cause for the arrest.  *See United States v. Pena*, 961 F.2d 333, 338-39 (2d Cir. 1992).  "[P]robable cause requires only a probability or substantial chance of criminal

- 12 -

activity, not an actual showing of such activity." *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)).  In assessing whether probable cause exists, courts review the totality of the circumstances to determine whether an officer had "sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990).  "[P]robable cause is a flexible, commonsense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983).

"Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment[.]" *Katz v. United States*, 389 U.S. 347, 357 (1967).  An exception to this rule is that incident to an arrest based on probable cause, an officer may search a defendant's person.  *See United States v. Robinson*, 414 U.S. 218 (1973).  Beyond this exception (and a few others not relevant here), physical evidence derived from an illegal search or seizure is excluded from use at trial, as are verbal statements, unless the prosecution can demonstrate that such statements were made voluntarily and not tainted by the illegal seizure.  *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *Brown v. Illinois*, 422 U.S. 590, 603 (1975).

- 13 -

In determining whether probable cause existed for the DEA agents to arrest the defendant, the first issue to address is whether the information relayed to Agent Aceves in New York by Agent Walsh in Colombia with respect to information gained from eavesdropping on a telephone call in Colombia between unidentified and presumably untested speakers (the "informants") was properly relied upon by Agent Aceves.  "[T]he core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993).  Whether information provided by an informant may serve as the basis for probable cause must be determined based upon the totality of the circumstances. *U.S. v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)).  "In performing this examination of the totality of the circumstances, however . . . the court may consider . . . an informant's veracity, reliability and basis of knowledge[.]" *Id*.  In assessing the veracity of an informant's statements, however, "it is improper to discount" the information provided "simply because [the informant] has no proven record of truthfulness or accuracy." *United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000) (internal quotation marks omitted).  Information from an "untested" informant may be sufficiently reliable if it is corroborated in material respects by independent evidence, even

- 14 -

if those respects are "innocent." *Sultan*, 463 F.2d at 1069.  "If a substantial amount of information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that he provides, though uncorroborated, is also reliable." *Wagner*, 989 F.2d at 73.  In addition, "there is no need to show past reliability when the informant . . . is in fact a participant in the very crime at issue." *U.S. v. Jackson*, 560 F.2d 112, 121 (2d Cir. 1977).  "To require a showing of previous reliability by such a person would . . . make his information totally unavailable, despite the peculiar likelihood of its accuracy." *U.S. v. Miley*, 513 F.2d 1191, 1204 (2d Cir. 1975).

In this case, there is no question that Agent Aceves was entitled to rely upon communications from fellow DEA Agent Walsh.  "When making a probable cause determination, police officers are entitled to rely on the allegations of fellow police officers." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal citations omitted).[4]  The issue here is whether the information

---

[4] In *Panetta*, the Second Circuit went on to cite *Bernard v. United States*, 25 F.3d 98, 103 (2d Cir. 1994), for the proposition that the determination of probable cause does not turn on whether the fellow agent's relayed information was accurate, but on whether the arresting agent was reasonable in relying on the relayed information.  *Panetta*, 460 F.3d at 395.  The instant case, however, is distinguishable from *Bernard*.  In *Bernard*, the arresting officer relied on a fellow officer's report of that officer's personal observation of a suspect's physical appearance and location.  Here, Agent Aceves relied on a report from Agent Walsh concerning statements overheard by Agent Walsh.  The reliability of overheard statements presents questions of double hearsay that the observation of physical facts, such as

- 15 -

Agent Walsh obtained by monitoring a foreign wiretap was
sufficiently reliable to support a later finding of probable
cause to arrest the defendant.  Although in the United States,
"[i]t is elementary that the probable cause needed to validate
the issuance of an authorization for a wiretap must exist at the
time of issuance," *U.S. v. Martino*, 664 F.2d 860, 866 (2d Cir.
1981), in this case, part of the information that led to
defendant's arrest came from a wiretap authorized by a court in
Colombia, which did not require a showing of probable cause.[5]

   There is no evidence that the individual whose phone was
tapped was aware of Agent Walsh's monitoring of his phone calls.
That the individual whose phone was tapped was most likely
unaware of the wiretap increases the likelihood that the
individual's statements were accurate.  In addition, the

_____

the observation of the suspect's appearance and location in *Bernard*, does not.

   [5] That the wiretap was authorized without a showing of probable cause is
not necessarily dispositive.  "Wiretap evidence may be admissible when foreign
officials, acting on their own to enforce foreign law, properly follow their
own law in obtaining the evidence." *U.S. v. Maturo*, 982 F.2d 57, 60 (2d Cir.
1992); *see also U.S. v. Cotroni*, 527 F.2d 708, 711 (2d Cir. 1975) (holding
that Canadian wiretaps were not governed by American wiretapping statutes and
information derived therefrom was admissible even though no showing of
probable cause was made to secure wiretaps).  Indeed, "modern day narcotics
trafficking is conducted on a global scale with the dealers or traffickers
frequently crossing the national boundaries.  It is to be expected that United
States law enforcement agencies will have to enlist the cooperation of their
counterparts in other parts of the world[.]" *U.S. v. Gutierrez*, No. 99 CR.
0209, 1999 WL 550213 (S.D.N.Y. July 28, 1999) (holding based on factual
circumstances similar to those present here that the fact that information
relayed to a DEA agent in the United States by a DEA agent in Colombia
originally came from a wiretap that was valid under Colombian law and was
monitored by Colombian law enforcement does not rule out the information's
reliability).  Rather, the totality of the circumstances as they existed at
the time of defendant's arrest, including the information said to have come
from a foreign wiretap, must be considered together in determining whether the
wiretap was a reliable source of information.

- 16 -

statements overheard by Agent Walsh tend to show that the speaker

was a participant in the drug conspiracy, as the speaker had

knowledge of and was actively relaying precise details of an

impending drug transfer.  Although the individual whose phone was

tapped was not a confessed co-conspirator, Second Circuit

precedent on the general reliability of statements against

interest made by participants in a crime is nevertheless

instructive.  *See U.S. v. Jackson*, 560 F.2d 112, 121 (2d Cir.

1977) ("there is no need to show past reliability when the

informant . . . is in fact a participant in the very crime at

issue").  Finally, and most importantly, key portions of the

information gleaned from the wiretap -- the defendant's gender

and physical appearance, her precise location, and the time she

would be present at said location -- were independently

corroborated by the DEA agents' surveillance of defendant's hotel

before they entered her hotel room and arrested her.  The fact

that these aspects of the wiretap information were "innocent"

does not imply that their corroboration does not provide a basis

for inferring that the remainder of the information obtained

through the wiretap was accurate.  *See Sultan*, 463 F.2d at 1069.

DEA agents obtained the following information before

attempting to arrest the defendant: (1) Agent Walsh indicated to

Agent Aceves that a heavy-set Hispanic female drug courier would

be staying at Room 166 of the Metro Hotel, 7300 Queens Boulevard,

- 17 -

Flushing, New York, during the day of July 31, 2008, and that she
would be in possession of a substantial quantity of drugs; (2)
after establishing surveillance of the location, DEA agents
observed a heavy-set Hispanic woman enter Room 166 of the Metro
Hotel, during the day of July 31, 2008; (3) the woman was
observed opening her door and looking around outside her room,
while using her cell phone, on two occasions; and (4) the woman
suddenly and forcefully attempted to slam her door closed upon
seeing Agent O'Connor standing outside her room.  Having
determined that the information Agent Aceves received from Agent
Walsh was reliable, I conclude that the totality of these facts
and circumstances established probable cause to arrest the
defendant.  *See, e.g.*, *United States v. Montana*, 958 F.2d 516,
519 (2d Cir. 1992) (information on drug pickup, corroborated by
defendant's pacing and looking around, provided probable cause to
arrest); *United States v. Martinez-Gonzalez*, 686 F.2d 93, 98 (2d
Cir. 1982) (defendant's sudden retreat, when agents identified
themselves as police, transformed officers' reasonable suspicion
into probable cause for arrest).  Accordingly, defendant's claim
that the agents lacked probable cause to arrest her is without
merit.

*3.    Whether Defendant's Consent to Search Was Valid*

      Defendant claims that she did not sign the consent form
authorizing the DEA agents to search her room and her luggage

- 18 -

voluntarily, and thus that her consent to the search was not
legally valid.  A warrantless search, even without probable
cause, does not violate the Fourth Amendment if "the authorities
have obtained the voluntary consent of a person authorized to
grant such consent." *United States v. Elliott*, 50 F.3d 180, 185
(2d Cir. 1995).  As the Second Circuit has observed, "suspects
can, and often do, voluntarily consent to a search even when it
must be clear to them that incriminating evidence will be
disclosed." *United States v. Price*, 599 F.2d 494, 503 (2d Cir.
1979).  It is undisputed that the defendant in this case provided
the agents with written consent to search her hotel room and
bags.  The issue before the Court is whether that consent was
voluntary.[6]

The voluntariness of a defendant's consent is determined
based on an inquiry into the totality of the circumstances.
*United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993).  The
factors to be considered include defendant's age, education,

_____

[6] Defendant does not make the argument that the scope of her consent to
search her bags did not include consent to search the sealed metal canisters
within her bags, where the heroin was filed.  However, this argument is
without merit.  In *Florida v. Jimeno,* 500 U.S. 248, 252 (1991), the Supreme
Court rejected the argument that if police wish to search closed containers
within closed containers, they must separately request permission to search
each container.  Rather, the test is whether it was "objectively reasonable"
under the circumstances for the searching officer to believe that the scope of
consent to search included permission to open particular containers within
containers.  *U.S. v. Sparks*, 287 Fed. Appx. 918 (2d Cir. 2008).  Here, the
defendant consented to the search of her bags, observed the searching of her
bags, and voiced no objection to the searching of the metal canisters found
within her bags other than stating that she had never seen them before.  Under
these circumstances, it was objectively reasonable for the DEA agents to
conclude that defendant's consent to search included the metal canisters.

- 19 -

background, physical and mental condition, and the setting in
which the consent is obtained.  *See Schneckloth v. Bustamonte*,
412 U.S. 218, 226 (1973).  Claims of consent by those in custody
"should be scrutinized with care."  *United States v. Vasquez-
Santiago*, 602 F.2d 1069, 1073 (2d Cir. 1979), *cert. denied* 447
U.S. 911 (1979).  However, the fact that a defendant is in
custody, standing alone, is insufficient to vitiate consent.  *See
United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir. 1986).
Further, "[k]nowledge of the right to refuse consent is not a
requirement to a finding of voluntariness, although it may be a
factor in ascertaining whether the consent was coerced."  *United
States v. Garcia*, 56 F.3d 418, 422-23 (2d Cir. 1995).  Nor does
the failure to advise a defendant of her *Miranda* warnings
preclude valid consent.  *United States v. Faruolo*, 506 F.2d 490,
495 (2d Cir. 1974) ("The argument that *Miranda* warnings are a
prerequisite to an effective consent to search is not at all
persuasive").

Here, defendant argues that her free will was overcome by
"the presence of several agents in the hotel room, the fact that
[she] was detained, and that she did not understand that she had
any legal right to refuse consent."  Def.'s Memo. at 3-4.  The
fact that DEA agents struggled with and handcuffed defendant less
than one minute after entering her hotel room, and that defendant
remained handcuffed until asked for her consent to search her

- 20 -

room and belongings, does not weigh in favor of finding that
defendant's consent to the search was voluntary.  Nor does the
fact that at least one agent had his weapon drawn at the time of
entry, that the DEA agents failed to advise defendant of her
right to refuse consent, and that Agent O'Connor advised
defendant that it was in her best interests to cooperate.  Aside
from these circumstances, however, defendant has submitted no
other evidence that her consent was not voluntary, and indeed
fails to allege that she was coerced into giving consent.  The
atmosphere of the encounter between the DEA agents and the
defendant, while clearly not friendly, does not appear to have
been unduly hostile.  There is no allegation that the agents used
intimidating or coercive language or gestures in an attempt to
secure defendant's consent.  In addition, the undisputed facts
indicate that defendant provided oral consent immediately upon
request, stating that her bags had already been searched at the
JFK Airport.  Having reviewed the totality of the circumstances
at the time consent was given, I find that defendant's consent to
the search was voluntary.[7]

---

[7] Even if defendant's consent to search were not voluntary, the heroin
found in her bags is nonetheless admissible under the inevitable discovery
doctrine.  The inevitable discovery doctrine allows evidence procured as a
result of an illegal search to be introduced if "the prosecution can establish
by a preponderance of the evidence that the information ultimately or
inevitably would have been discovered by lawful means." *Nix v. Williams*, 467
U.S. 431, 444 (1984).  Here, the heroin would inevitably have been discovered
by lawful means during a search of defendant's bags.
    When a defendant is arrested in a place other than her home, the
arresting officers may impound her personal effects to ensure their safety, or
to remove nuisances from the area.  *United States v. Perea*, 986 F.2d 633, 643

*4.   Whether Exigent Circumstances Justified Warrantless Entry
      into Defendant's Hotel Room*

Finally, defendant argues that the DEA agents' entry into her hotel room without a warrant was illegal because it was not justified by exigent circumstances.  Warrantless arrests at an individual's home are presumptively unreasonable under the Fourth Amendment, unless exigent circumstances exist requiring entry before officers can obtain a warrant.  *See Payton v. New York*, 445 U.S. 573, 585-86, 589-90 (1980) ("To be arrested in the home

---

(2d Cir. 1993).  After such an arrest and seizure, an inventory search of the property seized is justified by the government's interests in averting any danger the property might pose, in protecting the property from unauthorized interference, and in protecting itself against claims of theft or negligent treatment of the property.  *Id.* at 644.  Accordingly, if there has been a lawful arrest, illegally obtained evidence will not be suppressed if it would inevitably have been obtained through a law enforcement inventory search procedure.  *United States v. Mendez*, 315 F.3d 132, 137-38 (2d Cir. 2002); *see also Perea*, 986 F.2d at 644; *United States v. Wyche*, 307 F.Supp.2d 453, 460-61 (E.D.N.Y. 2004).  In performing an inventory search, law enforcement officials may open closed containers "so long as they act in good faith pursuant to 'standardized criteria . . . or established routine.'"  *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)).  "The existence of such a valid procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices."  *Id.* (citations omitted).

Here, after arresting the defendant at the Metro Hotel, the DEA agents inevitably would have seized and completed an inventory search of her belongings, consistent with DEA protocol.  At that time, they would have (1) determined that the perfume canisters were unbalanced and unusually heavy; (2) opened the canisters in good faith; and (3) discovered the heroin hidden inside the canisters.  Even assuming the heroin was sufficiently hidden and sealed inside the canisters that a search warrant would have been required to open them, once the agents determined that the canisters were the probable receptacle for contraband during the inventory search, they inevitably would have obtained a search warrant to open the canisters.  *See, e.g., United States v. Whitehorn*, 829 F.2d 1225, 1231 (2d Cir. 1987) (applying inevitable discovery doctrine to search warrant context).

Defendant counters that the inevitable discovery doctrine does not apply in this case because had no drugs been found during the search of defendant's bags at the hotel, defendant would not have been arrested.  However, defendant was arrested within the legal definition of that term as soon as the agents handcuffed her upon entering the hotel room.  Once arrested, consistent with DEA protocol, defendant would have been processed and an inventory search of her belongings conducted.

Case 1:08-cr-00605-JG   Document 76   Filed 02/24/09   Page 22 of 24 PageID #: 1237

- 22 -

involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home.  This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances") (internal citation omitted); *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (en banc), *cert. denied*, 498 U.S. 1119 (1991); *United States v. Cattouse*, 846 F.2d 144, 146 (2d Cir. 1988), *cert. denied*, 488 U.S. 929 (1988).  The same is true not only of a defendant's home, but also of "all constitutionally protected areas," including a defendant's hotel room.  See *United States v. Parizo*, 514 F.2d 52, 54 (2d Cir. 1975).  "[T]he test for determining whether a warrantless entry is justified by exigent circumstances is an objective one." *MacDonald*, 916 F.2d at 769. The court must determine, considering the totality of the circumstances, "whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *MacDonald*, 916 F.2d at 769 (internal citation omitted).  In determining whether exigent circumstances exist, the court should consider:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*Id*. at 769-70 (citations omitted).  These factors are merely illustrative, not exhaustive, and the presence or absence of any

- 23 -

one factor is not conclusive.  *Id.* at 770; *Cattouse*, 846 F.2d at
147 (citation omitted).

Considering the totality of the circumstances confronting
the DEA agents at the time they entered defendant's hotel room, I
conclude that exigent circumstances justified their warrantless
entry.  The agents were faced with a situation (1) involving the
serious offense of narcotics trafficking, *see Cattouse*, 846 F.2d
at 146 ("Distributing narcotics is unquestionably a most serious
offense") (internal citation omitted); (2) where it was unknown
whether the defendant was armed, or whether she was alone, as the
agents reasonably believed an accomplice might have been present
in the room; (3) where the defendant's description and location
precisely matched the information obtained by Agent Aceves from
Agent Walsh, which, having been determined to be sufficiently
reliable, and together with defendant's observed demeanor,
established probable cause that defendant was or soon would be
committing the crime; (4) where, based on their surveillance, the
agents believed the defendant was in the room at the time; and
(5) the agents' entry into the room, while unwelcome and met with
resistance, did not result in any injury to the defendant or any
damage to the hotel property.  Finally, the offense involved
powdered heroin, which could be disposed of in a toilet at the
first indication that DEA agents sought to speak with the

- 24 -

defendant or gain access to the room.[8]  Based on these factors,

exigent circumstances justified the DEA agents' immediate entry

into the defendant's hotel room, before the agents could obtain a

warrant.  Accordingly, the agents' entry did not violate

defendant's Fourth Amendment rights.

### CONCLUSION

For the reasons set forth above, defendant's motion is

denied.  The Clerk is directed to transmit a filed copy of the

within to the parties.


SO ORDERED.

Dated :   Brooklyn, New York
          February 24, 2009

                         By: /s/ Charles P. Sifton (electronically signed)
                              United States District Judge

---

[8] Although DEA agents subsequently determined that the heroin was
concealed inside sealed metal canisters, rendering quick disposal upon contact
with police impossible, the officers had no way of knowing how the heroin was
packaged before entering defendant's hotel room.