UNITED STATES DISTRICT COURT  
EASTERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

UNITED STATES OF AMERICA

- versus -

NORBY MARIN-MORENO,

                        Defendant.

MEMORANDUM  
AND ORDER  
08-CR-605 (JG)

APPEARANCES:

    ROBERT L. CAPERS  
        United States Attorney  
        Eastern District of New York  
        271 Cadman Plaza East  
        Brooklyn, NY 11201  
    By:    Hiral D. Mehta  
        *Attorney for United States of America*

    COLSON & HARRIS LLP  
        80 Broad Street  
        Suite 1900  
        New York, NY 10004  
    By:    Justine A. Harris  
        *Attorney for Norby Marin-Moreno*

    KELLER LAW FIRM  
        80 Broad Street  
        Suite 1900  
        New York, NY 10004  
    By:    Matthew Keller, *Of Counsel*  
        *Attorney for Norby Marin-Moreno*

JOHN GLEESON, United States District Judge:

BACKGROUND

On July 31, 2008, Drug Enforcement Administration agents went to a particular hotel room of a Queens hotel upon receiving a tip that a drug courier named "Norby" would be there waiting for someone to retrieve drugs that she had imported from Colombia.[1] Finding Moreno-Moreno in the room, they searched her luggage and seized 1.2 kilograms of heroin concealed in four metal perfume cylinders. The government decided to charge her under a ten-year mandatory minimum sentencing enhancement simply because of the drug type and quantity at issue. And because Marin-Moreno exercised her right to trial by jury (where she claimed that she lacked knowledge of the drugs in her luggage), the government refused to remove the mandatory minimum provision from her case. Marin-Moreno was convicted and sentenced to a ten-year term of imprisonment. Her projected release date is April 17, 2017.

On August 20, 2015, Marin-Moreno filed an amended motion for a writ of *coram nobis* under the All Writs Act, 28 U.S.C. § 1651(a), seeking relief from her ten-year sentence. ECF No. 117. The government opposed her motion, ECF No. 115, on grounds that Marin-Moreno has not availed herself of opportunities to lessen her sentence, namely by satisfying the requirements of the "safety valve." *See* 18 U.S.C. § 3553(f); U.S.S.G. §§ 2D1.1(b)(17), 5C1.2(a).

Because I find that Marin-Moreno's psychological deficits, arising from her extraordinarily traumatic life circumstances, precluded her from satisfying the requirements for safety valve relief from the mandatory minimum, her motion is granted.

---

[1] These undisputed facts are drawn from a previous order in this case. *See* ECF No. 76.

DISCUSSION

A.    Holloway *Relief*

In this case, I asked the United States Attorney to agree to allow me to rectify what everyone involved – including the United States Attorney himself [2] – agrees is an unjust sentence that should have come to an end long ago. I made this request for two reasons.

First, as a courier, Marin-Moreno occupied the lowest rung on the drug distribution ladder. Yet she was subjected to a mandatory minimum sentence Congress enacted in 1986 specifically for those who occupy the highest rung, that is, the leaders of drug operations. It is undisputed that Marin-Moreno would not have been subjected to that sentence enhancement if she had been prosecuted after August 12, 2013, when the Attorney General changed the charging policy.[3]

The second reason for my request of the United States Attorney was his predecessor's refusal in 2008 to lift the ten-year mandatory minimum once it was initially invoked in Marin-Moreno's case. Even though couriers were routinely charged with mandatory minimums back then, based solely on the type and quantity of drugs in their luggage or bellies,

---

[2] *See* Tr. of Aug. 20, 2015 Hr'g at 16:

> THE COURT: And it remains the case today that we all agree that her sentence should be reduced down to time served.
>
> MR. MEHTA: Yes, your Honor.

[3] On that date, the Attorney General issued a memorandum to all United States Attorneys restricting the use of the drug offense mandatory minimum sentences. *See* Memorandum of Eric H. Holder, Jr., Att'y Gen. of the United States, to U.S. Att'ys and Assistant U.S. Att'ys for the Criminal Div. re: Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases (Aug. 12, 2013), http://big.assets.huffingtonpost.com/HolderMandatoryMinimumsMemo.pdf. As General Holder stated to the American Bar Association when the new policy was announced, "By reserving the most severe penalties for serious, high-level, or violent drug traffickers, we can better promote public safety, deterrence, and rehabilitation – while making our expenditures smarter and more productive." Eric H. Holder, Jr., Att'y Gen. of the United States, Remarks at the Annual Meeting of the ABA's House of Delegates (Aug. 12, 2013), http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html.

the government just as routinely lifted the mandatory minimum – so long as the defendants pleaded guilty. Indeed, until October of 2014, federal prosecutors around the country used mandatory minimums, and recidivism-based enhancements of those already harsh sentences,[4] to coerce defendants to plead guilty, and to punish those who refused to do so.[5] The prosecutor in this case openly admitted that Marin-Moreno would continue to face the ten-year mandatory sentence because she insisted on a trial.[6] On September 24, 2014, General Holder made it clear to all federal prosecutors that mandatory sentences are not to be used for that impermissible purpose.[7]

      I urged the United States Attorney to, in the interest of justice, consent to: (1) a vacatur of the judgment; and (2) a resentencing on a lesser-included offense without the ten-year mandatory minimum. I have made the same request in other cases. It has been granted on three occasions in my courtroom and at least twice in other courtrooms.[8] This time, however,

---

[4] A single prior drug felony conviction would have empowered the prosecutor to subject Marin-Moreno to a 20-year minimum; two such convictions would have empowered the prosecutor to subject her to mandatory life without parole. *See* 21 U.S.C. § 841; *see also United States v. Kupa*, 976 F. Supp. 2d 417, 423 (E.D.N.Y. 2013).

[5] *See Kupa*, 976 F. Supp. 2d at 427.

[6] In its sentencing memorandum, the government stated "it would not agree to forgo application of the 21 U.S.C. 841 § (b)(1)(A) penalty provision," and that the "decision was based upon . . . the defendant's failure to avail herself of the numerous pre-trial opportunities to plead guilty to a lesser-included offense." *See* ECF No. 90 at 8.

[7] *See* Memorandum of Eric H. Holder, Jr., Att'y Gen. of the United States, to Dep't of Justice Attys re: Guidance Regarding § 851 Enhancements in Plea Negotiations (Sept. 24, 2014), http://famm.org/wp-content/uploads/2014/10/AG_851_Letter.pdf. Though the policy prohibiting the use of sentence enhancements to coerce guilty pleas was announced in the specific context of the so-called "851 enhancements," which double the mandatory minimums (and can require mandatory life imprisonment in some cases), it certainly applies to the initial decision to charge an unenhanced mandatory minimum. This is not only a matter of logic; the August 2013 policy governing the latter subject specifies the factors that, if present, should result in a decision not to charge a mandatory minimum, and a defendant's decision to plead guilty is not among them.

[8] *See United States v. Rivera*, Nos. 83-00096-01-CR & 83-00138-02-CR (E.D. Okla.), Order of Sept. 15, 2015 (granting defendant's motion to vacate and resentence after the government agreed to support the motion); *United States v. Washington*, No. 11-CR-705 (S.D.N.Y.), Judgment of Dec. 19, 2014, ECF No. 130 (dismissing charge that invoked a mandatory minimum on the government's motion after Judge Sullivan asked the government about "the fairness of the fifty-two-year mandatory minimum sentence that Defendant is facing because he opted to forego a ten-year plea offer and go to trial," ECF No. 109 at 12); *United States v. Holloway*, 68 F. Supp. 3d 310, 311 (E.D.N.Y. 2014) ("[The government] has agreed to an order vacating two of Holloway's counts of conviction

the request was denied. As I wrote in *Holloway*, *see supra* n.8, relief of the sort granted in that case and the others cited can properly be granted only as frequently as the government chooses to consent to it.[9] The mere fact that the United States Attorney agrees that relief from an unjust sentence is appropriate does not permit me to vacate a conviction and resentence in the absence of such express consent. A contrary approach would not only be a grant of relief in search of authority, but it would pose an undue risk of chilling United States Attorneys' support of petitions for clemency. Accordingly, relief of the sort ordered in *Holloway* is denied in this case.

However, on the extraordinary facts of this case, relief is appropriate on another ground.

B.     Coram Nobis *Relief*

   1.     *The Relevant Facts*

Marin-Moreno is a 57-year-old woman who was born in Tulua del Valle on September 22, 1958.[10] During her childhood and early adult years, she was subjected to sustained physical and emotional abuse, first by her alcoholic father and later by her husband. Her father beat her repeatedly, including with the flat side of a machete, leaving scars on her face. She lived in constant fear of him, and would hide under the bed when he came home drunk

---

and to a resentencing of him on the remaining counts."); *United States v. Anandani*, No. 11-CR-763 (E.D.N.Y.), Tr. of Oct. 25, 2013 Hr'g at 2-3; *United States v. Mayo*, No. 05-CR-43 (E.D.N.Y.), Am. Judgment of June 10, 2007, ECF No. 316 (reducing sentence to time served after government consented to joining in an application to vacate sentence under 28 U.S.C. § 2255, *see* ECF No. 309). *See also United States v. Ezell*, No. 02-815-1 (E.D. Pa.), Mem. of Aug. 18, 2015, ECF No. 253, at 23-27 (asking the government to consent to such relief); *United States v. Trader*, No. 4-680-6 (E.D. Pa.), Mem. of Aug. 18, 2015, ECF No. 760, at 28-30 (same).

   [9] *See Holloway*, 68 F. Supp. 3d at 316 ("There are no floodgates to worry about; the authority exercised in this case will be used only as often as the Department of Justice itself chooses to exercise it, which will no doubt be sparingly.").

   [10] These facts are gleaned from an expert's mental health evaluation and psychosocial history report of Marin-Moreno. That evaluation was submitted to the Court *ex parte* at the Court's request. *See* ECF No. 87.

and angry. When Marin-Moreno first met her future husband's family at the age of 17, they did not approve of her, and she was afraid of what would happen when her father found out. In desperation, she shot herself with a gun – but she did not die. Her husband later beat her, sometimes with a metal pipe, and frequently in front of their children.

Terrible as that was, it pales in comparison to the events that began in 1988, when Colombian police killed Marin-Moreno's 26-year-old brother Hubert. Her father brought legal action against the government. The officers were fired, but they later joined the paramilitary group United Self-Defense Forces of Colombia ("AUC"), and for nearly two decades subjected Marin-Moreno and her family to a brutal campaign of terror, extortion, and murder. In December of 1988, Marin-Moreno's younger brother Norman died in a car accident; the family believes that his death was intentional because the brakes in his car were allegedly tampered with. The same year, the AUC began to shake her father down regularly, which continued for five years. In addition to becoming fed up with the extortion, Marin-Moreno's father was running out of money to properly care for his family, so he stopped making payments in 1993. Within one month of his refusal to pay, the AUC murdered him.

Marin-Moreno took over her father's business,[11] and the paramilitary group continued the extortion, this time from her. She made payments until 1999, when she closed the business in an attempt to stop the demands. But the threats continued. They attempted to kill her half-brother Hugo by shooting him ten times and running him over with a van. Hugo had insisted on trying to track down the killers of their father. In 2003, the AUC murdered Hugo.

---

[11] Her father not only left her in charge of his business, but also his estate. Marin-Moreno became the center of family chaos (her father had 12 children with three different women), including legal claims that took 15 years to resolve.

Following the deaths of her father and three brothers, Marin-Moreno experienced the murder and disappearance of three of her four sons within a four-week period. Her eldest son, Rodrigo, received a phone call in October 2005 demanding 200 million Colombian pesos (roughly $100,000 at the time).[12] Two months later, days before Christmas, Rodrigo and Marin-Moreno's nephew were executed in front of her home. Marin-Moreno watched her son bleed to death and became haunted by the image of him trying to speak but not being able to get out the words. Rodrigo was 27 years old. Weeks later, two of her younger sons, Carlos Andres and Juan Sebastian, went to town to get their minds off of Rodrigo's death. They disappeared without explanation and are presumed dead.

As a result of these immensely tragic personal circumstances, Marin-Moreno suffers from Chronic Complex Post-Traumatic Stress Disorder, and she endures ongoing psychological, physical, and cognitive disturbances that have compromised her judgment. The expert's report submitted prior to sentencing, which is based on more than 35 hours of face-to-face interviews with Marin-Moreno, explains as follows:

> After reviewing Norby's life history, I believe that her actions are the result of long term chronic exposure to trauma . . . a complex confluence of societal and personal factors have [] affected Norby's capacity to think clearly, exercise good judgement, and think through the long-term consequences of an action. Sometimes she is impulsive, and does not think through her actions, they very often are the result of 'flight or fight' responses to 'traumatic triggers' that can occur within seconds. She is not conscious of the event that triggers her response; rather, it is an automatic central nervous system response in the face of 'perceived danger.'
>
> Like many traumatized people, Norby's adaptation to life has been severely compromised. She is impulsive; she dissociates, and she has enormous trouble trusting that the world is a safe place. Because of sustained threats to her person and to her family, she has developed coping survival mechanisms that are often contradictory.

---

[12] Later that month, there was an attempt made on the life of Olmez Marin, Marin-Moreno's half-brother.

> For example on occasion, Norby's world view is colored by paranoid ideation of such intensity that it appears delusional in nature.

The expert further explains that Marin-Moreno uses "splitting" as a psychological defense mechanism:

> Norby unconsciously splits off parts of herself in order to survive. This is a common adaptive defense seen in people who have been severely traumatized, or who have been exposed to ongoing trauma throughout their lives. . . . An example of Norby's capacity for splitting is observed in her idealization of her father, and her ability to amputate from consciousness his abuse.

In addition to her mental health issues, for which she has sought psychiatric help and takes medication, Marin-Moreno suffers from high blood pressure, bleeding, stomach problems, severe headaches, vertigo, and confusion.

2. *The Safety Valve*

Recognizing the onerousness of the ten-year mandatory minimum when it is applied to low-level, non-violent defendants like Marin-Moreno, Congress enacted the "safety valve" provision in 1994. Codified in 18 U.S.C. § 3553(f), it removes the mandatory sentencing provisions for such defendants who agree to tell the government the truth about their offense of conviction and related criminal conduct.[13] A defendant can avoid the mandatory sentence as long as that "safety valve proffer" is made before the sentencing proceeding. Thus, the fact that Marin-Moreno went to trial and denied her guilt at trial did not preclude her from making a truthful proffer and thereby avoiding the mandatory ten-year sentence.

---

[13] Marin-Moreno satisfies the other safety valve requirements, *i.e.*, she did not have more than one criminal history point, her offense did not involve violence or weapons and did result in serious injury or death, and she did not occupy an aggravating role in the offense.

3. *The Appropriateness of* Coram Nobis *Relief*

Marin-Moreno's severe psychological deficits, however, precluded her from making a truthful safety valve proffer, warranting issuance of a writ of *coram nobis* to relieve her of the resulting mandatory sentence.

*Coram nobis* relief is available pursuant to the All Writs Act, 28 U.S.C. § 1651(a), to correct "errors of the most fundamental character." *United States v. Morgan*, 346 U.S. 502, 512 (1954) (internal quotation marks removed). It gives courts the authority "to attain justice" or "to remedy an invalid sentence." *Id.* at 507, 513. The Second Circuit has further held that a writ provides a sentencing court with authority to correct such errors that "have rendered the proceeding itself irregular and invalid." *Foont v. United States*, 93 F.3d 76, 78 (2d Cir. 1996) (internal quotation marks and citations omitted).

Before her sentencing in March 2010, it was clear and undisputed that Marin-Moreno suffered from severe psychological and cognitive deficits resulting from her uniquely horrific personal history in Colombia. Those deficits precluded her from satisfying the proffer requirement of safety valve relief. In particular, I accept that her propensity for "splitting" has "severely impact[ed] her ability to recount traumatic events, and perceive and recall reality." Am. Mot. for Writ, ECF No. 117, at 14. I find that her impulsiveness and inability to use sound judgment have contributed to her incapacity to understand the benefit to her of offering the government evidence regarding her offense. Furthermore, Marin-Moreno's confusion and lack of ability to think clearly made her unable to provide that information. Marin-Moreno's mental health issues are both significant and extraordinary. For those reasons, I

grant her motion for a writ of *coram nobis* vacating her sentence and re-sentencing her to time served.[14]

## CONCLUSION

For the reasons set forth above, I conclude that Marin-Moreno's severe psychological impairments, which are the result of her extraordinarily traumatic personal history, deprived her of the opportunity to escape the mandatory minimum via a safety valve proffer. Accordingly, an amended judgment will issue affording her such relief, and reducing her sentenced to time served in the custody of the Attorney General.

So ordered.

John Gleeson, U.S.D.J.

Dated: March 9, 2016
      Brooklyn, New York

---

[14] I have not stayed my decision to give the United States Attorney time to seek appellate review because Marin-Moreno will remain in the custody of the Attorney General due to an immigration detainer. Thus, the absence of a stay will not prejudice the government should it seek review of my decision.